IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF NEW MEXICO, and NEW MEXICO ENVIRONMENT DEPARTMENT, )<br><br>Plaintiffs, )<br><br>v. )<br><br>CHEVRON MINING INC., )<br><br>Defendant. ) | Civil Action No. _16-904 WPL/SCY_ |

**FIRST PARTIAL REMEDIAL DESIGN/REMEDIAL ACTION (RD/RA)
CONSENT DECREE**

# TABLE OF CONTENTS

I.         BACKGROUND ............................................................................................ 1
II.       JURISDICTION ......................................................................................... 4
III.     PARTIES BOUND .................................................................................... 5
IV.     DEFINITIONS .......................................................................................... 5
V.        GENERAL PROVISIONS ...................................................................... 13
VI.     PERFORMANCE OF THE WORK BY CMI .......................................... 16
VII.    QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS .......... 20
VIII.   ACCESS AND INSTITUTIONAL CONTROLS ...................................... 22
IX.     REPORTING REQUIREMENTS ............................................................. 25
X.        EPA APPROVAL OF PLANS, REPORTS, AND OTHER DELIVERABLES ...... 26
XI.     PROJECT COORDINATORS .................................................................. 28
XII.    PERFORMANCE GUARANTEE ............................................................ 29
XIII.   CERTIFICATION OF COMPLETION .................................................... 37
XIV.   EMERGENCY RESPONSE ..................................................................... 38
XV.    PAYMENTS FOR RESPONSE COSTS ................................................... 39
XVI.   INDEMNIFICATION AND INSURANCE ............................................... 44
XVII.   FORCE MAJEURE .................................................................................. 46
XVIII.   DISPUTE RESOLUTION ........................................................................ 48
XIX.   STIPULATED PENALTIES ..................................................................... 52
XX.    COVENANTS BY PLAINTIFFS .............................................................. 56
XXI.   COVENANTS BY CMI ............................................................................ 61
XXII.   EFFECT OF SETTLEMENT; CONTRIBUTION .................................... 64
XXIII.   ACCESS TO INFORMATION .................................................................. 66
XXIV.   RETENTION OF RECORDS ................................................................... 68
XXV.   NOTICES AND SUBMISSIONS ............................................................. 70
XXVI.   RETENTION OF JURISDICTION .......................................................... 71
XXVII.   APPENDICES ......................................................................................... 71
XXVIII.   COMMUNITY INVOLVEMENT ............................................................ 72
XXIX.   MODIFICATION ..................................................................................... 72
XXX.   LODGING AND OPPORTUNITY FOR PUBLIC COMMENT .............. 73
XXXI.   SIGNATORIES/SERVICE ...................................................................... 73
XXXII.   FINAL JUDGMENT ................................................................................ 74

I. BACKGROUND

A.    The United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), together with the State of New Mexico (the "State") and the New Mexico Environment Department ("NMED"), filed a joint complaint in this matter against Chevron Mining Inc. ("CMI").

B.    The United States and the State in their joint complaint seek, inter alia, reimbursement of costs incurred by EPA, the United States Department of Justice ("DOJ"), and the State for response actions at the Chevron Questa Mine Superfund Site in Taos County, New Mexico, together with accrued interest, pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607. NMED further seeks performance of the Work described in Appendix A by CMI pursuant to the New Mexico Water Quality Act ("WQA"), NMSA 1978, §§ 74-6-10 and 74-6-11.

C.    In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the State of New Mexico on September 14, 2011, of negotiations with CMI regarding the implementation of the remedial design and remedial action for the Site.

D.    The State of New Mexico is the regulatory authority under the New Mexico Water Quality Act and the New Mexico Mining Act and has issued permits to CMI for ongoing activities at the Site that contain requirements for mine reclamation and groundwater protection. EPA is the regulatory authority under CERCLA regarding the Work under this Partial Consent Decree, in consultation with the State.

E.    On September 30, 2015, the Court entered a Consent Decree in *U.S. and State of New Mexico v. Chevron Mining, Inc.*, 14-cv-783 (KBM-SCY) (D.N.M). In the Complaint, Plaintiffs United States and State of New Mexico, on behalf of their natural resource trustee agencies – i.e., the

State Office of Natural Resources Trustee, Fish and Wildlife Service of the U.S. Department of the Interior, and the Forest Service of the U.S. Department of Agriculture – asserted claims against Defendant Chevron Mining Inc. under CERCLA for injuries to natural resources resulting from Defendant's mining operations at the Site. The Consent Decree entered in that action resolves this claim for natural resource damages and requires Defendant to pay $4 million to fund restoration, replacement, or acquisition of natural resources, as well as to pay certain agency costs and to transfer a 225-acre parcel, including approximately 100 acres of sensitive riparian habitat. That separate action, including the Consent Decree, pertains only to natural resource damages caused by the Defendant's mining activities. In contrast, in this Consent Decree, the Defendant has agreed to perform certain response actions and to reimburse certain response costs incurred by the United States and the State of New Mexico.

F. By entering into this Consent Decree, CMI does not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the complaints, nor does it acknowledge that the release or threatened release of hazardous substances at or from the Site constitutes an imminent and substantial endangerment to the public health or welfare or the environment.

G. On November 16, 2009, CMI submitted a Feasibility Study Report to EPA, which EPA approved on November 24, 2009.

H. In January 2010, pursuant to CERCLA § 117, 42 U.S.C. § 9617, EPA published a notice of the issuance of the Proposed Cleanup Plan ("Proposed Plan") in *The Taos News*, a major local newspaper of general circulation, and advised the public of the opportunity to submit written and oral comments regarding the Proposed Plan. Public comments were submitted to EPA during an 85-day period which began on January 6, 2010, and ended on March 31, 2010.

I.       On December 20, 2010, EPA issued a Record of Decision ("ROD") describing the selected remedy and the reasons for selection of the remedy. The ROD includes an explanation of significant differences between the Proposed Plan and the ROD, as well as EPA's responses to public comments on the Proposed Plan. Notice of the final plan as set forth in the ROD was published in accordance with CERCLA § 117(b), 42 U.S.C. § 9617(b).

J.       On September 16, 2011, pursuant to CERCLA § 105, 42 U.S.C. § 9605, the Site was listed on the National Priorities List ("NPL"). 76 Fed. Reg. 57662 (Sept. 16, 2011).

K.       On March 7, 2012, CMI and EPA signed an Administrative Settlement Agreement and Order on Consent for Removal Actions, which was filed with the EPA Region 6 Hearing Clerk on March 8, 2012, in *In the Matter of: Chevron Mining Inc., Respondent,* CERCLA Docket No. 06-09-12 (hereinafter referred to as the "Removal AOC").

L.       On September 19 and 25, 2012, CMI and EPA, respectively, signed an Administrative Settlement Agreement and Order on Consent for Early Design Actions, which was filed with the EPA Region 6 Hearing Clerk on September 26, 2012, in *In the Matter of: Chevron Mining Inc., Respondent*, CERCLA Docket No. 06-13-12 (hereinafter referred to as the "Early Design AOC").

M.       The Early Design AOC was amended on September 30, 2014, resulting in the First Amendment to the Administrative Settlement Agreement and Order on Consent for Early Design Actions. On November 13, 2014, the Early Design AOC was amended again, resulting in the Second Amendment to the Administrative Settlement Agreement and Order on Consent for Early Design Actions. All references herein to the Early Design AOC include these amendments as well as any others that become effective before or after the Effective Date of this Consent Decree.

N.       In this First Partial Remedial Design/Remedial Action Consent Decree, CMI has agreed to perform certain response actions set forth in the ROD and to pay certain costs. Other

aspects of the remedy (as set forth in the ROD) are currently the subject of the Removal AOC and the Early Design AOC, as amended, or will otherwise be addressed separately from this Consent Decree at a later date.

O.     Based on the information currently available to EPA and the State, EPA and the State believe that the Work will be properly and promptly conducted by CMI if conducted in accordance with the requirements of this Consent Decree and its appendices.

P.     Solely for the purposes of Section 113(j) of CERCLA, 42 U.S.C. § 9613(j), the remedy set forth in the ROD and the Work to be performed by CMI shall constitute a response action taken or ordered by the President for which judicial review shall be limited to the administrative record.

Q.     The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and implementation of this Consent Decree will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

II.     JURISDICTION

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1367, and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b). This Court also has personal jurisdiction over CMI. Solely for the purposes of this Consent Decree and the underlying complaints, CMI waives all objections and defenses that it may have to jurisdiction of the Court or to venue in this District. CMI shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

III.    PARTIES BOUND

2.      This Consent Decree applies to and is binding upon the United States and the State and upon CMI and its successors and assigns. Any change in ownership or corporate status of CMI including, but not limited to, any transfer of assets or real or personal property, shall in no way alter the Settling Defendant's responsibilities under this Consent Decree.

3.      CMI shall provide a copy of this Consent Decree to each contractor hired to perform the Work required by this Consent Decree and to each person representing CMI with respect to the Site or the Work, and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this Consent Decree. CMI or its contractors shall provide written notice of the Consent Decree to all subcontractors hired to perform any portion of the Work required by this Consent Decree. CMI shall nonetheless be responsible for ensuring that its contractors and subcontractors perform the Work in accordance with the terms of this Consent Decree. With regard to the activities undertaken pursuant to this Consent Decree, each contractor and subcontractor shall be deemed to be in a contractual relationship with CMI within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

IV.     DEFINITIONS

4.      Unless otherwise expressly provided in this Consent Decree, terms used in this Consent Decree that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Consent Decree or its appendices, the following definitions shall apply solely for purposes of this Consent Decree:

"Chevron Questa Mine Superfund Site Special Account" shall mean the special account, within the EPA Hazardous Substance Superfund, established for the Site by EPA pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3).

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601-9675.

"CMI" shall mean Chevron Mining Inc.

"CMI's Related Parties" shall mean (i) CMI's successors and assigns, but only to the extent that the alleged liability of such person is based on the alleged liability of CMI; (ii) CMI's former or current officers, directors and employees, but only to the extent that the alleged liability of such person is based on acts and/or omissions that occurred in the scope of the person's employment or capacity as an officer, director or employee of CMI; (iii) Union Oil Company of California and Unocal Corporation, but only to the extent that the alleged liability of such entity is based on its status as the direct or indirect corporate parent of CMI (f/k/a Molycorp Inc.) or its alleged status as a former owner or operator of the Site; and (iv) the former or current officers, directors and employees of Union Oil Company of California and Unocal Corporation, but only to the extent that the alleged liability of such person is based on the person's employment or capacity as an officer, director or employee of Union Oil Company of California or Unocal Corporation.

"CMI Property" shall mean the areas within the yellow property lines depicted by Figures 1-2 and 1-3, provided as Attachments 1 and 2 to Appendix A.

"Consent Decree," "Decree" and "Partial Consent Decree" shall mean this Consent Decree and all appendices attached hereto (listed in Section XXVII).

"Day" or "day" shall mean a calendar day unless expressly stated to be a working day. The term "working day" shall mean a day other than a Saturday, Sunday, or federal or state holiday. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal or state holiday, the period shall run until the close of business of the next working day.

"DOJ" shall mean the United States Department of Justice and its successor departments, agencies, or instrumentalities.

"Effective Date" shall mean the date upon which this Consent Decree is entered by the Court as recorded on the Court docket, or, if the Court instead issues an order approving the Consent Decree, the date such order is recorded on the Court docket.

"EMNRD" shall mean the New Mexico Energy, Minerals and Natural Resources Department and its successor departments, agencies or instrumentalities.

"EPA" shall mean the United States Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

"EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

"Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States, and the State as applicable, incur in reviewing or developing plans, reports, and other deliverables submitted pursuant to this Consent Decree, in overseeing implementation of the Work, or otherwise implementing, overseeing, or enforcing this Consent Decree, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to Paragraph 9 (Notice to Successors-in-Title and Transfers of Real Property), Sections VIII (Access and Institutional Controls) (including, but not limited to, the cost of attorney time and any monies paid to secure access and/or to secure, implement, monitor, maintain, or enforce Institutional Controls including, but not limited to, the amount of just compensation), XIV (Emergency Response), Paragraph 46 (Funding for Work Takeover), and Section XXVIII (Community Involvement). Future Response Costs shall also include all Interim Response Costs and all Interest on those Past Response Costs that CMI has agreed to pay under this Consent Decree that

has accrued pursuant to 42 U.S.C. § 9607(a) during the period from March 1, 2015 to the Effective Date. Future Response Costs shall also include all costs not inconsistent with the NCP, incurred by the United States or the State from the Effective Date forward, in implementing the Removal AOC (EPA Docket No. 06-09-12) and the Early Design AOC (EPA Docket No. 06-13-12). Future Response Costs shall not include any costs that the State incurs in administering the State Permits.

"FWPCA" shall mean the Federal Water Pollution Control Act, as amended, 33 U.S.C. §§ 1251-1387 (also known as the Clean Water Act).

"Interim Response Costs" shall mean all unreimbursed costs, including, but not limited to, direct and indirect costs, (a) paid by the United States or the State in connection with the Site between March 1, 2015 and the Effective Date, or (b) incurred prior to the Effective Date but paid after that date.

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at: http://www.epa.gov/superfund/superfund-interest-rates.

"Mine Site Area" shall mean the area within the yellow boundary lines depicted by Figure 1-2 and designated as the "Questa Mine Site" by Attachment 1 to Appendix A.

"MMD" shall mean the Mining and Minerals Division of the New Mexico Energy, Minerals and Natural Resources Department.

"MMD Permit" shall mean any and all permits issued by MMD, pursuant to the NMMA and MMD Regulations, to CMI and/or its successor in connection with the Mine Site Area and the

Tailing Facility Area, including without limitation Permit No. TA001RE (MMD), as such permit may have been or may be amended, modified or revised from time to time.

"MMD Regulations" shall mean regulations adopted pursuant to the NMMA, including without limitation Title 19 Chapter 10 Part 1 through Title 19 Chapter 10 Part 14 NMAC, as such regulations may have been or may be amended from time to time.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"NMED" shall mean the New Mexico Environment Department and any successor departments, agencies or instrumentalities.

"NMED Permit" shall mean shall mean any and all permits issued by NMED, pursuant to the WQA and NMED Regulations, to CMI and/or its successor in connection with the Mine Site Area and the Tailing Facility Area, including without limitation Ground Water Discharge Permit Nos. DP-1055, DP-933, and DP-1539, as such permits may have been or may be amended, modified or revised from time to time.

"NMED Regulations" shall mean regulations adopted pursuant to the WQA, including without limitation Title 20 Chapter 6 Part 2 NMAC, as such regulations may have been or may be amended from time to time.

"NMMA" shall mean the New Mexico Mining Act, NMSA 1978, §§ 69-36-1 to -20.

"Operation and Maintenance" or "O&M" shall mean all activities required to maintain the effectiveness of the Remedial Action as required under the Operation and Maintenance Plan approved or developed by EPA pursuant to Section VI (Performance of the Work by CMI) of this Consent Decree and the SOW.

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral or an upper or lower case letter, or combinations thereof.

"Parties" shall mean the United States, the State of New Mexico and CMI.

"Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States paid at or in connection with the Site from November 24, 2009 through February 28, 2015, plus Interest on all such costs that has accrued pursuant to 42 U.S.C. § 9607(a) through such date.

"Past Response Costs (State)" shall mean all costs, including, but not limited to, direct and indirect costs, that the State paid at or in connection with the Site through February 28, 2015, plus Interest on all such costs that has accrued pursuant to 42 U.S.C. § 9607(a) through such date.

"Performance Standards" shall mean the remedial action objectives, cleanup standards and other measures of achievement of the goals of the Remedial Action, set forth in the ROD and the SOW and any modified standards established pursuant to this Consent Decree.

"Plaintiffs" shall mean the United States, the State of New Mexico and NMED.

"Record of Decision" or "ROD" shall mean the EPA Record of Decision relating to the Chevron Questa Mine Superfund Site signed on December 20, 2010, by the Superfund Division Director, EPA Region 6, and all attachments thereto. The ROD is available from EPA's website and upon request.

"Remedial Action" or "RA" shall mean all the Remedial Action Projects that CMI is required to perform under this Consent Decree to implement the ROD, consistent with the SOW, the final approved remedial design submission, the approved Remedial Action Project Work Plan(s), and other plans approved by EPA, including implementation of Institutional Controls, until the

Performance Standards are met, and excluding performance of the Remedial Design, O&M, and the activities required under Section XXIV (Retention of Records).

"Remedial Action Work Plan" shall mean the document(s) developed pursuant to Section 10 of the Statement of Work and approved by EPA, as well as any modifications thereto.

"Remedial Design" or "RD" shall mean those activities to be undertaken by CMI to develop the final plans and specifications for the Remedial Action pursuant to the Remedial Design Work Plan, as specified in the SOW.

"Remedial Design Work Plan" shall mean the document(s) developed pursuant to Sections 8 and 9 of the Statement of Work and approved by EPA, as well as any modifications thereto.

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

"Settling Defendant" shall mean Chevron Mining Inc.

"Site" shall mean the Chevron Questa Mine Superfund Site, located in Taos County, New Mexico. The Site consists of a molybdenum mine and milling facility located approximately four miles east of the Village of Questa on approximately three square miles of land owned and operated by CMI (lat. 36°41' 54" N., long. 105°30' 18" W). The mine includes underground mine workings, an historic open pit, nine waste rock dumps or piles surrounding the open pit and a subsidence area which represents a surface-collapse feature above the ore extraction area. The Site also includes a tailing pipeline running parallel to State Highway 38, the area in the vicinity of the pipeline and the Tailing Facility in the Village of Questa (lat. 36°42' 13" N., long. 105°36' 40" W. and lat. 36°42' 08" N., long. 105°37' 54" W.). The Site also includes all other areas where any hazardous substance, pollutant or contaminant from the Molycorp, Inc. (or successor) mining, milling and tailing disposal

operations is located. The Site is depicted generally on Figures 1-2 and 1-3, provided as Attachments 1 and 2 to Appendix A.

"State" shall mean the State of New Mexico, and, unless otherwise specified, refers specifically to both NMED and MMD; in Section XX (Covenants by Plaintiffs) only, "State" shall include each department, agency, and instrumentality of the State.

"State Permits" shall mean the MMD Permit and NMED Permit.

"State Regulations" shall mean the MMD Regulations and the NMED Regulations.

"Statement of Work" or "SOW" shall mean the statement of work for implementation of the Remedial Design, Remedial Action, and O&M at the Site, as set forth in Appendix A to this Consent Decree and any modifications made in accordance with this Consent Decree.

"Supervising Contractor" shall mean the principal contractor(s) retained by CMI to supervise and direct the implementation of the Work under this Consent Decree.

"SWDA" shall mean the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901-6992k (also known as the Resource Conservation and Recovery Act or "RCRA").

"Tailing Facility Area" shall mean the area within the yellow boundary lines depicted by Figure 1-3 and designated as the "Questa Tailing Facility" on Attachment 2 to Appendix A.

"Transfer" shall mean to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

"United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA.

"Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of

CERCLA, 42 U.S.C. § 9601(33); and (3) any "solid waste" as defined by SWDA § 1004(27), 42 U.S.C. § 6903(27).

"Work" shall mean all activities and obligations CMI is required to perform under this Consent Decree, including Operation and Maintenance, except the activities required under Section XXIV (Retention of Records).

"WQA" shall mean the New Mexico Water Quality Act, NMSA 1978, §§ 74-6-1 to -17.

## V.    GENERAL PROVISIONS

5.    Objectives of the Parties.  The objectives of the Parties in entering into this Consent Decree are to protect public health or welfare or the environment by the design and implementation of the specified response actions at the Site by CMI, to pay response costs of the Plaintiffs, and to resolve certain claims of the Plaintiffs against CMI, as provided in this Consent Decree.

6.    Commitments by CMI.  CMI shall finance and perform the Work in accordance with this Consent Decree, the ROD, the SOW, and all work plans and other plans, standards, specifications, and schedules set forth in this Consent Decree or developed by CMI and approved by EPA pursuant to this Consent Decree.  CMI shall pay the United States and the State for Past Response Costs and Future Response Costs as provided in this Consent Decree.

7.    Compliance with Applicable Law.  All activities undertaken by CMI pursuant to this Consent Decree shall be performed in accordance with the requirements of all applicable federal and State laws and regulations.  CMI must also comply with all applicable or relevant and appropriate requirements of all federal and State environmental laws, as set forth in the ROD and the SOW.  The activities conducted pursuant to this Consent Decree, if approved by EPA, shall be deemed to be consistent with the NCP.

8.    Permits.

a.      As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and Section 300.400(e) of the NCP, no permit, other than as provided in the ROD, shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, CMI shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

b.      CMI may seek relief under the provisions of Section XVII (Force Majeure) for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval referenced in Paragraph 8.a and required for the Work, provided that it has submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals.

c.      This Consent Decree is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

d.      The State intends to amend any State Permit provisions that pertain to the Work to ensure their consistency with the requirements of the SOW. In the event that State Permit provisions pertain to the Work but have not been amended to conform thereto, the State will not enforce the obligations or directives of the State Permits that are inconsistent with the SOW. The State agrees to address any alleged noncompliance with the SOW solely pursuant to this Consent Decree, in cooperation with EPA.

9.    Notice to Successors-in-Title and Transfers of Real Property.

a.    For any real property owned or controlled by CMI located at the Site, CMI shall, within 15 days after the Effective Date, submit to EPA and the State for review and approval a proposed notice to be filed with the appropriate land records office that provides a description of the real property and provides notice to all successors-in-title that the real property is part of the Site, that EPA has selected a remedy for the Site, and that potentially responsible parties have entered into a Consent Decree requiring implementation of a portion of the remedy. The notice also shall describe the land use restrictions, if any, set forth in Paragraphs 21.j and 23 and shall identify the United States District Court in which the Consent Decree was filed, the name and civil action number of this case, and the date the Consent Decree was entered by the Court. CMI shall record the notice within ten days after EPA's approval of the notice. CMI shall provide EPA and the State with a certified copy of the recorded notice within ten days after recording such notice.

b.    CMI shall, at least 60 days prior to any Transfer of any real property located at the Site, give written notice: (1) to the transferee regarding the Consent Decree and any Institutional Controls regarding the real property; and (2) to EPA and the State regarding the proposed Transfer, including the name and address of the transferee and the date on which the transferee was notified of the Consent Decree and any Institutional Controls.

10.    In the event of any Transfer of real property located at the Site, unless the United States and the State otherwise consent in writing, CMI shall continue to comply with its obligation under the Consent Decree, including, but not limited to, its obligation to provide and/or secure access, to implement, maintain, monitor, and report on Institutional Controls, and to abide by such Institutional Controls. In addition, in the event of any Transfer of real property located at the Site,

unless NMED and MMD consent in writing, CMI shall continue to be the permittee under all permits that have been issued to CMI at the Site by NMED or MMD.

## VI. PERFORMANCE OF THE WORK BY CMI

11. <u>Selection of Supervising Contractor.</u>

a. All aspects of the Work to be performed by CMI pursuant to Sections VI (Performance of the Work by CMI), VII (Quality Assurance, Sampling, and Data Analysis), VIII (Access and Institutional Controls), and XIV (Emergency Response) shall be performed under the direction and supervision of one or more Supervising Contractor(s), the selection of which shall be subject to disapproval by EPA, after a reasonable opportunity for review and comment by the State. Within ten days after the Effective Date of this Consent Decree, CMI shall notify EPA and the State in writing of the name, title, and qualifications of any contractor proposed to be the Supervising Contractor. With respect to any contractor proposed to be Supervising Contractor, CMI shall demonstrate that the proposed contractor has a quality assurance system that complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs" (American National Standard, January 5, 1995), by submitting a copy of the proposed contractor's Quality Management Plan ("QMP"). The QMP should be prepared in accordance with "EPA Requirements for Quality Management Plans (QA/R-2)" (EPA/240/B-01/002, March 2001, reissued May 2006) or equivalent documentation as determined by EPA. EPA will issue a notice of disapproval or an authorization to proceed regarding hiring of the proposed contractor. If at any time thereafter, CMI proposes to change a Supervising Contractor, CMI shall give such notice to EPA and the State and must obtain an authorization to proceed from EPA, after a reasonable opportunity for review and comment by the State, before the new Supervising Contractor performs, directs, or supervises any Work under this Consent Decree. CMI shall demonstrate that the proposed replacement contractor has a quality

assurance system that complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs" (American National Standard, January 5, 1995), by submitting a copy of the proposed contractor's Quality Management Plan. The QMP should be prepared in accordance with "EPA Requirements for Quality Management Plans (QA/R-2)" (EPA/240/B-01/002, March 2001, reissued May 2006) or equivalent documentation as determined by EPA.

b.      If EPA disapproves a proposed Supervising Contractor, EPA will notify CMI in writing. CMI shall submit to EPA and the State a list of contractors, including the qualifications of each contractor, that would be acceptable to CMI within 30 days after receipt of EPA's disapproval of the contractor previously proposed. EPA will provide written notice of the names of any contractor(s) that it disapproves and an authorization to proceed with respect to any of the other contractors. CMI may select any contractor from that list that is not disapproved and shall notify EPA and the State of the name of the contractor selected within 21 days after EPA's authorization to proceed.

c.      If EPA fails to provide written notice of its authorization to proceed or disapproval as provided in this Paragraph and this failure prevents CMI from meeting one or more deadlines in a plan approved by EPA pursuant to this Consent Decree, CMI may seek relief under Section XVII (Force Majeure).

12.      <u>Performance of the Work in accordance with the SOW</u>. Unless an earlier deadline is set forth in the SOW, CMI shall, within 60 days after EPA's issuance of an authorization to proceed pursuant to Paragraph 11 (Selection of Supervising Contractor), commence implementation of the SOW and all EPA-approved, conditionally approved, or modified deliverables, as required by the SOW. Upon approval by EPA, each Remedial Design Work Plan and Remedial Action Project

Work Plan, and all other plans required by the SOW to be developed by CMI, shall be automatically incorporated into and enforceable under this Consent Decree.

13.     CMI shall continue to implement the Remedial Action and the O&M until the Performance Standards are achieved.

14.     <u>Modification of SOW or Related Work Plans</u>.

a.      If EPA, after consulting with the State regarding, *inter alia*, the State Permits, determines that (i) it is necessary to modify the Work specified in the SOW, and/or in work plans developed pursuant to the SOW, to achieve and maintain the Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the ROD, and (ii) such modification is consistent with the scope of the remedy set forth in the ROD, as defined herein, then EPA may issue such modification in writing and shall notify CMI of such modification. For the purposes of this Paragraph and Paragraph 48 (Completion of the Work) only, the "scope of the remedy set forth in the ROD" corresponds to the Work described in Section 5 of the SOW (Appendix A). If CMI objects to the modification, it may, within 30 days after EPA's notification, seek dispute resolution under Paragraph 67 (Record Review).

b.      The SOW and/or related work plans shall be modified: (1) in accordance with the modification issued by EPA; or (2) if CMI invokes dispute resolution, in accordance with the final resolution of the dispute. The modification shall be incorporated into and shall be enforceable under this Consent Decree, and CMI shall implement all Work required by such modification. CMI shall incorporate the modification into the Remedial Design Work Plan(s) or Remedial Action Work Plan(s) developed pursuant to Paragraph 12 (Performance of the Work in accordance with the SOW) or the SOW, as appropriate.

c.    Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this Consent Decree.

15.    Nothing in this Consent Decree, the SOW, or the Remedial Design or Remedial Action Work Plans constitutes a warranty or representation of any kind by Plaintiffs that compliance with the Work requirements set forth in the SOW and the Work Plans will achieve the Performance Standards.

16.    Off-Site Shipment of Waste Material.

a.    CMI may ship Waste Material from the Site pursuant to this Consent Decree to an off-Site facility only if CMI complies with Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3) and 40 C.F.R. § 300.440. CMI will be deemed to be in compliance with CERCLA § 121(d)(3) and 40 C.F.R. § 300.440 regarding a shipment if CMI obtains a prior determination from EPA that the proposed receiving facility for such shipment is acceptable under the criteria of 40 C.F.R. § 300.440. CMI may ship Investigation Derived Waste ("IDW") from the Site to an off-Site facility, pursuant to this Consent Decree, only if CMI complies with *EPA's Guide to Management of Investigation Derived Waste*, OSWER 9345.3-03FS (Jan. 1992).

b.    CMI may ship Waste Material from the Site pursuant to this Consent Decree to an out-of-state waste management facility only if, prior to any shipment, it provides written notice to the appropriate state environmental official in the receiving facility's state and to the EPA Project Coordinator. This notice requirement shall not apply to any off-Site shipments when the total quantity of all such shipments will not exceed ten cubic yards. The written notice shall include the following information, if available: (1) the name and location of the receiving facility; (2) the type and quantity of Waste Material to be shipped; (3) the schedule for the shipment; and (4) the method of transportation. CMI also shall notify the state environmental official referenced above and the

EPA Project Coordinator of any major changes in the shipment plan, such as a decision to ship the Waste Material to a different out-of-state facility. CMI shall provide the written notice after the award of the contract for Remedial Action construction and before the Waste Material is shipped.

## VII. QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS

17. Quality Assurance.

a. CMI shall use quality assurance, quality control, and chain of custody procedures for all sampling and analyses performed pursuant to this Consent Decree in accordance with "EPA Requirements for Quality Assurance Project Plans (QA/R5)" (EPA/240/B-01/003, March 2001, reissued May 2006), "Guidance for Quality Assurance Project Plans (QA/G-5)" (EPA/240/R-02/009, December 2002), and *Uniform Federal Policy for Quality Assurance Project Plans*, Parts 1-3, EPA/505/B-04/900A through 900C (Mar. 2005).

b. Prior to the commencement of any sampling or analysis performed pursuant to this Consent Decree, CMI shall submit to EPA for approval, after a reasonable opportunity for review and comment by the State, Quality Assurance Project Plan(s) ("QAPP") that are consistent with the SOW, the NCP, and applicable guidance documents. If relevant to the proceeding, the Parties agree that validated sampling data generated in accordance with the QAPP and reviewed and approved by EPA shall be admissible as evidence, without objection, in any proceeding under this Consent Decree. CMI shall ensure that EPA and State personnel and their authorized representatives are allowed access at reasonable times to all laboratories utilized by CMI in implementing this Consent Decree. In addition, CMI shall ensure that such laboratories shall analyze all samples submitted by EPA pursuant to the QAPP for quality assurance monitoring. CMI shall ensure that the laboratories it utilizes for the analysis of samples taken pursuant to this Consent Decree perform all analyses according to accepted EPA methods. Accepted EPA methods consist of those methods that are documented in the "USEPA Contract Laboratory Program Statement of Work for Inorganic

Analysis, ILM05.4," and the "USEPA Contract Laboratory Program Statement of Work for Organic Analysis, SOM01.2," and any amendments made thereto during the course of the implementation of this Consent Decree; however, upon approval by EPA, after opportunity for review and comment by the State, CMI may use other analytical methods that are as stringent as or more stringent than the CLP-approved methods. CMI shall ensure that all laboratories it uses for analysis of samples taken pursuant to this Consent Decree participate in an EPA or EPA-equivalent quality assurance/quality control ("QA/QC") program. CMI shall use only laboratories that have a documented Quality System that complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs" (American National Standard, January 5, 1995), and "EPA Requirements for Quality Management Plans (QA/R-2)" (EPA/240/B-01/002, March 2001, reissued May 2006) or equivalent documentation as determined by EPA. EPA may consider laboratories accredited under the National Environmental Laboratory Accreditation Program as meeting the Quality System requirements. CMI shall ensure that all field methodologies utilized in collecting samples for subsequent analysis pursuant to this Consent Decree are conducted in accordance with the procedures set forth in the QAPP approved by EPA.

18.     Upon request, CMI shall allow split or duplicate samples to be taken by EPA and the State or their authorized representatives. CMI shall notify EPA and the State not less than 14 days in advance of any sample collection activity unless shorter notice is agreed to by EPA and the State. In addition, EPA and the State shall have the right to take any additional samples that EPA or the State deem necessary. Upon request, EPA and the State shall allow CMI to take split or duplicate samples of any samples they take as part of Plaintiffs' oversight of CMI's implementation of the Work.

19.     CMI shall submit to EPA and the State the results of all sampling and/or tests or other data obtained or generated by or on behalf of CMI in the implementation of this Consent Decree unless EPA agrees otherwise.

20.     Notwithstanding any provision of this Consent Decree, the United States and the State retain all of their respective information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, NMMA, WQA, State Regulations and any other applicable statutes or regulations.

VIII.     ACCESS AND INSTITUTIONAL CONTROLS

21.     CMI shall, commencing on the date of lodging of the Consent Decree, provide the United States and the State, and their representatives, contractors, and subcontractors, with access at all reasonable times to the Site, or any other real property owned or controlled by CMI, where access and/or land and/or water use restrictions are needed, to conduct any activity regarding the Consent Decree including, but not limited to, the following activities:

a.     Monitoring the Work;

b.     Verifying any data or information submitted to the United States or the State;

c.     Conducting investigations regarding contamination at or near the Site or other CMI Property;

d.     Obtaining samples;

e.     Assessing the need for, planning, or implementing additional response actions at or near the Site;

f.     Assessing implementation of quality assurance and quality control practices as defined in the approved CQAP;

g.     Implementing the Work pursuant to the conditions set forth in Paragraph 84 (Work Takeover);

h.     Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by CMI or its agents, consistent with Section XXIII (Access to Information);

i.     Assessing CMI's compliance with the Consent Decree; and

j.     Determining whether the Site or other real property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the Consent Decree.

22.     Commencing on the date of lodging of the Consent Decree, CMI shall not use the Site, or any other real property owned or controlled by CMI, where access and/or land and/or water use restrictions are needed, in any manner that EPA or the State determines will pose an unacceptable risk to human health or to the environment due to exposure to Waste Material or interfere with or adversely affect the implementation, integrity, or protectiveness of the Remedial Action or O&M.

23.     If the Site, or any other real property where access and/or land and/or water use restrictions are needed, is owned or controlled by persons other than CMI, then CMI shall use best efforts to secure from such persons:

a.     an agreement to provide access thereto for the United States, the State, and CMI, and their representatives, contractors, and subcontractors, to conduct any activity regarding the Consent Decree including, but not limited to, the activities listed in Paragraph 21; and

b.     an agreement, enforceable by CMI and the United States and the State, to refrain from using the Site, or such other real property, in any manner that EPA or the State determines will pose an unacceptable risk to human health or to the environment due to exposure to

Waste Material or interfere with or adversely affect the implementation, integrity, or protectiveness of the Remedial Action.

24.     For purposes of Paragraph 23, "best efforts" means the efforts that a reasonable person in the position of CMI would use so as to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to obtain access or secure an agreement to restrict land/water use. If CMI is unable to accomplish what is required under Paragraph 23 in a timely manner, it shall notify the United States and the State in writing, and shall include in that notification a summary of the steps that CMI has taken to attempt to comply with Paragraph 23. The United States and the State may, as they deem appropriate, assist CMI or take independent action in obtaining access or agreements to restrict land/water use. CMI shall reimburse the United States or the State, as applicable, under Section XV (Payments for Response Costs) for all costs incurred, direct or indirect, by the United States or the State in obtaining such access or agreements to restrict land/water use, including, but not limited to, the cost of attorney time and the amount of monetary consideration or just compensation paid.

25.     If EPA determines in a decision document prepared in accordance with the NCP that Institutional Controls in the form of state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls are needed at or in connection with the Site, CMI shall cooperate with EPA's and the State's efforts to secure and ensure compliance with such governmental controls.

26.     Notwithstanding any provision of the Consent Decree, the United States and the State retain all of their respective access authorities and rights, as well as all of their rights to require Institutional Controls, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable federal statute or regulations, or under the WQA, the NMMA, State Regulations or State Permits.

27.     Nothing in this Decree shall be construed to prohibit, restrict, limit or otherwise affect the State's right or authority to access the Site as authorized by the WQA, the NMMA, State Regulations or State Permits.

IX.     REPORTING REQUIREMENTS

28.     In addition to any other requirement of this Consent Decree, CMI shall submit to EPA and the State, respectively, one copy of each written monthly progress report. Each such report shall be prepared in accordance with the requirements of Section 7.4 of the Statement of Work attached hereto as Appendix A. CMI shall submit these progress reports to EPA and the State by the fifteenth day of every month following the lodging of this Consent Decree until EPA notifies CMI pursuant to Paragraph 48.c of Section XIII (Certification of Completion). If requested by EPA or the State, CMI shall also provide briefings for EPA and the State to discuss the progress of the Work.

29.     CMI shall notify EPA and the State of any change in the schedule described in the monthly progress report for the performance of any activity, including, but not limited to, data collection and implementation of work plans, no later than seven days prior to the performance of the activity.

30.     Upon the occurrence of any event during performance of the Work that CMI is required to report pursuant to Section 103 of CERCLA, 42 U.S.C. § 9603, or Section 304 of the Emergency Planning and Community Right-to-know Act ("EPCRA"), 42 U.S.C. § 11004, CMI shall, within 24 hours of the onset of such event, orally notify the (i) EPA Project Coordinator or the Alternate EPA Project Coordinator (in the event of the unavailability of the EPA Project Coordinator), or, in the event that neither the EPA Project Coordinator nor Alternate EPA Project Coordinator is available, the Emergency Response Section, Region 6, United States Environmental Protection Agency, (ii) the NMED Project Coordinator and (iii) the MMD Project Coordinator.

These reporting requirements are in addition to the reporting required by CERCLA Section 103 or EPCRA Section 304.

31.     Within 20 days after the onset of an event described in Paragraph 30, CMI shall furnish to EPA and the State a written report, signed by CMI's Project Coordinator, setting forth the events that occurred and the measures taken, and to be taken, in response thereto. Within 30 days after the conclusion of such an event, CMI shall submit a report to EPA and the State setting forth all actions taken in response thereto.

32.     CMI shall submit one copy of all plans, reports, data, and other deliverables required by the SOW, the Remedial Design Work Plan, the Remedial Action Work Plan, or any other approved plans to EPA in accordance with the schedules set forth in such plans. CMI shall simultaneously submit two copies of all such plans, reports, data, and other deliverables to the State. Upon request by EPA or the State, CMI shall submit to EPA or the State, as requested, in electronic form all or any portion of any deliverables CMI is required to submit pursuant to the provisions of this Consent Decree.

33.     All deliverables submitted by CMI to EPA that purport to document CMI's compliance with the terms of this Consent Decree shall be signed by an authorized representative of CMI.

34.     Nothing in this Section IX shall relieve CMI of any reporting obligations it has under the NMMA, the WQA, State Regulations or State Permits.

        X.      EPA APPROVAL OF PLANS, REPORTS, AND OTHER DELIVERABLES

35.     Initial Submissions.

        a.      After review of any plan, report, or other deliverable that is required to be submitted for approval pursuant to this Consent Decree, EPA, after reasonable opportunity for review and comment by the State, shall: (1) approve, in whole or in part, the submission; (2) approve

the submission upon specified conditions; (3) disapprove, in whole or in part, the submission; or (4) any combination of the foregoing.

b.        EPA also may modify the initial submission to cure deficiencies in the submission if: (1) EPA determines that disapproving the submission and awaiting a resubmission would cause substantial disruption to the Work; or (2) previous submission(s) have been disapproved due to material defects and the deficiencies in the initial submission under consideration indicate a bad faith lack of effort to submit an acceptable plan, report, or deliverable.

36.        <u>Resubmissions</u>. Upon receipt of a notice of disapproval under Paragraph 35.a(3) or (4), or if required by a notice of approval upon specified conditions under Paragraph 35.a(2), CMI shall, within 30 days or such longer time as specified in the SOW or by EPA in writing, correct the deficiencies and resubmit to EPA and the State the plan, report, or other deliverable for approval. After review of the resubmitted plan, report, or other deliverable, EPA may: (a) approve, in whole or in part, the resubmission; (b) approve the resubmission upon specified conditions; (c) modify the resubmission; (d) disapprove, in whole or in part, the resubmission, requiring CMI to correct the deficiencies; or (e) any combination of the foregoing.

37.        <u>Material Defects</u>. If an initially submitted or resubmitted plan, report, or other deliverable contains a material defect, and the plan, report, or other deliverable is disapproved or modified by EPA under Paragraph 35.b(2) or 36 due to such material defect, then the material defect shall constitute a lack of compliance for purposes of Paragraph 70. The provisions of Section XVIII (Dispute Resolution) and Section XIX (Stipulated Penalties) shall govern the accrual and payment of any stipulated penalties regarding CMI's submissions under this Section.

38.        <u>Implementation</u>. Upon approval, approval upon conditions, or modification by EPA under Paragraph 35 (Initial Submissions) or Paragraph 36 (Resubmissions), of any plan, report, or

other deliverable, or any portion thereof: (a) such plan, report, or other deliverable, or portion thereof, shall be incorporated into and enforceable under this Consent Decree; and (b) CMI shall take any action required by such plan, report, or other deliverable, or portion thereof, subject only to its right to invoke the Dispute Resolution procedures set forth in Section XVIII (Dispute Resolution) with respect to the modifications or conditions made by EPA. The implementation of any non-deficient portion of a plan, report, or other deliverable submitted or resubmitted under Paragraph 35 or 36 shall not relieve CMI of any liability for stipulated penalties under Section XIX (Stipulated Penalties).

## XI. PROJECT COORDINATORS

39. Within 20 days after lodging this Consent Decree, CMI, MMD, NMED and EPA will notify each other, in writing, of the name, address, telephone number, and email address of their respective designated Project Coordinators and Alternate Project Coordinators. If a Project Coordinator or Alternate Project Coordinator initially designated is changed, the identity of the successor will be given to the other Parties and the Parties' Project Coordinators at least five working days before the change occurs, unless impracticable, but in no event later than the actual day the change is made. CMI's Project Coordinator shall be subject to disapproval by EPA and shall have the technical expertise sufficient to adequately oversee all aspects of the Work. CMI's Project Coordinator shall not be an attorney for CMI in this matter. He or she may assign other representatives, including other contractors, to serve as a Site representative for oversight of performance of daily operations during remedial activities.

40. EPA, NMED and MMD may designate other representatives, including, but not limited to EPA and State employees, and federal and State contractors and consultants, to observe and monitor the progress of any activity undertaken pursuant to this Consent Decree. EPA's Project Coordinator and Alternate Project Coordinator shall have the authority lawfully vested in a Remedial

Project Manager and an On-Scene Coordinator by the NCP, 40 C.F.R. Part 300. EPA's Project Coordinator or Alternate Project Coordinator, consistent with the NCP, and NMED's and MMD's Project Coordinators shall have authority to halt any Work required by this Consent Decree and to take any necessary response action when he or she determines that conditions at the Site constitute an emergency situation or may present an immediate threat to public health or welfare or the environment due to release or threatened release of Waste Material.

41.     The Project Coordinator for CMI shall communicate at least weekly with the EPA Project Coordinator, either in face-to-face meetings, through conference calls, or through electronic mail, unless otherwise agreed to in writing.

#### XII.     PERFORMANCE GUARANTEE

42.     In order to ensure the full and final completion of the Work, CMI shall establish and maintain a performance guarantee, initially in the amount of $143,632,481, for the benefit of EPA (hereinafter "Estimated Cost of the Work"). The performance guarantee, which must be satisfactory in form and substance to EPA, shall be in the form of one or more of the following mechanisms (provided that, if CMI intends to use multiple mechanisms, such multiple mechanisms shall be limited to surety bonds guaranteeing payment, letters of credit, trust funds, and insurance policies):

a.      A surety bond unconditionally guaranteeing payment and/or performance of the Work that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

b.      One or more irrevocable letters of credit, payable to or at the direction of EPA, that is issued by one or more financial institution(s) (1) that has the authority to issue letters of credit and (2) whose letter-of-credit operations are regulated and examined by a federal or state agency;

c.     A trust fund established for the benefit of EPA that is administered by a trustee (1) that has the authority to act as a trustee and (2) whose trust operations are regulated and examined by a federal or state agency;

d.     A policy of insurance that (1) provides EPA with acceptable rights as a beneficiary thereof; and (2) is issued by an insurance carrier (i) that has the authority to issue insurance policies in the applicable jurisdiction(s) and (ii) whose insurance operations are regulated and examined by a federal or state agency;

e.     A demonstration by CMI that it meets the financial test criteria of 40 C.F.R. § 264.143(f) and reporting requirements of this Section for the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; or

f.     A guarantee to fund or perform the Work executed in favor of EPA by one or more of the following: (1) a direct or indirect parent company of CMI, or (2) a company that has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with CMI; provided, however, that any company providing such a guarantee must demonstrate to the satisfaction of EPA that it meets the relevant financial test criteria of 40 C.F.R. § 264.143(f) and reporting requirements of this Section for the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, and tribal environmental obligations financially assured through the use of a financial test or guarantee.

43.     Initial Performance Guarantee.

a.     Notwithstanding the first sentence of Paragraph 42, the initial performance guarantee provided by CMI shall be established and maintained for the benefit of EPA and the State (through the NMED and the EMNRD).  Until and unless CMI is notified in writing by EPA of a

change in the name of the beneficiary, any revised or alternative performance guarantee provided by CMI pursuant to Paragraphs 45 or 47 shall also be for the benefit of EPA and the State and may not include a demonstration under Paragraph 42.e.

b.        CMI has selected, and EPA and the State have found satisfactory, as an initial performance guarantee, a written guarantee by Chevron Corporation, pursuant to Paragraph 42.f, attached hereto as Appendix B. Within 30 days after the Effective Date, CMI shall execute or otherwise finalize all instruments or other documents required in order to make the selected performance guarantee(s) legally binding in a form substantially identical to the documents attached hereto as Appendix B, and such performance guarantee shall thereupon be fully effective. Within 30 days after the Effective Date, CMI shall submit copies of all executed and/or otherwise finalized instruments or other documents required in order to make the selected performance guarantee legally binding to the EPA Regional Financial Management Officer in accordance with Section XXV. (Notices and Submissions), with a copy to Section Chief, Enforcement Assessment Section, Superfund Division, U.S. Environmental Protection Agency, Region 6, 1445 Ross Ave., Suite 1200, Dallas, TX 75202, and to the United States, EPA, and the State, as specified in Section XXV.

44.        If CMI provides financial assurance by means of a demonstration or guarantee pursuant to Paragraph 42.e or 42.f, CMI shall also comply and shall ensure that its guarantor complies with the other relevant criteria and requirements of 40 C.F.R. § 264.143(f)(3) (except (f)(3)(i) and the fourth sentence of (f)(10)) and this Section, including but not limited to: (a) the initial submission to EPA of required documents from the affected entity's chief financial officer and independent certified public accountant no later than 30 days after the Effective Date; (b) the annual resubmission of such reports and statements within 90 days after the close of each such entity's fiscal year; and (c) the notification of EPA no later than 30 days after any such entity determines that it no

longer satisfies the financial test requirements set forth at 40 C.F.R. § 264.143(f)(1). CMI agrees that EPA may also, based on a belief that an affected entity may no longer meet the financial test requirements of Paragraph 42.e or 42.f, require reports of financial condition at any time from such entity in addition to those specified in this Paragraph. For purposes of this Section, references in 40 C.F.R. Part 264, Subpart H, to: the terms "current closure cost estimate, "current post-closure cost estimate," and "current plugging and abandonment cost estimate" include the Estimated Cost of the Work; (2) "the sum of the current closure and post-closure cost estimates and the current plugging and abandonment cost estimates" mean the sum of all environmental obligations (including obligations under CERCLA, RCRA and any other federal, state, or tribal environmental obligation) guaranteed by such company or for which such company is otherwise financially obligated in addition to the Estimated Cost of Work under this Partial Consent Decree; (3) the terms "owner" and "operator" include CMI; and (d) the terms "facility" and "hazardous waste management facility" include the Site.

45.    In the event that EPA determines at any time that a performance guarantee provided by CMI pursuant to this Section is inadequate or otherwise no longer satisfies the requirements set forth in this Section, whether due to an increase in the estimated cost of completing the Work or for any other reason, or in the event that CMI becomes aware of information indicating that a performance guarantee provided pursuant to this Section is inadequate or otherwise no longer satisfies the requirements set forth in this Section, whether due to an increase in the estimated cost of completing the Work or for any other reason, CMI, within 30 days after receipt of notice of EPA's determination or, as the case may be, within 30 days after CMI becomes aware of such information, shall obtain and present to EPA and the State for approval a proposal for a revised or alternative form of performance guarantee listed in Paragraph 42 that satisfies all requirements set forth in this

Section XII; provided, however, that if CMI cannot obtain such revised or alternative form of performance guarantee within such 30-day period, and provided further that CMI shall have commenced to obtain such revised or alternative form of performance guarantee within such 30-day period, and thereafter diligently proceeds to obtain the same, EPA shall extend such period for such time as is reasonably necessary for CMI in the exercise of due diligence to obtain such revised or alternative form of performance guarantee, such additional period not to exceed 30 days. In seeking approval for a revised or alternative form of performance guarantee, CMI shall follow the procedures set forth in Paragraph (2). CMI's inability to post a performance guarantee for completion of the Work shall in no way excuse performance of any other requirements of this Consent Decree, including, without limitation, the obligation of CMI to complete the Work in strict accordance with the terms of this Consent Decree.

46. _Funding for Work Takeover_. The commencement of any Work Takeover pursuant to Paragraph 84 shall trigger EPA's right to receive the benefit of any performance guarantee(s) provided pursuant to Paragraphs 42.a, 42.b, 42.c, 42.d, or 42.f, and at such time EPA shall have immediate access to resources guaranteed under any such performance guarantee(s), whether in cash or in kind, as needed to continue and complete the Work assumed by EPA under the Work Takeover. Upon the commencement of any Work Takeover, if (a) for any reason EPA is unable to promptly secure the resources guaranteed under any such performance guarantee(s), whether in cash or in kind, necessary to continue and complete the Work assumed by EPA under the Work Takeover, or (b) in the event that the performance guarantee involves a demonstration of satisfaction of the financial test criteria pursuant to Paragraph 42.e or Paragraph 42.f(2), CMI (or in the case of Paragraph 42.f(2), the guarantor) shall immediately upon written demand from EPA deposit into a special account within the EPA Hazardous Substance Superfund or such other account as EPA may

specify, in immediately available funds and without setoff, counterclaim, or condition of any kind, a cash amount up to but not exceeding the estimated cost of completing the Work as of such date, as determined by EPA. In addition, if at any time EPA is notified by the issuer of a performance guarantee that such issuer intends to cancel the performance guarantee mechanism it has issued, then, unless CMI provides a substitute performance guarantee mechanism in accordance with this Section XII no later than 30 days prior to the impending cancellation date, EPA shall be entitled (as of and after the date that is 30 days prior to the impending cancellation) to draw fully on the funds guaranteed under the then-existing performance guarantee. All EPA Work Takeover costs not reimbursed under this Paragraph shall be reimbursed under Section XV (Payments for Response Costs).

47. <u>Modification of Amount and/or Form of Performance Guarantee.</u>

a. <u>Reduction of Amount of Performance Guarantee.</u> If CMI believes that the estimated cost of completing the Work has diminished below the amount set forth in Paragraph 42, CMI may, no more than once during each calendar year after the first anniversary of the Effective Date, or at any other time agreed to by the Parties, petition EPA in writing to request a reduction in the amount of the performance guarantee provided pursuant to this Section so that the amount of the performance guarantee is equal to the estimated cost of completing the Work. CMI shall submit a written proposal for such reduction to EPA that shall specify, at a minimum, the estimated cost of completing the Work and the basis upon which such cost was calculated. In seeking approval for a reduction in the amount of the performance guarantee, CMI shall follow the procedures set forth in Paragraph 47.(2) for requesting a revised or alternative form of performance guarantee, except as specifically provided in this Paragraph 47.a. If EPA decides, after consultation with the State, to accept CMI's proposal for a reduction in the amount of the performance guarantee, either to the

amount set forth in CMI's written proposal or to some other amount as selected by EPA, EPA will notify CMI of such decision in writing. Upon EPA's acceptance of a reduction in the amount of the performance guarantee, the Estimated Cost of the Work shall be deemed to be the estimated cost of completing the Work set forth in EPA's written decision. After receiving EPA's written decision, CMI may reduce the amount of the performance guarantee in accordance with and to the extent permitted by such written acceptance and shall submit copies of all executed and/or otherwise finalized instruments or other documents required in order to make the selected performance guarantee(s) legally binding in accordance with Paragraph 47.(2). In the event of a dispute, CMI may reduce the amount of the performance guarantee required hereunder only in accordance with a final administrative or judicial decision resolving such dispute pursuant to Section XVIII (Dispute Resolution). No change to the form or terms of any performance guarantee provided under this Section, other than a reduction in amount, is authorized except as provided in Paragraphs 45 or 47.b.

   b.  <u>Change of Form of Performance Guarantee</u>.

   (1)  If, after the Effective Date, CMI desires to change the form or terms of any performance guarantee(s) provided pursuant to this Section, CMI may, on any anniversary of the Effective Date, or at any other time agreed to by EPA and CMI, petition EPA and the State in writing to request a change in the form or terms of the performance guarantee provided hereunder. The submission of such proposed revised or alternative performance guarantee shall be as provided in Paragraph 47.b(2). Any decision made by EPA on a petition submitted under this Paragraph shall be made in EPA's sole and unreviewable discretion, and such decision shall not be subject to challenge by CMI pursuant to the dispute resolution provisions of this Consent Decree or in any other forum.

(2)     CMI shall submit a written proposal for a revised or alternative performance guarantee to EPA, MMD and NMED that shall specify, at a minimum, the estimated cost of completing the Work, the basis upon which such cost was calculated, and the proposed revised performance guarantee, including all proposed instruments or other documents required in order to make the proposed performance guarantee legally binding. The proposed revised or alternative performance guarantee must satisfy all requirements set forth or incorporated by reference in this Section. CMI shall submit such proposed revised or alternative performance guarantee to the EPA Regional Financial Management Officer in accordance with Section XXV (Notices and Submissions), with a copy to Section Chief, Enforcement Assessment Section, Superfund Division, U.S. Environmental Protection Agency, Region 6, 1445 Ross Ave., Suite 1200, Dallas, TX 75202. EPA will notify CMI in writing of its decision to accept or reject a revised or alternative performance guarantee submitted pursuant to this Paragraph. Within ten days after receiving a written decision approving the proposed revised or alternative performance guarantee, CMI shall execute and/or otherwise finalize all instruments or other documents required in order to make the selected performance guarantee(s) legally binding in a form substantially identical to the documents submitted to EPA as part of the proposal, and such performance guarantee(s) shall thereupon be fully effective. CMI shall submit copies of all executed and/or otherwise finalized instruments or other documents required in order to make the selected performance guarantee(s) legally binding to the EPA Regional Financial Management Officer in accordance with Section XXV (Notices and Submissions) within 30 days after receiving a written decision approving the proposed revised or alternative performance guarantee, with a copy to Section Chief, Enforcement Assessment Section, Superfund Division, U.S. Environmental Protection Agency, Region 6, 1445 Ross Ave., Suite 1200, Dallas, TX 75202, and to the United States, EPA and the State as specified in Section XXV.

c. <u>Release of Performance Guarantee</u>. CMI shall not release, cancel, or discontinue any performance guarantee provided pursuant to this Section except as provided in this Paragraph. If CMI receives written notice from EPA in accordance with Paragraph 48 that the Work has been fully and finally completed in accordance with the terms of this Consent Decree, or if EPA otherwise so notifies CMI in writing, CMI may thereafter release, cancel, or discontinue the performance guarantee(s) provided pursuant to this Section. In the event of a dispute, CMI may release, cancel, or discontinue the performance guarantee(s) required hereunder only in accordance with a final administrative or judicial decision resolving such dispute pursuant to Section XVIII (Dispute Resolution).

## XIII. CERTIFICATION OF COMPLETION

48. <u>Completion of the Work</u>.

a. Within 90 days after CMI concludes that all phases of the Work have been fully performed, CMI shall schedule and conduct a pre-certification inspection to be attended by CMI, EPA and the State. If, after the pre-certification inspection, CMI still believes that the Work has been fully performed, CMI shall submit to EPA and the State a written report by a registered professional engineer stating that the Work has been completed in full satisfaction of the requirements of this Consent Decree. The report shall contain the following statement and be signed by a responsible corporate official of CMI or CMI's Project Coordinator:

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

b.     If, after review of the written report, EPA, after reasonable opportunity for review, inspection and comment by the State, determines that any portion of the Work has not been completed in accordance with this Consent Decree, EPA will notify CMI in writing of the activities that must be undertaken by CMI pursuant to this Consent Decree to complete the Work, provided, however, that EPA may only require CMI to perform such activities pursuant to this Paragraph to the extent that such activities are consistent with the "scope of the remedy set forth in the ROD," as that term is defined in Paragraph 14.a. EPA will set forth in the notice a schedule for performance of such activities consistent with the Consent Decree and the SOW or require CMI to submit a schedule to EPA and the State for EPA's approval pursuant to Section X (EPA Approval of Plans, Reports, and Other Deliverables). CMI shall perform all activities described in the notice in accordance with the specifications and schedules established therein, subject to its right to invoke the dispute resolution procedures set forth in Section XVIII (Dispute Resolution).

c.     If EPA concludes, based on the initial or any subsequent request for Certification of Completion of the Work by CMI and after a reasonable opportunity for review, inspection and comment by the State, that the Work has been performed in accordance with this Consent Decree, EPA will so notify CMI in writing.

XIV.     EMERGENCY RESPONSE

49.     If any event occurs during the performance of the Work that causes or threatens a release of Waste Material on, at or from the Site and either constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, CMI shall, subject to Paragraph 50, immediately take all appropriate actions to prevent, abate, or minimize such release or threat of release, and shall immediately notify EPA's Project Coordinator, or, if the Project Coordinator is unavailable, EPA's Alternate Project Coordinator. If neither of these persons is available, CMI shall notify the EPA Response and Prevention Branch, Region 6, at 866-372-7745.

In addition, CMI shall notify the National Response Center at 800-424-8802 as well as NMED's Project Coordinator and MMD's Project Coordinator. CMI shall take such actions in consultation with EPA's Project Coordinator or other available authorized EPA officer and in accordance with all applicable provisions of the Health and Safety Plans, the Contingency Plans, and any other applicable plans or documents developed pursuant to the SOW. In the event that CMI fails to take appropriate response action as required by this Section, and EPA or, as appropriate, the State takes such action instead, CMI shall reimburse EPA and the State all costs of the response action under Section XV (Payments for Response Costs).

50. Subject to Section XX (Covenants by Plaintiffs), nothing in the preceding Paragraph or in this Consent Decree shall be deemed to limit any authority of the United States, or the State, (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, or (b) to direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site.

## XV.  PAYMENTS FOR RESPONSE COSTS

51. <u>Payment by CMI for the United States' Past Response Costs.</u>

    a. Within 45 days after the Effective Date, CMI shall pay to EPA $5,269,949.78 in payment for Past Response Costs. Payment shall be made in accordance with Paragraphs 53.a (Instructions for Past Response Cost Payments).

    b. The total amount to be paid by CMI pursuant to Paragraph 51.a shall be deposited by EPA in the Chevron Questa Mine Superfund Site Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

52.   Payments by CMI for Future Response Costs.  CMI shall pay to EPA all Future Response Costs not inconsistent with the NCP.

a.   On a periodic basis, EPA will send CMI a bill requiring payment that includes a Certified Cost Documentation Package (which includes direct and indirect costs incurred by EPA, its contractors, the State and DOJ).  CMI shall make all payments within 45 days after CMI's receipt of each bill requiring payment, except as otherwise provided in Paragraph 54, in accordance with Paragraphs 53.b (Instructions for Future Response Cost Payments).

b.   CMI shall receive a credit of $1,810,000 to reflect prepayment previously made to EPA under the Removal AOC (EPA Docket No. 06-09-12) and the Early Design AOC (EPA Docket No. 06-13-12). If the first bill under paragraph 52.a. is less than $1,810,000, the remaining credit shall apply to succeeding bills issued under paragraph 52.a.

c.   The total amount to be paid by CMI to EPA pursuant to Paragraph 52.a. shall be deposited by EPA in the Chevron Questa Mine Superfund Site Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

d.   This Consent Decree shall supersede the requirements of Paragraph 43 of the Removal AOC and Paragraph 52 of the Early Design AOC.

53.   Payment Instructions for CMI Payments to EPA.

a.   Instructions for Past Response Costs Payments.  All payments to EPA required elsewhere in this Consent Decree to be made in accordance with this Paragraph 53.a shall be made at https://www.pay.gov to the U.S. Department of Justice account, in accordance with instructions provided to CMI by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the District of New Mexico after the Effective Date.  Any payments exceeding $9.9 million and required, elsewhere in this Consent Decree, to be made in accordance with this

Paragraph may be made by Fedwire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice account in accordance with current EFT procedures, and in accordance with instructions provided to CMI by the FLU after the Effective Date. The payment instructions provided by the Financial Litigation Unit shall include a Consolidated Debt Collection System ("CDCS") number, which shall be used to identify all payments required to be made in accordance with this Consent Decree. The FLU shall provide the payment instructions to:

> Chevron Environmental Management Company
> ATTN: Michael D. Coats, Questa Project Manager
> 345 State Road 38
> P.O. Box 469
> Questa, NM 87556
> (575) 586-7507
> MichaelCoats@chevron.com

on behalf of CMI. CMI may change the individual to receive payment instructions on its behalf by providing written notice of such change in accordance with Section XXV (Notices and Submissions). When making payments under this Paragraph 53.a, CMI shall also comply with Paragraph 53.c.

> b.    Instructions for Future Response Costs Payments and Stipulated Penalties.

All payments to EPA required, elsewhere in this Consent Decree, to be made in accordance with this Paragraph 53.b shall be made by Fedwire EFT to:

> Federal Reserve Bank of New York
> ABA = 021030004
> Account = 68010727
> SWIFT address = FRNYUS33
> 33 Liberty Street
> New York NY 10045
> Field Tag 4200 of the Fedwire message should read:
>      "D 68010727 Environmental Protection Agency"

When making payments under this Paragraph 53.b, CMI shall also comply with Paragraph 53.c.

c. <u>Instructions for All Payments</u>. All payments to EPA made under Paragraphs 53.a (Instructions for Past Response Cost Payments) or 53.b (Instructions for Future Response Cost Payments and Stipulated Penalties) shall reference the CDCS Number, Site/Spill ID Number 06DL, and DOJ Case Number 90-11-3-10261. At the time of any payment required to be made in accordance with Paragraphs 53.a or 53.b, CMI shall send notice that payment has been made to the United States in accordance with Section XXV (Notices and Submissions), to the EPA Cincinnati Finance Center by email at acctsreceivable.cinwd@epa.gov, by U.S. mail to 26 Martin Luther King Drive, Cincinnati, Ohio 45268, and to Section Chief, Enforcement Assessment Section, Superfund Division, U.S. Environmental Protection Agency, Region 6, 1445 Ross Avenue, Suite 1200, Dallas, TX 75202. Such notice shall also reference the CDCS Number, Site/Spill ID Number, and DOJ Case Number.

54. <u>Instructions for stipulated penalty payments to the State</u>. Any stipulated penalty payments payable under Section XIX to NMED shall be made by certified or cashier's checks payable to "State of New Mexico" and referencing the Chevron Questa Mine Superfund Site and shall be sent to:

> Director, Water Protection Division
> New Mexico Environment Department
> Post Office Box 5469
> Santa Fe, New Mexico 87502-5469

A copy of the check and transmittal letter shall be sent to counsel for NMED.

Any stipulated penalty payments payable under Section XIX to EMNRD shall be made by certified or cashier's checks payable to "State of New Mexico" and referencing the Chevron Questa Mine Superfund Site and shall be sent to:

> Director, Mining and Minerals Division,
> New Mexico Energy, Minerals and Natural Resources Department
> 1220 South St. Francis Drive
> Santa Fe, New Mexico 87505

A copy of the check and transmittal letter shall be sent to counsel for EMNRD.

55.    CMI may contest any Future Response Costs billed under Paragraph 52 (Payments by CMI for Future Response Costs) if it determines that EPA or the State has made a mathematical error or included a cost item that is not within the definition of Future Response Costs, or if it believes EPA or the State incurred excess costs as a direct result of an EPA or State action that was inconsistent with a specific provision or provisions of the NCP. Such objection shall be made in writing within 45 days after receipt of the bill and must be sent to the United States and the State pursuant to Section XXV (Notices and Submissions). Any such objection shall specifically identify the contested Future Response Costs and the basis for objection. In the event of an objection, CMI shall pay all uncontested Future Response Costs to the United States within 45 days after CMI's receipt of the bill requiring payment. Simultaneously, CMI shall establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the Federal Deposit Insurance Corporation ("FDIC"), and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs. CMI shall send to the United States, as provided in Section XXV (Notices and Submissions), a copy of the transmittal letter and (i) a check paying the uncontested Future Response Costs, (ii) a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established and (iii) a bank statement showing the initial balance of the escrow account. Simultaneously with establishment of the escrow account, CMI shall initiate the Dispute Resolution procedures in Section XVIII (Dispute Resolution). If the United States prevails in the dispute, CMI shall pay the sums due (with accrued Interest) to the United States within five working days after the resolution of the dispute. If CMI prevails concerning any aspect of the contested costs, CMI shall pay that portion of the costs (plus associated accrued Interest) for

which it did not prevail to the United States, within five working days after the resolution of the dispute. CMI shall be disbursed any balance of the escrow account. All payments to the United States under this Paragraph shall be made in accordance with Paragraphs 53.b (Instructions for Future Response Costs Payments and Stipulated Penalties). The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XVIII (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding CMI's obligation to reimburse the United States and the State for their Future Response Costs.

56.     Interest. In the event that any payment for Past Response Costs or for Future Response Costs required under this Section is not made by the date required, CMI shall pay Interest on the unpaid balance. The Interest to be paid on Past Response Costs under this Paragraph shall begin to accrue on the Effective Date. The Interest on all subsequent Future Response Costs shall begin to accrue on the date of the bill. The Interest shall accrue through the date of CMI's payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to EPA or the State by virtue of CMI's failure to make timely payments under this Section including, but not limited to, payment of stipulated penalties pursuant to Paragraph 72.

XVI.    INDEMNIFICATION AND INSURANCE

57.     CMI's Indemnification of the United States and the State.

a.      The United States and the State do not assume any liability by entering into this Consent Decree or by virtue of any designation of CMI as EPA's authorized representatives under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e). CMI shall indemnify, save and hold harmless the United States, the State, and their officials, agents, agencies, employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of CMI, its officers, directors, employees, agents, agencies, contractors, subcontractors, invitees and any persons acting on its

behalf or under its control, in carrying out activities pursuant to this Consent Decree, including, but not limited to, any claims arising from any designation of CMI as EPA's authorized representatives under Section 104(e) of CERCLA. Further, CMI agrees to pay the United States and the State all costs it incurs including, but not limited to, attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States or the State based on negligent or other wrongful acts or omissions of CMI, its officers, directors, employees, agents, agencies, contractors, subcontractors, and any persons acting on its behalf or under its control, in carrying out activities pursuant to this Consent Decree. Neither the United States nor the State shall be held out as a party to any contract entered into by or on behalf of CMI in carrying out activities pursuant to this Consent Decree. Neither CMI nor any such contractor shall be considered an agent of the United States or the State.

b.      The United States and the State shall give CMI notice of any claim for which the United States or the State plans to seek indemnification pursuant to this Paragraph 57, and shall consult with CMI prior to settling such claim.

58.      CMI covenants not to sue and agrees not to assert any claims or causes of action against the United States and the State, respectively, for damages or reimbursement or for set-off of any payments made or to be made to the United States or the State, arising from or on account of any contract, agreement, or arrangement between any CMI and any person for performance of the Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, CMI shall indemnify and hold harmless the United States and the State with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between CMI and any person for performance of the Work on or relating to the Site, including, but not limited to, claims on account of construction delays.

59.     No later than 15 days before commencing any on-site Work, CMI shall secure, and shall maintain until the first anniversary after the issuance of EPA's Certification of Completion of the Work pursuant to Paragraph 48.c., commercial general liability insurance with limits of $2 million dollars, for any one occurrence, and automobile liability insurance with limits of $2 million dollars, combined single limit, naming the United States and the State as additional insureds with respect to all liability arising out of the activities performed by or on behalf of CMI pursuant to this Consent Decree. In addition, for the duration of this Consent Decree, CMI shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of CMI in furtherance of this Consent Decree. Prior to commencement of the Work under this Consent Decree, CMI shall provide to EPA and the State certificates of such insurance and a copy of each insurance policy. CMI shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date. If CMI demonstrates by evidence satisfactory to EPA and the State that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, CMI need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor.

XVII.   FORCE MAJEURE

60.     "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of CMI, of any entity controlled by CMI, or of CMI's contractors that delays or prevents the performance of any obligation under this Consent Decree despite CMI's best efforts to fulfill the obligation. The requirement that CMI exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential

force majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible. "Force majeure" does not include financial inability to complete the Work or a failure to achieve the Performance Standards.

61.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree for which CMI intends or may intend to assert a claim of force majeure, CMI shall notify EPA's Project Coordinator orally or, in his or her absence, EPA's Alternate Project Coordinator or, in the event both of EPA's designated representatives are unavailable, the Director of the Superfund Division, EPA Region 6, within 72 hours of when CMI first knew that the event might cause a delay. Within ten working days of when CMI first knew the event might cause a delay, CMI shall provide in writing to EPA and the State an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; CMI's rationale for attributing such delay to a force majeure; and a statement as to whether, in the opinion of CMI, such event may cause or contribute to an endangerment to public health or welfare, or the environment. CMI shall include with any notice all available documentation supporting its claim that the delay was attributable to a force majeure. CMI shall be deemed to know of any circumstance of which CMI, any entity controlled by CMI, or CMI's contractors knew or should have known. Failure to comply with the above requirements regarding an event shall preclude CMI from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late notice, is able to assess to its satisfaction whether the event is a force majeure under Paragraph 60 and whether CMI has exercised its best efforts under Paragraph 60, EPA may, in its unreviewable discretion, excuse in writing CMI's failure to submit timely notices under this Paragraph.

62.     If EPA, after a reasonable opportunity for review and comment by the State, agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this Consent Decree that are affected by the force majeure will be extended by EPA, after a reasonable opportunity for review and comment by the State, for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance of any other obligation. If EPA, after a reasonable opportunity for review and comment by the State, does not agree that the delay or anticipated delay has been or will be caused by a force majeure, EPA will notify CMI in writing of its decision. If EPA, after a reasonable opportunity for review and comment by the State, agrees that the delay is attributable to a force majeure, EPA will notify CMI in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

63.     If CMI elects to invoke the dispute resolution procedures set forth in Section XVIII (Dispute Resolution), it shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, CMI shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that CMI complied with the requirements of Paragraphs 60 and 61. If CMI carries this burden, the delay at issue shall be deemed not to be a violation by CMI of the affected obligation of this Consent Decree identified to EPA and the Court.

### XVIII. DISPUTE RESOLUTION

64.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes regarding this

Consent Decree or its implementation. However, the procedures set forth in this Section shall not apply to actions by the United States or the State to enforce obligations of CMI that have not been disputed in accordance with this Section. Moreover, nothing in this Section shall affect the dispute resolution procedures set forth in the WQA, the NMMA, State Regulations, or State Permits, as they may apply to disputes that are not regarding this Consent Decree or its implementation.

65.     Any dispute regarding this Consent Decree or its implementation shall in the first instance be the subject of informal negotiations between the parties to the dispute. The period for informal negotiations shall not exceed 20 days from the time the dispute arises, unless it is modified by written agreement of the parties to the dispute. The dispute shall be considered to have arisen when one party sends the other parties a written Notice of Dispute.

66.     <u>Statements of Position</u>. In the event that the parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by EPA (or, in disputes involving the State and CMI exclusively, the State) shall be considered binding unless, within 14 days after the conclusion of the informal negotiation period, CMI invokes the formal dispute resolution procedures of this Section by serving on the United States and the State a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by CMI. The Statement of Position shall specify CMI's position as to whether formal dispute resolution should proceed under Paragraph 67 (Record Review) or Paragraph 68.

a.     Within 30 days after receipt of CMI's Statement of Position, EPA (or the State, as appropriate) will serve on CMI its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA. This Statement of Position shall include a statement as to whether formal dispute

resolution should proceed under Paragraph 67 (Record Review) or Paragraph 68. Within 30 days after receipt of EPA's (or the State's) Statement of Position, CMI may submit a Reply.

b. If there is disagreement between EPA (or the State, as appropriate) and CMI as to whether dispute resolution should proceed under Paragraph 67 (Record Review) or Paragraph 68, the parties to the dispute shall follow the procedures set forth in the paragraph determined by EPA to be applicable. However, if CMI ultimately appeals to the Court to resolve the dispute, the Court shall determine which paragraph is applicable in accordance with the standards of applicability set forth in Paragraphs 67 and 68.

67. <u>Record Review.</u> Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph. For purposes of this Paragraph, the adequacy of any response action includes, without limitation, the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by EPA under this Consent Decree, and the adequacy of the performance of response actions taken pursuant to this Consent Decree. Nothing in this Consent Decree shall be construed to allow any dispute by CMI regarding the validity of the ROD's provisions.

a. An administrative record of the dispute shall be maintained by EPA and shall contain all statements of position, including supporting documentation, submitted pursuant to this Section. Where appropriate, EPA may allow submission of supplemental statements of position by the parties to the dispute.

b. The Director of the Superfund Division, EPA Region 6, will issue a final administrative decision resolving the dispute based on the administrative record described in

Paragraph 67.a. This decision shall be binding upon CMI, subject only to the right to seek judicial review pursuant to Paragraphs 67.c and 67.d.

   c. Any administrative decision made by EPA pursuant to Paragraph 67.b shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by CMI with the Court and served on all Parties within ten days after receipt of EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this Consent Decree. The United States may file a response to CMI's motion.

   d. In proceedings on any dispute governed by this Paragraph, CMI shall have the burden of demonstrating that the decision of the Superfund Division Director is arbitrary and capricious or otherwise not in accordance with law. Judicial review of EPA's decision shall be on the administrative record maintained pursuant to Paragraph 67.a.

   68. Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under applicable principles of administrative law, shall be governed by this Paragraph.

   a. Following receipt of CMI's Statement of Position submitted pursuant to Paragraph 66, the Director of the Superfund Division, EPA Region 6, will issue a final decision resolving the dispute. The Superfund Division Director's decision shall be binding on CMI unless, within ten days after receipt of the decision, CMI files with the Court and serves on the parties a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be

resolved to ensure orderly implementation of the Consent Decree. The United States may file a response to CMI's motion.

b.    Notwithstanding Paragraph P (CERCLA Section 113(j) Record Review of ROD and Work) of Section I (Background), above, judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

69.    The invocation of formal dispute resolution procedures under this Section shall not extend, postpone, or affect in any way any obligation of CMI under this Consent Decree, not directly in dispute, unless EPA or the Court agrees otherwise. Stipulated penalties with respect to the disputed matter shall continue to accrue but payment shall be stayed pending resolution of the dispute as provided in Paragraph 77. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this Consent Decree. In the event that CMI does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XIX (Stipulated Penalties).

XIX.    STIPULATED PENALTIES

70.    CMI shall be liable for stipulated penalties in the amounts set forth in Paragraphs 72 and 73 to the United States and the State, divided equally, for CMI's failure to comply with the requirements of this Consent Decree specified below, unless excused under Section XVII (Force Majeure). "Compliance" by CMI shall include completion of all payments and activities required under this Consent Decree, or any plan, report, or other deliverable approved under this Consent Decree, in accordance with all applicable requirements of law, this Consent Decree, the SOW, and any plans, reports, or other deliverables approved under this Consent Decree and within the specified time schedules established by and approved under this Consent Decree.

71.    The assessment or collection of penalties pursuant to this Section XIX shall not relieve CMI of its obligation to pay penalties assessed by the State pursuant to State law, including

without limitation, the NMMA, the WQA, State Regulations or State Permits, provided, however, that the State shall not seek penalties under State law for any violation that is also subject to a stipulated penalty under this Section XIX. All parties reserve their rights and defenses with respect to any penalties assessed by the State relating to the Site.

72. Stipulated Penalty Amounts.

    a. Stipulated Penalty Amounts - Other Than Monthly Progress Reports. The following stipulated penalties shall accrue per violation per day for each failure to complete a deliverable in a timely manner or produce a deliverable of acceptable quality, or for any other non-compliance with this Consent Decree with the exception of monthly progress reports as described in Paragraph b:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1000 | 1st through 14th day |
| $2000 | 15th through 30th day |
| $4,250 | 31st day and beyond |

    b. Stipulated Penalty Amounts - Monthly Progress Reports. The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate monthly progress reports pursuant to Paragraph 28:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 | 1st through 14th day |
| $1000 | 15th through 30th day |
| $2500 | 31st day and beyond |

73. In the event that EPA assumes performance of a portion or all of the Work pursuant to Paragraph 84 (Work Takeover), CMI shall be liable for a stipulated penalty in the amount of $750,000. Stipulated penalties under this Paragraph are in addition to the remedies available under Paragraphs 46 (Funding for Work Takeover) and 84 (Work Takeover).

74.     All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity.  However, stipulated penalties shall not accrue:  (a) with respect to a deficient submission under Section X (EPA Approval of Plans, Reports, and Other Deliverables), during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies CMI of any deficiency; (b) with respect to a decision by the Director of the Superfund Division, EPA Region 6, under Paragraph 67.b or 68.a of Section XVIII (Dispute Resolution), during the period, if any, beginning on the 21st day after the date that CMI's reply to EPA's Statement of Position is received until the date that the Director issues a final decision regarding such dispute; or (c) with respect to judicial review by this Court of any dispute under Section XVIII (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute.  Nothing in this Consent Decree shall prevent the simultaneous accrual of separate penalties for separate violations of this Consent Decree.

75.     Following EPA's determination that CMI has failed to comply with a requirement of this Consent Decree, EPA may give CMI written notification of the same and describe the noncompliance.  EPA and the State may send CMI a written demand for the payment of the penalties.  However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified CMI of a violation.

76.     All penalties accruing under this Section shall be due and payable to the United States and the State within 45 days after CMI's receipt from EPA of a demand for payment of the penalties, unless CMI invokes the Dispute Resolution procedures under Section XVIII (Dispute Resolution) within the 45-day period.  All payments to the United States under this Section shall indicate that the

payment is for stipulated penalties and shall be made in accordance with Paragraph 53.b

(Instructions for Future Response Cost Payments and Stipulated Penalties). All payments to the

State under this Section shall indicate that the payment is for stipulated penalties and shall be made

in accordance with Paragraph 54 (Instructions for stipulated penalty payment to the State).

77.     Penalties shall continue to accrue as provided in Paragraph 74 during any dispute

resolution period, but need not be paid until the following:

      a.      If the dispute is resolved by agreement of the Parties or by a decision of EPA

that is not appealed to this Court, accrued penalties determined to be owed shall be paid to EPA and

the State within 30 days after the agreement or the receipt of EPA's decision or order;

      b.      If the dispute is appealed to this Court and the United States prevails in whole

or in part, CMI shall pay all accrued penalties determined by the Court to be owed to EPA and the

State within 60 days after receipt of the Court's decision or order, except as provided in

Paragraph 77.c;

      c.      If the District Court's decision is appealed by any Party, CMI shall pay all

accrued penalties determined by the District Court to be owed to the United States and the State into

an interest-bearing escrow account, established at a duly chartered bank or trust company that is

insured by the FDIC, within 60 days after receipt of the Court's decision or order. Penalties shall be

paid into this account as they continue to accrue, at least every 60 days. Within 15 days after receipt

of the final appellate court decision, the escrow agent shall pay the balance of the account to EPA

and the State or to CMI to the extent that it prevails.

78.     If CMI fails to pay stipulated penalties when due, CMI shall pay Interest on the

unpaid stipulated penalties as follows: (a) if CMI has timely invoked dispute resolution such that the

obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution,

Interest shall accrue from the date stipulated penalties are due pursuant to Paragraph 77 until the date of payment; and (b) if CMI fails to timely invoke dispute resolution, Interest shall accrue from the date of demand under Paragraph 76 until the date of payment. If CMI fails to pay stipulated penalties and Interest when due, the United States or the State may institute proceedings to collect the penalties and Interest.

79.     The payment of penalties and Interest, if any, shall not alter in any way CMI's obligation to complete the performance of the Work required under this Consent Decree.

80.     Nothing in this Consent Decree shall be construed as prohibiting, altering, or in any way limiting the ability of the United States or the State to seek any other remedies or sanctions available by virtue of CMI's violation of this Consent Decree or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(*l*) of CERCLA, 42 U.S.C. § 9622(*l*), provided, however, that the United States shall not seek civil penalties pursuant to Section 122(*l*) of CERCLA for any violation for which a stipulated penalty is provided in this Consent Decree, except in the case of a willful violation of this Consent Decree.

81.     Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Consent Decree.

XX.     COVENANTS BY PLAINTIFFS

82.     Covenants for CMI by United States. In consideration of the actions that will be performed and the payments that will be made by CMI under this Consent Decree, and except as specifically provided in Paragraph 83 (General Reservations of Rights) of this Section, the United States covenants not to sue or to take administrative action against CMI for the Work, Past Response Costs, and Future Response Costs pursuant to (a) Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606, 9607(a); (b) Section 7003 of RCRA, 42 U.S.C. § 6973; and (c) Section 311(f) of

the FWPCA, 42 U.S.C. § 1321(f), except as to the costs or expenses incurred in the assessment, restoration or replacement of natural resources damaged or destroyed as a result of a discharge of hazardous substances or oil that are recoverable under FWPCA Section 311(f)(4) or (5). These covenants shall take effect upon the Effective Date. These covenants are conditioned upon the satisfactory performance by CMI of its obligations under this Consent Decree. These covenants extend only to CMI and CMI's Related Parties and not to any other person.

83.  General Reservations of Rights. The United States reserves, and this Consent Decree is without prejudice to, all rights against CMI and CMI's Related Parties with respect to all matters not expressly included within the United States' covenant. Notwithstanding any other provision of this Consent Decree, the United States reserves all rights against CMI and CMI's Related Parties with respect to:

a.  liability for failure by CMI to meet a requirement of this Consent Decree;

b.  liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Site;

c.  liability based on the ownership of the Site by CMI when such ownership commences after signature of this Consent Decree by CMI;

d.  liability based on the operation of the Site by CMI when such operation commences after signature of this Consent Decree by CMI and does not arise solely from CMI's performance of the Work;

e.  liability based on CMI's transportation, treatment, storage, or disposal, or arrangement for transportation, treatment, storage, or disposal of Waste Material at or in connection with the Site, other than as provided in the ROD, the Work, or otherwise ordered by EPA, after signature of this Consent Decree by CMI;

f.      liability for damages for injury to, destruction of, or loss of natural resources and for the costs of any natural resource damage assessments that was not otherwise resolved in *U.S. and State of New Mexico v. Chevron Mining, Inc.*, 14-cv-783 (KBM-SCY) (D.N.M);

g.      criminal liability;

h.      liability for violations of federal or state law that occur during or after implementation of the Work;

i.      liability, prior to achievement of Performance Standards in accordance with Paragraph 13, for additional response actions that EPA determines are necessary to achieve and maintain Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the ROD, but that cannot be required pursuant to Paragraph 14 (Modification of SOW or Related Work Plans);

j.      liability for additional operable units at the Site or the final response action;

k.      liability for costs that the United States will incur regarding the Site but that are not within the definition of Future Response Costs; and

l.      all claims, including but not limited to claims under Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), and all defenses that the United States has or could assert in *Chevron Mining Inc. v. United States of America, et al.*, Case number 1:13-cv-00328 (MCA)(SMV)(D.N.M), in the event that the reservation of rights in Paragraph 90(c), below, becomes operative.

84.     <u>Work Takeover.</u>

a.      In the event EPA determines that CMI has (1) ceased implementation of any portion of the Work, or (2) is seriously or repeatedly deficient or late in its performance of the Work, or (3) are implementing the Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Work Takeover Notice") to CMI. Any Work

Takeover Notice issued by EPA will specify the grounds upon which such notice was issued and will provide CMI a period of ten days within which to remedy the circumstances giving rise to EPA's issuance of such notice.

b.  If, after expiration of the ten-day notice period specified in Paragraph 84.a, CMI has not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, EPA may at any time thereafter assume the performance of all or any portion(s) of the Work as EPA deems necessary ("Work Takeover"). EPA will notify CMI in writing (which writing may be electronic) if EPA determines that implementation of a Work Takeover is warranted under this Paragraph 84.b. Funding of Work Takeover costs is addressed under Paragraph 46.

c.  CMI may invoke the procedures set forth in Paragraph 67 (Record Review), to dispute EPA's implementation of a Work Takeover under Paragraph 84.b. However, notwithstanding CMI's invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA may in its sole discretion commence and continue a Work Takeover under Paragraph 84.b until the earlier of (1) the date that CMI remedies, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, or (2) the date that a final decision is rendered in accordance with Paragraph 67 (Record Review) requiring EPA to terminate such Work Takeover.

85.  Notwithstanding any other provision of this Consent Decree, the United States and the State retain all authority and reserve all rights to take any and all response actions authorized by law.

86.  Covenants for CMI by the State. In consideration of the actions that will be performed and the payments that will be made by CMI under this Consent Decree, and except as

specifically provided in Paragraph 87 (Reservations of State's Rights) of this Section, the State covenants not to sue or to take administrative action against CMI under Section 107(a) of CERCLA, Section 505 of the FWPCA, Section 7002 of RCRA, the NMMA, the WQA, the Hazardous Waste Act (NMSA 1978, Chapter 74, Article 4), the Department of Environment Act (NMSA 1978, Sections 9-7A-1 through 9-7A-12), NMSA 1978, Section 30-8-8 (abatement of public nuisance), and common law for the Work, Past Response Costs (State), and Future Response Costs. These covenants shall take effect upon the Effective Date. These covenants are conditioned upon the satisfactory performance by CMI of their obligations under this Consent Decree. These covenants extend only to CMI and CMI's Related Parties and do not extend to any other person.

87.    Reservation of State's Rights. Nothing in this Decree shall limit (i) the authority of NMED or MMD to require CMI to provide financial assurance pursuant to the NMMA, WQA, State Permits and State Regulations, or (ii) the authority of NMED or MMD, pursuant to the NMMA, WQA, State Permits and State Regulations regarding matters other than the Work. Nothing in this Decree shall be construed to be a waiver of the State's immunity from suit under the United States Constitution, the New Mexico Constitution or New Mexico law. The State reserves, and this Consent Decree is without prejudice to, all rights against CMI and CMI's Related Parties with respect to all matters not expressly included within the State's covenant. Notwithstanding any other provision of this Consent Decree, the State reserves all rights against CMI and CMI's Related Parties with respect to:

        a.      liability for failure by CMI to meet a requirement of this Consent Decree;

        b.      liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Site;

c.      liability based on the ownership of the Site by CMI when such ownership commences after signature of this Consent Decree by CMI;

d.      liability for damages for injury to, destruction of, or loss of natural resources and for the costs of any natural resource damage assessments that was not otherwise resolved in *U.S. and State of New Mexico v. Chevron Mining, Inc.*, 14-cv-783 (KBM-SCY) (D.N.M);

e.      criminal liability;

f.      liability for violations of federal or state law that occur during or after implementation of the Work;

g.      liability, prior to achievement of Performance Standards in accordance with Paragraph 13, for additional response actions that EPA determines are necessary to achieve and maintain Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the ROD, but that cannot be required pursuant to Paragraph 14 (Modification of SOW or Related Work Plans);

h.      liability for additional operable units at the Site or the final response action;

i.      liability for costs that the State will incur regarding the Site but that are not within the definition of Future Response Costs; and

j.      any claims that may arise against CMI or CMI's Related Parties for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee or contractor of CMI or CMI's Related Parties, while such employee or contractor is acting within the scope of his or her employment.

XXI.   COVENANTS BY CMI

88.    <u>Covenants by CMI</u>. Subject to the reservations in Paragraph 90, CMI and CMI's Related Parties covenant not to sue and agree not to assert any claims or causes of action against the

United States or the State with respect to the Work, past response actions regarding the Site, Past Response Costs, Future Response Costs, and this Consent Decree, including, but not limited to:

a. any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through CERCLA Sections 106(b)(2), 107, 111, 112 or 113, or any other provision of law;

b. any claims under CERCLA Sections 107 or 113, RCRA Section 7002(a), 42 U.S.C. § 6972(a), or state law regarding the Work, past response actions regarding the Site, Past Response Costs, Future Response Costs, and this Consent Decree; or

c. any claims arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the New Mexico Constitution, the Tucker Act, 28 U.S.C. §1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law.

89. Except as provided in Paragraph 92 (Claims Against De Micromis Parties) and Paragraph 99 (Res Judicata and Other Defenses), the covenants in this Section shall not apply if the United States or the State brings a cause of action or issues an order pursuant to any of the reservations in Section XX (Covenants by Plaintiffs), other than in Paragraphs 83.a (claims for failure to meet a requirement of the Consent Decree), 83.g (criminal liability), and 83.h (violations of federal/state law during or after implementation of the Work), but only to the extent that CMI's claims arise from the same response action, response costs, or damages that the United States or the State is seeking pursuant to the applicable reservation.

90. CMI and CMI's Related Parties reserve, and this Consent Decree is without prejudice to:

a. claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, and brought pursuant to any statute other than CERCLA or

RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States, as that term is defined in 28 U.S.C. § 2671, while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, the foregoing shall not include any claim based on EPA's selection of response actions, or the oversight or approval of CMI's plans, reports, other deliverables, or activities;

        b.     claims against the State, to the extent allowed by and subject to the provisions of the New Mexico Tort Claims Act, NMSA 1978, §§ 41-4-1 to -30 (2013), for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee of the State, as defined in NMSA 1978, § 41-4-3, while such employee is acting within the scope of his or her employment. However, the foregoing reservation shall not include any claim based on the oversight or approval of CMI's plans, reports, other deliverables, or activities; and

        c.     CMI's right to assert all claims and defenses that it has asserted or could assert in *Chevron Mining Inc. v. United States of America, et al.*, Case number 1:13-cv-00328 (MCA)(SMV)(D.N.M), including in any appeal or other proceedings following the final judgment entered in that case on September 30, 2015.

91.     Nothing in this Consent Decree shall be deemed to constitute preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

92.     Claims Against De Micromis Parties. CMI agrees not to assert any claims and to waive all claims or causes of action (including but not limited to claims or causes of action under

Sections 107(a) and 113 of CERCLA) that it may have for all matters relating to the Site against any person where the person's liability to CMI with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if all or part of the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material containing hazardous substances contributed by such person to the Site was less than 110 gallons of liquid materials or 200 pounds of solid materials.

93. The waiver in Paragraph 92 (Claims Against De Micromis Parties) shall not apply with respect to any defense, claim, or cause of action that CMI may have against any person meeting the criteria in Paragraph 92 if such person asserts a claim or cause of action relating to the Site against CMI. This waiver also shall not apply to any claim or cause of action against any person meeting the criteria in Paragraph 92 if EPA determines:

      a. that such person has failed to comply with any EPA requests for information or administrative subpoenas issued pursuant to Section 104(e) or 122(e) of CERCLA, 42 U.S.C. § 9604(e) or 9622(e), or Section 3007 of RCRA, 42 U.S.C. § 6927, or has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the Site, or has been convicted of a criminal violation for the conduct to which this waiver would apply and that conviction has not been vitiated on appeal or otherwise; or

      b. that the materials containing hazardous substances contributed to the Site by such person have contributed significantly, or could contribute significantly, either individually or in the aggregate, to the cost of response action or natural resource restoration at the Site.

### XXII. EFFECT OF SETTLEMENT; CONTRIBUTION

94. Nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree. Each of the Parties expressly

reserves any and all rights (including, but not limited to, pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action that each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto. Nothing in this Consent Decree diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

95.      The Parties agree, and by entering this Consent Decree this Court finds, that this Consent Decree constitutes a judicially approved settlement pursuant to which CMI has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for "matters addressed" in this Consent Decree. The "matters addressed" in this Consent Decree are the Work, Past Response Costs, Future Response Costs and Past Response Costs (State).

96.      The Parties further agree, and by entering this Consent Decree this Court finds, that the complaint filed by the United States in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this Consent Decree constitutes a judicially approved settlement pursuant to which CMI has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

97.      CMI shall, with respect to any suit or claim brought by it for matters related to this Consent Decree, notify the United States and the State in writing no later than 60 days prior to the

initiation of such suit or claim. Paragraphs 97 and 98 do not apply in any way to *Chevron Mining Inc. v. United States of America, et al.*, Case number 1:13-cv-00328 (MCA)(SMV)(D.N.M).

98. CMI shall, with respect to any suit or claim brought against it for matters related to this Consent Decree, notify in writing the United States and the State within ten days after service of the complaint on such Settling Defendant. In addition, CMI shall notify the United States and the State within ten days after service or receipt of any Motion for Summary Judgment and within ten days after receipt of any order from a court setting a case for trial.

99. <u>Res Judicata and Other Defenses</u>. In any subsequent administrative or judicial proceeding initiated by the United States or the State for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, CMI shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Section XX (Covenants by Plaintiffs).

### XXIII. ACCESS TO INFORMATION

100. CMI shall provide to EPA and the State, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within CMI's possession or control or that of its contractors or agents relating to activities at the Site or to the implementation of this Consent Decree, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work. CMI shall also make available to EPA and the State, for purposes

of investigation, information gathering, or testimony, its employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

101.    Nothing in this Decree shall be construed to limit the information gathering authority of EPA or the State under CERCLA 104(e), 42 U.S.C. § 9604(e), the WQA, NMSA 1978, § 74-6-9(E), the NMMA, or any other provision of federal or state law.

102.    Business Confidential and Privileged Documents.

    a.    CMI may assert business confidentiality claims covering part or all of the Records submitted to Plaintiffs under this Consent Decree to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), 40 C.F.R. § 2.203(b), and State law.  Records determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B by EPA.  Records determined to be confidential by the State will be afforded the protection specified in State law.  If no claim of confidentiality accompanies Records when they are submitted to EPA and the State, or if EPA has notified CMI that the Records are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to CMI.

    b.    CMI may assert that certain Records are privileged under the attorney-client privilege or any other privilege recognized by federal law.  If CMI asserts such a privilege in lieu of providing Records, it shall provide Plaintiffs with the following:  (1) the title of the Record; (2) the date of the Record; (3) the name, title, affiliation (e.g., company or firm), and address of the author of the Record; (4) the name and title of each addressee and recipient; (5) a description of the contents of the Record; and (6) the privilege asserted by CMI.  If a claim of privilege applies only to a portion of a Record, the Record shall be provided to the United States or the State in redacted form to mask the privileged portion only.  CMI shall retain all Records that it claims to be privileged until the

United States, or the State, respectively, has had a reasonable opportunity to dispute the privilege claim and any such dispute has been resolved in CMI's favor.

      c.     No Records created or generated pursuant to the requirements of this Consent Decree shall be withheld from the United States or the State on the grounds that they are privileged or confidential.

103.    CMI may make no claim of privilege or protection regarding any data regarding the Site, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological or engineering data, or the portion of any other Record that evidences conditions at or around the Site.

104.    Notwithstanding the foregoing, the State's responsibilities regarding the preservation and protection of confidentiality of documents claimed by CMI to be Confidential Business Information shall be governed exclusively by the New Mexico Inspection of Public Records Act (NMSA 1978, §§ 14-2-1 et seq.) or as otherwise provided by State law.

## XXIV. RETENTION OF RECORDS

105.    Until ten years after CMI's receipt of EPA's notification pursuant to Paragraph 48.c (Completion of the Work), CMI shall preserve and retain all non-identical copies of Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to its liability under CERCLA with respect to the Site and, in addition, all Records that relate to the liability of any other person under CERCLA with respect to the Site. CMI shall also retain, and instruct its contractors and agents to preserve, for the same period of time specified above, all non-identical copies of the last draft or final version of any Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to the performance of the Work, provided, however, that CMI (and its contractors and agents) must retain, in addition, copies of all data generated during

the performance of the Work and not contained in the aforementioned Records required to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

106. At the conclusion of this record retention period, CMI shall notify the United States and the State at least 90 days prior to the destruction of any such Records, and, upon request by the United States or the State, CMI shall deliver any such Records to EPA or the State. CMI may assert that certain Records are privileged under the attorney-client privilege or any other privilege recognized by federal law. If CMI asserts such a privilege, it shall provide Plaintiffs with the following: (a) the title of the Record; (b) the date of the Record; (c) the name, title, affiliation (e.g., company or firm), and address of the author of the Record; (d) the name and title of each addressee and recipient; (e) a description of the subject of the Record; and (f) the privilege asserted by CMI. If a claim of privilege applies only to a portion of a Record, the Record shall be provided to the United States or the State in redacted form to mask the privileged portion only. CMI shall retain all Records that it claims to be privileged until the United States or the State, respectively, has had a reasonable opportunity to dispute the privilege claim and any such dispute has been resolved in CMI's favor. However, no Records created or generated pursuant to the requirements of this Consent Decree shall be withheld on the grounds that they are privileged or confidential.

107. CMI certifies that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its potential CERCLA liability regarding the Site since the receipt of EPA's Special Notice Letter by CMI's predecessor, Molycorp, Inc., on November 6, 2000, and that it has fully complied with any and all EPA and State requests for information regarding the Site

pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6927.

### XXV. NOTICES AND SUBMISSIONS

108. Whenever, under the terms of this Consent Decree, written notice is required to be given or a report or other document is required to be sent by one Party to another, it shall be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other Parties in writing. All notices and submissions shall be considered effective upon receipt, unless otherwise provided. Written notice as specified in this Section shall constitute complete satisfaction of any written notice requirement of the Consent Decree with respect to the United States, EPA, the State, and CMI, respectively. Notices required to be sent to EPA, and not to the United States, under the terms of this Consent Decree should not be sent to the U.S. Department of Justice.

As to the United States:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Re: DJ # 90-11-3-10261

As to EPA:

Chevron Questa Mine Site
Remedial Project Manager
Superfund Division
U.S. Environmental Agency Region 6
1445 Ross Avenue, Suite 1200
Dallas, Texas 75202
Phone: 214-665-6749
Fax: 214-665-6660
Email: Baumgarten.gary@epa.gov

As to the State:

Director, Water Protection Division
New Mexico Environment Department
P. O. Box 5469
Santa Fe, New Mexico 87502

Telephone: (505) 827-1758
Fax: (505) 827-2965

and

Questa Project Manager
Mining Act Reclamation Program
Mining and Minerals Division
Energy, Mining and Natural Resources Department
1220 S. St. Francis Drive
Santa Fe, New Mexico 87505
Telephone: (505) 476-3437
Fax: (505) 476-3402

As to CMI:

Michael D. Coats
Questa Project Coordinator
Chevron Environmental Management Company
ATTN: Michael D. Coats
345 State Road 38
P.O. Box 469
Questa, NM 87556
(575) 586-7507
michaelcoats@chevron.com

## XXVI. RETENTION OF JURISDICTION

109. This Court retains jurisdiction over both the subject matter of this Consent Decree and CMI for the duration of the performance of the terms and provisions of this Consent Decree for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this Consent Decree, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XVIII (Dispute Resolution).

## XXVII.      APPENDICES

110. The following appendices are attached to and incorporated into this Consent Decree:

"Appendix A" is the SOW and its attachments.

"Appendix B" is the Initial Performance Guarantee referenced in Paragraph 43, above.

## XXVIII. COMMUNITY INVOLVEMENT

111. If requested by EPA or the State, CMI shall participate in community involvement activities pursuant to the community involvement plan to be developed by EPA. EPA will determine the appropriate role for CMI under the plan. CMI shall also cooperate with EPA and the State in providing information regarding the Work to the public. As requested by EPA or the State, CMI shall participate in the preparation of such information for dissemination to the public and in public meetings that may be held or sponsored by EPA or the State to explain activities at or relating to the Site. Costs incurred by the United States or the State under this Section, including the costs of any technical assistance grant under Section 117(e) of CERCLA, 42 U.S.C. § 9617(e), shall be considered Future Response Costs that CMI shall pay pursuant to Section XV (Payments for Response Costs).

## XXIX. MODIFICATION

112. Except as provided in Paragraph 14 (Modification of SOW or Related Work Plans), material modifications to this Consent Decree, including the SOW, shall be in writing, signed by the United States and CMI, and shall be effective upon approval by the Court. Except as provided in Paragraph 14, non-material modifications to this Consent Decree, including the SOW, shall be in writing and shall be effective when signed by duly authorized representatives of the United States and CMI. All modifications to the Consent Decree, other than to the SOW, also shall be signed by the State, or a duly authorized representative of the State, as appropriate. A modification to the SOW shall be considered material if it fundamentally alters the basic features of the selected remedy within the meaning of 40 C.F.R. § 300.435(c)(2)(ii). Before providing its approval to any modification to the SOW, the United States will provide the State with a reasonable opportunity to review and comment on the proposed modification.

113.    Nothing in this Consent Decree shall be deemed to alter the Court's power to enforce, supervise, or approve modifications to this Consent Decree.

## XXX.   LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

114.    This Consent Decree shall be lodged with the Court for a period of not less than 30 days for public notice and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7.  The United States and the State each reserve the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations that indicate that the Consent Decree is inappropriate, improper, or inadequate.  CMI consents to the entry of this Consent Decree without further notice.

115.    If for any reason the Court should decline to approve this Consent Decree in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

## XXXI. SIGNATORIES/SERVICE

116.    The undersigned representatives of CMI, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, the Cabinet Secretary for the New Mexico Environment Department, and the Cabinet Secretary for the New Mexico Energy, Minerals and Natural Resources Department each certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind such Party to this document.

117.    CMI agrees not to oppose entry of this Consent Decree by this Court or to challenge any provision of this Consent Decree unless the United States has notified CMI in writing that it no longer supports entry of the Consent Decree.

118.    CMI shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on behalf of that Party

with respect to all matters arising under or relating to this Consent Decree. CMI agrees to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons. CMI need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

XXXII.    FINAL JUDGMENT

119.    This Consent Decree and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties regarding the settlement embodied in the Consent Decree. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

SO ORDERED THIS 28TH DAY OF April, 2017

_William P. Lynch_
United States Magistrate Judge, by consent

Signature Page for Consent Decree regarding the Chevron Questa Mine Superfund Site

**FOR THE UNITED STATES OF AMERICA**:

8/8/16
Date

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20530

NICOLE VEILLEUX
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 616-8746 (phone)
(202) 514-8395 (fax)
nicole.veilleux@usdoj.gov

Signature Page for Consent Decree regarding the Chevron Questa Mine Superfund Site

**FOR THE UNITED STATES OF AMERICA:**

DAMON P. MARTINEZ
United States Attorney, District of New Mexico

HOWARD R. THOMAS
Assistant United States Attorney
201 3rd Street, NW, Suite 900
Albuquerque, NM 87102
505-224-1508
Howard.thomas@usdoj.gov

Signature Page for Consent Decree regarding the Chevron Questa Mine Superfund Site

**FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:**

Carl E. Edlund
Director, Superfund Division
U.S. Environmental Protection Agency
Region 6
1445 Ross Avenue, Suite 1200
Dallas, Texas 75202-2722

Elizabeth Pletan
Assistant Regional Counsel
U.S. Environmental Protection Agency
Region 6
1445 Ross Avenue, Suite 1200
Dallas, Texas 75202-2722

Signature Page for Consent Decree regarding the Chevron Questa Mine Superfund Site

**FOR THE STATE OF NEW MEXICO:**

HECTOR BALDERAS
Attorney General

7/14/16
Date

William Grantham
Assistant Attorney General
408 Galisteo Street
Santa Fe, New Mexico 85701

Signature Page for Consent Decree regarding the Chevron Questa Mine Superfund Site

**FOR THE STATE OF NEW MEXICO:**

6 - 20 - 2016
Date

Ryan Flynn
Cabinet Secretary
New Mexico Environment Department
1190 St. Francis Drive
Suite N4050
Santa Fe, New Mexico 87505

6/2-/16
Date

Jennifer Hower – Certifying Legal Sufficiency
Deputy General Counsel
New Mexico Environment Department
121 Tijeras Ave., NE, Suite 1000
Albuquerque, New Mexico 87102-3400

Signature Page for Consent Decree regarding the Chevron Questa Mine Superfund Site

**FOR THE STATE OF NEW MEXICO:**

6-28-16
Date

David Martin
Cabinet Secretary
New Mexico Energy, Minerals and Natural Resources
Department
1220 South St. Francis Drive
Santa Fe, New Mexico 87505

June 28, 2016
Date

Bill Brancard – Certifying Legal Sufficiency
General Counsel
New Mexico Energy, Minerals and Natural Resources
Department
1220 South St. Francis Drive
Santa Fe, New Mexico 87505

Signature Page for Consent Decree regarding the Chevron Questa Mine Superfund Site

**FOR CHEVRON MINING, INC.**

7/14/16
Date

Robert R. John
President
Chevron Mining Inc.
6001 Bollinger Canyon Road
San Ramon, CA 94583-2324

Agent Authorized to Accept Service on Behalf of
Above-signed Party:

Steven M. Jawetz
Beveridge & Diamond, P.C.
1350 I Street, N.W., Suite 700
Washington, DC 20005-3311

Louis W. Rose
Montgomery & Andrews, P.A.
P.O. Box 2307
325 Paseo de Peralta
Santa Fe, New Mexico 87504-2307

Signature Page for Consent Decree regarding the Chevron Questa Mine Superfund Site

**FOR CHEVRON MINING, INC.**

_____
Date

_____
Robert R. John
President
Chevron Mining Inc.
6001 Bollinger Canyon Road
San Ramon, CA 94583-2324


Agent Authorized to Accept Service on Behalf of
Above-signed Party:

_____
Steven M. Jawetz
Beveridge & Diamond, P.C.
1350 I Street, N.W., Suite 700
Washington, DC 20005-3311


_____
Louis W. Rose
Montgomery & Andrews, P.A.
P.O. Box 2307
325 Paseo de Peralta
Santa Fe, New Mexico 87504-2307

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

_____
                                                     )
UNITED STATES OF AMERICA,          )
STATE OF NEW MEXICO, and           )
NEW MEXICO ENVIRONMENT          )
DEPARTMENT,                                      )
                                                     )
                          Plaintiffs,              )
                                                     )
v.                                                       )          Civil Action No. _16-904 WPL/SCY_
                                                     )
CHEVRON MINING INC.,                   )
                                                     )
                          Defendant.             )
_____)

**APPENDIX A TO THE FIRST PARTIAL CONSENT DECREE:**

**STATEMENT OF WORK**
**FOR THE FIRST PARTIAL REMEDIAL DESIGN AND REMEDIAL ACTION (RD/RA)**
**CONSENT DECREE**
**AT THE CHEVRON QUESTA MINE SUPERFUND SITE**

**QUESTA, NEW MEXICO**
**CERCLIS ID NO: NMD002899094**

# Table of Contents

| | | |
|---|---|---|
| 1. | INTRODUCTION | 1 |
| 2. | PURPOSE | 2 |
| 3. | BACKGROUND INFORMATION | 2 |
| 4. | ROLE OF EPA | 4 |
| 5. | PARTIAL RD/RA WORK TO BE PERFORMED | 5 |
| 5.1. | Mine Site Area | 6 |
| 5.1.1. | Surface-based Mine Dewatering System Operation & Maintenance | 6 |
| 5.1.2. | New Groundwater Extraction System | 7 |
| 5.1.3. | Performance Monitoring | 7 |
| 5.1.4. | New Mine Site Area Water Treatment Plant | 8 |
| 5.2. | Tailing Facility Area | 8 |
| 5.2.1. | Tailing Facility Cover Demonstration Pilot Project | 8 |
| 5.2.2. | Excavate Soil at the Dry/Maintenance Area | 12 |
| 5.2.3. | Upgrade Tailing Facility Seepage Interception Systems | 13 |
| 5.2.4. | Install and Operate Groundwater Extraction Well System | 14 |
| 5.2.5. | Monitor Groundwater and Surface Water | 15 |
| 5.2.6. | Monitor and Maintain Tailing Dams | 16 |
| 5.2.7. | General Site Maintenance | 16 |
| 5.3. | Eagle Rock Lake | 16 |
| 5.3.1. | Operation of Inlet Control Structure | 17 |
| 5.3.2. | Performance Monitoring of Eagle Rock Lake Remediation | 18 |
| 6. | PERFORMANCE STANDARDS | 18 |
| 6.1. | Remedial Action Objectives | 19 |
| 6.2. | Remediation Goals | 19 |

**7.**         **GENERAL REQUIREMENTS** ................................................... **19**

**7.1.**        **Deliverables** .................................................................. **19**

**7.2.**        **Personnel, Materials and Services** ................................ **21**

**7.3.**        **Communication** ............................................................ **21**

**7.4.**        **Monthly Progress Reports** .......................................... **21**

**7.5.**        **Attendance at Meetings** ............................................... **22**

**7.6.**        **Field Operation Office and Equipment** ..................... **23**

**7.7.**        **Community Relations Support** ................................... **23**

       7.7.1.      Attendance at Community Relations Events: ........................... 23

       7.7.2.      Logistics and Presentation Support: ........................................ 24

       7.7.3.      Technical Support: ................................................................... 24

       7.7.4.      Fact Sheet Preparation Support: .............................................. 24

       7.7.5.      Information Repository Support: .............................................. 24

**8.**         **REMEDIAL DESIGN REQUIREMENTS** .......................... **25**

**8.1.**        **Site-Wide Plans** .......................................................... **25**

       8.1.1.      General Project Schedule ......................................................... 26

       8.1.2.      Site Management Plan ............................................................. 26

       8.1.3.      Health and Safety Plan ............................................................ 27

       8.1.4.      Sampling and Analysis Plans ................................................... 28

       8.1.5.      Data Management Plan ............................................................ 30

       8.1.6.      Contingency Plan ................................................................... 30

**9.**         **REMEDIAL DESIGN** ........................................................ **31**

**9.1**        **Tailing Facility Cover Demonstration Pilot Project** .......................... **31**

       9.1.1.      Pre-Final Design ..................................................................... 31

       9.1.2.      Final Design ............................................................................ 33

       9.1.3.      Update Overall Site Plan ......................................................... 34

       9.1.4.      Implement Tailing Facility Cover Demonstration Pilot Project ............... 34

       9.1.5.      Construction Phase .................................................................. 34

       9.1.6.      Monitoring Phase .................................................................... 38

**9.2.**        **Tailing Facility Groundwater Extraction Well System** ...................... **42**

| | | |
|---|---|---|
| 9.2.1. | Pre-final Remedial Design | 42 |
| 9.2.2. | Final Remedial Design | 43 |
| **10.** | **REMEDIAL ACTION** | **44** |
| **10.1.** | **Project Planning and Support** | **44** |
| 10.1.1. | Attend Scoping Meetings | 45 |
| 10.1.2. | Conduct Site Visits | 45 |
| 10.1.3. | Develop Draft RA Project Work Plans | 45 |
| 10.1.4. | RA Project Work Plan Elements | 45 |
| 10.1.5. | Revise Draft RA Project Work Plans | 46 |
| 10.1.6. | Update Site-wide Plans | 46 |
| **10.2.** | **Construction Phase** | **50** |
| 10.2.1. | Attend Pre-Construction Meeting | 50 |
| 10.2.2. | Advance Notice of Start of Construction | 50 |
| 10.2.3. | RA Project Construction | 51 |
| 10.2.4. | RA Project Construction Completion | 54 |
| 10.2.5. | Mine Site Water Treatment Plant RA Project Construction Completion | 57 |
| 10.2.6. | Surface Based Mine Dewatering System RA Project Construction Completion | 58 |
| 10.2.7. | Dry/Maintenance Area Soil Excavation RA Project Completion | 58 |
| **10.3** | **Monitoring, Operation and Maintenance** | **61** |
| 10.3.1 | O&M Plan and O&M Manual | 62 |
| 10.3.2 | Performance Monitoring Plans | 63 |
| 10.3.3 | Eagle Rock Lake Performance Monitoring | 64 |
| 10.3.4 | Operation and Maintenance of Remedial Actions | 65 |
| 10.3.5 | Performance Monitoring | 66 |
| 10.3.6 | Annual Remedial Action Effectiveness Report | 66 |
| **11** | **FIVE-YEAR REVIEWS** | **68** |

**ATTACHMENTS**

Attachment 1          Questa Mine Site (Figure 1-2, Final FS Report)

Attachment 2          Questa Tailing Facility (Figure 1-3, Final FS Report)

Attachment 3          Lower Sulphur Gulch Extraction System

Attachment 4          Tailing Facility Area (Figure 12-26, ROD)

Attachment 5          Tailing Facility Cover Demonstration Pilot Project Area

Attachment 6          Regulations and Guidance Documents

Attachment 7          Summary of Major Deliverables

# STATEMENT OF WORK
# FOR THE FIRST PARTIAL
# REMEDIAL DESIGN AND REMEDIAL ACTION

# CHEVRON QUESTA MINE SUPERFUND SITE
# QUESTA, NEW MEXICO

## 1.   INTRODUCTION

This Statement of Work ("SOW") sets forth the framework and requirements for implementation of the work ("Work") described in this First Partial Remedial Design/Remedial Action Consent Decree ("Consent Decree" or "Decree"), to be performed at the Chevron Questa Mine Superfund Site ("the Site") (CERCLIS ID No. NMD002899094). The Site is located in and near the Village of Questa (Questa) in Taos County, New Mexico. The Site consists of a molybdenum mine and milling facility located approximately four miles east of the Village of Questa on land currently owned and operated by CMI. The mine includes underground mine workings, an historic open pit, nine waste rock dumps or piles surrounding the open pit and a subsidence area which represents a surface-collapse feature above the ore extraction area. The Site also includes a tailing pipeline running parallel to State Highway 38, the area in the vicinity of the pipeline and the Tailing Facility in the Village of Questa. The Site also includes all other areas where any hazardous substance, pollutant or contaminant from the Molycorp, Inc. (or successor) mining, milling and tailing disposal operations is located.

Maps of the Site are provided as Attachments 1 (Figure 1-2, the mine and milling facility) and 2 (Figure 1-3, the tailing impoundments) to this SOW, and incorporated by reference.

## 2.    PURPOSE

The purpose of this SOW is to set forth the framework, requirements and schedules for the performance of the Work as required by the Consent Decree.  The Work includes certain Remedial Design (RD) and Remedial Action (RA) activities, monitoring activities, and Operation and Maintenance (O&M) activities, consistent with the selected remedy for the Site, which is set forth in the Record of Decision (ROD) for the Site (issued by the U.S. EPA on December 20, 2010 (CERCLA SDMS # 9158694).  The remaining aspects of the Selected Remedy have been performed pursuant to Administrative Settlement Agreements and Orders on Consent as discussed in Section 3 or will be performed at a later date.

## 3.    BACKGROUND INFORMATION

**Site History:**  From 1919 to August 31, 2007, Molycorp, Inc. owned and operated a molybdenum mine on what is now the CMI Property. Underground mining operations were conducted from 1919 to 1958, resumed in 1981, and continued until June 2014. After molybdenum was extracted at the milling facility located at the Mine Site Area, the tailing was transported to the Tailing Facility where it was deposited in tailing impoundments. In addition to the underground mining operations, open pit mining was conducted at the Site from 1965 to 1983 by Molycorp, Inc. During open pit mining operations, approximately 328 million tons of acid-generating waste rock were excavated and deposited in nine large waste rock piles surrounding the open pit.

**The Site and its Setting:** As discussed in the ROD, the Site has been divided into the following five areas for clean-up: (1) the mine; (2) a milling facility; (3) a tailing facility; (4) the area of the Red River and associated riparian zone south of the tailing facility; and (5) Eagle Rock Lake.

Both the mine site and the milling facility are located in the Sangre de Cristo Mountains and the tailing facility is located in the Rio Grande Rift. Seepage from the tailing impoundments and acidic metal-laden leachate generated from the weathering of the waste rock piles at the mine site have contaminated groundwater and surface water. Past operating practices resulted in adjacent surface soil being contaminated with molybdenum. A small lake, known as Eagle Rock Lake, is located along the Red River and receives water from the river through an inlet gate. Sediments in Eagle Rock Lake were contaminated with heavy metals. The principal pollutants found at one or more locations at the Site include aluminum, arsenic, cadmium, chromium, cobalt, fluoride, lead, manganese, molybdenum, polychlorinated biphenyls (PCBs), sulfate, zinc and uranium.

**Prior Investigations and Clean-up Activities:** CMI conducted a Remedial Investigation/Feasibility Study (RI/FS) at the Site pursuant to an Administrative Order on Consent for RI/FS (hereinafter, "RI/FS AOC"), dated September 2001. EPA conducted a baseline human health risk assessment and baseline ecological risk assessment for the Site concurrently with CMI's RI/FS.

Following completion of these efforts, EPA selected a Remedy for the Site, which is embodied in a Record of Decision ("ROD"), dated December 20, 2010. The entire ROD consists of 1,052 pages, exclusive of appendices, tables and figures. The Site was added to the National Priorities List on September 16, 2011.

On March 7, 2012, EPA and CMI entered into an Administrative Settlement Agreement and Order on Consent for Removal Actions, according to which CMI agreed to perform certain removal actions at the Site (hereinafter, "Removal AOC") (CERCLA Docket #06-09-12). CMI is still performing the work required pursuant to the Removal AOC.

On September 26, 2012, EPA and CMI entered into a second Administrative Settlement Agreement and Order on Consent for Early Design Actions (hereinafter, "Early Design AOC") (CERCLA Docket #06-13-12), according to which the parties agreed to undertake Early Design Actions that will be used to implement portions of the selected remedy for the Site. CMI is still performing the work required pursuant to the Early Design AOC. On September 30, 2014, EPA and CMI entered into the First Amendment to the Early Design AOC ("First Amendment"). The First Amendment expanded the scope of the Early Design AOC to include three additional early design projects: 1) design of a groundwater extraction system to collect drainage from one of the roadside waste rock piles, 2) design of groundwater extraction systems to enhance existing seepage barriers at the tailings facility, and 3) design and construction of a pilot surface-based mine dewatering system.

On November 13, 2014, EPA and CMI entered into the Second Amendment to the Early Design AOC ("Second Amendment"). The Second Amendment further expands the scope of the Early Design AOC to include two more early design projects: 1) design of the grading plan for the tailing facility and 2) design and construction of field trials of waste rock cover material.

## 4.    ROLE OF EPA

EPA will provide oversight of Chevron Mining Inc.'s (CMI's) Work. This will include the review and comment on deliverables such as work plans, reports, and other submittals related to the RD/RA. EPA's acceptance or approval of deliverables is administrative in nature and allows CMI to proceed to the next steps in implementing the Work. EPA's acceptance or approval does not imply any warranty of performance, nor does it imply that the Work, when completed, will meet performance standards and be accepted by EPA. Acceptance or approval of plans, reports,

and other required submittals by EPA does not relieve CMI or its contractors of responsibility for the adequacy of the submittal or from their professional responsibilities. Pursuant to Section VI of the Consent Decree (Performance of the Work), EPA retains the right to not accept any of the deliverables, including submittals associated with contractor selection, work plans, reports, schedules, or any other deliverables required by the Consent Decree, including this SOW. EPA may require that CMI submit detailed information to demonstrate that any contractor, subcontractor, or analytical laboratory selected is qualified to conduct the Work, including information on personnel qualifications, equipment and material specifications.

## 5. PARTIAL RD/RA WORK TO BE PERFORMED

CMI shall perform the Work in this Consent Decree and this SOW, including the Remedial Design (RD), Remedial Action (RA), and Operation and Maintenance (O&M) activities that are described herein and that are part of the Selected Remedy set forth in the ROD or in the Tailings Facility Cover Demonstration Pilot Project, set forth in section 5.2.1 of this SOW. The Work, as set forth herein, will take place in three areas of the Site: the Mine Site Area; the Tailing Facility Area; and Eagle Rock Lake. The Work to be performed in each area is described below.

The RD activities to be performed include a Tailing Facility Cover Demonstration Pilot Project (5.2.1) and, if certain conditions occur, the design of a Tailing Facility Groundwater Extraction Well System (5.2.4). The RA activities to be performed are divided into the following Remedial Action Projects ("RA Projects"):

A. Surface-based Mine Dewatering System (5.1.1);

B. Mine Site Groundwater Extraction System (5.1.2);

C. Mine Site Area Water Treatment Plant (5.1.4);

D. Excavation of Soil at Dry/Maintenance Area (5.2.2);

E. Seepage Barrier Upgrade (5.2.3); and

F. Tailing Facility Groundwater Extraction System (5.2.4).

The O&M activities to be performed include monitoring of Mine Site groundwater at various locations, monitoring of the Tailing Facility groundwater and surface water, monitoring and maintenance of the Tailings Dams, and monitoring, operation, and maintenance of the Eagle Rock Lake remedy.

## 5.1. Mine Site Area

### 5.1.1. Surface-based Mine Dewatering System Operation & Maintenance

Upon receipt of written EPA approval of the Surface-based Mine Dewatering System Completion Report under Section 6.11.3.2.6 of Revision 3 of the Statement of Work for Early Design Actions ("Early Design SOW"), CMI may request EPA's approval of the Construction Phase of the Surface-based Mine Dewatering System, as described in Section 10.2.7 of this SOW (Certification of RA Project Completion). Following EPA's Certification of Completion of the Surface-based Mine Dewatering System RA Project, CMI shall perform long-term operation and maintenance O&M of the mine dewatering system consistent with the O&M Manual and O&M Plan approved under Section 6.11 of the Early Design SOW.

CMI shall update the O&M Manual and O&M Plan to reflect any modifications to the system that EPA or CMI determines are needed. CMI must promptly notify EPA of any such modifications to the O&M Manual or the O&M Plan.

Following the Effective Date of this Decree, if EPA determines, based on a recommendation made by CMI or for any other reason, that one or more design modifications are needed, CMI

shall submit a pre-final design report for such design modifications to EPA for review and approval no later than 60 days following EPA's request. CMI shall submit a final design report for such modifications within 30 days after receipt of EPA's comments on the pre-final design report for those modifications.

### 5.1.2. New Groundwater Extraction System

CMI shall construct and operate a new groundwater extraction system in the pre-mine drainage of the Sulphur Gulch South Waste Rock Pile, the Lower Sulphur Gulch drainage. The general location of this extraction system is identified on Attachment 3 as "Lower Sulphur Gulch Extraction System." The purpose of this groundwater extraction system is to capture impacted groundwater in the Lower Sulphur Gulch colluvium before it enters the Red River alluvial aquifer. CMI shall construct and operate the extraction system so the extracted water is pumped to and treated with lime for pH adjustment at Sump 5000 until the water treatment plant located at the Mine Site Area is in operation. The extracted water will then be pumped to the water treatment plant. CMI shall use the approved "Lower Sulphur Gulch Waste Rock Pile Drainage Groundwater Extraction System Final Design Report" submitted under the First Amendment to the Early Design AOC to construct and operate the extraction system.

### 5.1.3. Performance Monitoring

CMI shall monitor performance of the Lower Sulphur Gulch Groundwater Extraction System and the Surface-based Mine Dewatering System to assess the effectiveness of the systems on attaining performance standards in alluvial, colluvial and bedrock groundwater. Monitoring shall include sampling of the existing monitoring well network and any other monitoring wells installed under the CERCLA action for alluvial, colluvial and bedrock groundwater in the mine site tributary drainages. Monitoring shall also include sampling of seeps and springs along the

Red River in the Mine Site Area. Upon written request by CMI and approval by EPA, in consultation with the State, the number of monitoring locations, the specific parameters, and the frequency of monitoring may be reduced over time.

### 5.1.4. New Mine Site Area Water Treatment Plant

CMI is constructing a new water treatment plant at the mine site. Although Section 300.400(e) of the National Contingency Plan (NCP) does not require CMI to obtain an National Pollutant Discharge Elimination System (NPDES) permit for effluent discharges to waters of the United States from the water treatment plant, the Selected Remedy set forth in the ROD requires CMI to obtain an NPDES permit for all effluent discharges to surface water from the water treatment plant. Once CMI has completed construction of the new Mine Site Area Water Treatment Plant and EPA determines that the waters being collected by the selected remedy are being treated to meet discharge requirements included in the NPDES permit CMI has already obtained, CMI may request EPA's approval of the Construction Phase as described in Section 10.2.5 of the SOW.

Following construction of the new mine site area water treatment plant, CMI shall perform long-term O&M of the Mine Site Area Water Treatment Plant as described in Section 10.3.1.A of this SOW.

## 5.2. Tailing Facility Area

### 5.2.1. Tailing Facility Cover Demonstration Pilot Project

CMI shall conduct a cover demonstration Pilot Project (Pilot Project) on approximately 275 acres of the Dam 1 tailing impoundment of the Chevron Questa Mine Tailing Facility. A map of the Pilot Project area is shown on Attachment 5.

The purpose of the Pilot Project is (1) to determine whether a two-foot thick cover can be successfully designed, constructed and maintained such that it is adequately protective of soil and groundwater, can be successfully revegetated, and can be maintained over time, and (2) to support an inquiry into whether the CERCLA remedy, as it pertains to cover thickness at the tailing facility, should be modified accordingly. This project serves as a pilot demonstration project because it is the first area of the tailing facility to be addressed and because it will test the effectiveness of the two-foot cover thickness during an initial five-year period. CMI shall design, construct, and maintain the Pilot Project in such a manner so as to achieve the Pilot Project success criteria outlined below.

To evaluate the cover's effectiveness in protecting groundwater, CMI shall install three (3) instrumented vertical profiles with nested matric suction and water content sensors in each of three decision units (DUs) of approximately 100 acres each, for a total of nine (9) profiles across the three DUs. The sensor profile locations shall be representative of the textural characteristics of the Dam 1 tailing impoundment based on available data and selected in consultation with the agencies. CMI shall collect five (5) years of performance monitoring data from the installed sensors to develop a calibrated evaporative flux model. CMI shall use the calibrated evaporative flux model along with the long-term climate data from the Cerro Station to provide an estimate of the water balance of the cover and tailing system. CMI shall evaluate the performance of the cover using the long-term average precipitation and net percolation through the cover, as described further below.

To evaluate the cover's effectiveness in establishing sufficient vegetation, CMI shall compare vegetative performance to standards developed from measurements obtained from one or more reference area(s). This process shall be based on EMNRD's "*Closeout Plan Guidelines for*

*Existing Mines"* – *"Attachment 2, Revegetation Standards and Sampling Methods"* (1996).

CMI, in consultation with the agencies, shall select, and propose for EPA's review and approval, one or more reference area(s) that are in good range condition at the time of selection. CMI shall sample the reference area(s) for canopy cover by species (which will also yield diversity data) and shrub density. CMI shall use data collected from the reference area(s) to establish technical standards for review and approval by EPA. The technical standards approved by EPA will be used by EPA to determine the success of the Pilot Project in establishing sufficient vegetation, as discussed further below.

CMI may reseed or inter-seed the area only if (1) such seeding occurs no later than the start of the third growing season; and (2) there is less than an average of 1 seeded species per square foot. EPA will evaluate the success of the cover in establishing sufficient vegetation at the end of the fifth growing season regardless of any effort by CMI to reseed or inter-seed the area as mentioned above. That is, reseeding or inter-seeding will not, in any case, restart the timeframe for the demonstration Pilot Project, though it may affect application of the success criteria as discussed in success criterion C(3) below.

To evaluate the ability of the cover to be maintained over time, CMI shall design and construct the cover using alluvial materials from the northern portion of the Tailing Facility property. CMI shall design and construct the cover to ensure that it will achieve positive drainage. For purposes of this Pilot Project, CMI may design the cover system such that overall grade of the cover is less than 1-5% as required under the ROD. In no event shall the cover system design incorporate an overall grade of less than 0.5%.

EPA will evaluate the success of the Pilot Project after five growing seasons on the basis of the following four performance success criteria. The end of the fifth growing season shall be six years following completion of seeding of the cover.

EPA will make a determination that the Pilot Project has succeeded if it concludes, after five growing seasons, that the cover is showing progress toward a self-sustaining ecosystem through the satisfaction of all the following criteria:

A. **Surface Soil:** Concentrations of molybdenum in soil (sampled to 3 inches below ground surface) averaged within each of the three decision units (of approximately 100 acres each) are maintained at or below the Tailing Facility soil remediation goal of 41 mg/kg molybdenum;

B. **Groundwater:** Based on predictions using the calibrated evaporative flux model and the long term precipitation record (Cerro Station), there is a 90% probability that, in any given year, net percolation averaged across the entire cover demonstration project would be limited to less than 5% of mean annual precipitation.

C. **Vegetation:**

(1) Canopy Cover: Total canopy cover is ≥40% of the total canopy cover present at the selected reference area(s).

(2) Diversity:

a. Presence of 3 species of native perennial grasses

b. Presence of 2 species of native perennial forbs

   c. Presence of 2 species of native shrubs

  (3) Contingency: If circumstances unrelated to cover depth (for example, adverse climatic conditions) result or may result in non-achievement of the foregoing vegetation criteria by the end of the fifth growing season, such non-achievement of these criteria will not preclude success of the Pilot Project if CMI performs an evaluation and demonstrates, to EPA's satisfaction, that the pilot project area is likely to achieve the ARARs for vegetation success in the long term.

 D. **Cover Integrity:** The cover does not show significant deterioration from erosion, slip-offs, or other impacts that cannot be repaired through normal operation and maintenance (O&M). CMI shall, no later than the end of the fifth growing season, provide documentation to EPA that demonstrates that the cover achieves positive drainage (i.e., that required grades have been maintained and that any observed ponding has been or can be addressed through normal O&M).

5.2.2. **Excavate Soil at the Dry/Maintenance Area**

Prior to covering and revegetating the tailing impoundments, CMI shall excavate an area of soil south of the dry/maintenance area where soil sample TSS11-4 indicates molybdenum levels over 41 ppm. The excavated soil shall be placed in the tailing impoundments. Based on sampling conducted in January 2015, the volume of affected soil to be excavated is estimated to be less than 200 cubic yards ($yd^3$). The general location of the soil to be excavated is indicated in Attachment 4 (Figure 12-26) as soil sample location TSS11-4. CMI shall revegetate all disturbed areas within the dry/maintenance area. At its election, CMI may perform this work pursuant to an addendum to the Phase 2 Demolition and Decommissioning Plan (established

pursuant to Mining Act Permit No. TA001RE), which addendum must be approved by NMED and MMD before the Effective Date of this Consent Decree. CMI shall, no later than 180 days after the Effective Date, certify to EPA that the work has been completed consistent with the ROD and shall request a certification of completion of that portion of the RA as described in Section 10.2.7 of this SOW and Section VIII of the Consent Decree.

### 5.2.3. Upgrade Tailing Facility Seepage Interception Systems

There are two seepage interception systems located at the tailing facility which have been operating since 1975 and have had multiple phases of upgrades. The current Outfall 002 interception system is located south of Dam No. 1 and includes the lower 002 seepage barrier. CMI shall upgrade the Outfall 002 system by adding new groundwater extraction wells across the Dam No. 1 arroyo just downgradient of the location of the existing lower 002 seepage barrier. The general location of this upgrade is identified on Attachment 4 (Figure 12-26) as "New Lower 002 Extraction Wells."

The current Outfall 003 seepage interception system includes seepage barriers across the drainage on the eastern slope of Dam No. 4 and an extraction well, EW-1. CMI shall upgrade the Outfall 003 system by installing a new, deeper seepage collection system. The general location of this upgrade is identified on Attachment 4 (Figure 12-26) as "New 003 Seepage Barrier."

CMI shall construct and operate the Lower 002 and Upper 003 upgrades utilizing the approved "Tailing Facility Seepage Barrier Upgrade Final Design Report" developed under the Second Amendment to the Early Design AOC.

### 5.2.4. Install and Operate Groundwater Extraction Well System

CMI shall sample the groundwater downgradient of the historic buried tailing (in the area of monitoring wells MW-4 and MW-17) to assess the effectiveness of piping of irrigation water in the eastern diversion channel (as required by the Removal AOC) on achieving groundwater Performance Standards.

No later than April 1, 2017, CMI shall submit to EPA a "Groundwater Monitoring Evaluation Report" (Report). The Report shall present an evaluation, on the basis of the groundwater sampling results, of whether the eastern diversion channel removal action has been effective in reducing Chemicals of Concern (COC) concentrations in groundwater to (or toward) cleanup levels in the area of monitoring wells MW-4 and MW-17.

CMI shall use EPA's "Recommended Approach for Evaluating Completion of Groundwater Restoration Remedial Actions at a Groundwater Monitoring Well" (OSWER 9283.1-44, August 2014) and EPA's Groundwater Statistics Tool User's Guide" (OSWER 9283.1-46) to develop the Report.

If EPA determines that there is a statistically significant trend of COC concentrations in groundwater towards achieving cleanup levels and that the cleanup levels will be achieved within 10 years, CMI shall continue to submit annual Reports to EPA until COC concentrations in groundwater achieve the cleanup levels.

If EPA determines, at any point after April 1, 2017, that there is not a statistically significant trend of COC concentrations in groundwater towards cleanup levels or that the cleanup levels will not be achieved within 10 years, EPA shall so notify CMI of this determination. Within 30 days of such notification, CMI shall provide a proposed schedule and plan for: (a) expeditiously

performing any hydrological investigations that EPA agrees are necessary to the design of a groundwater extraction well system for this area; and (b) submitting a pre-final design report for the installation and operation of such groundwater extraction well system. Upon EPA's approval of such plan and schedule, CMI shall implement the plan and schedule.

The general locations of the five extraction wells are shown on Attachment 4 (Figure 12-26) as "New Extraction Wells" southeast of the "Historic Tailing (Buried)" along an east-west line approximately 240 feet apart. The new wells shall be designed to create a continuous zone of groundwater capture over the 1,200 feet of potentially affected aquifer.

5.2.5.     **Monitor Groundwater and Surface Water**

CMI shall conduct groundwater and surface water monitoring at the Tailing Facility as specified below to monitor progress toward achievement of the Performance Standards for the (COCs) at the Tailing Facility as set forth in Table 12-16 of the ROD.

CMI shall sample the groundwater downgradient of the historic buried tailing (in the area of monitoring wells MW-4 and MW-17) as provided in Section 5.2.4 of this SOW.

CMI shall also monitor groundwater and seeps/springs downgradient of Dam No. 4 and south of Dam No. 1, to assess the effectiveness of remedial actions in achieving groundwater Performance Standards within the alluvial and basal bedrock aquifers. The groundwater monitoring program shall, at a minimum, be consistent with monitoring conducted under permit DP-933 and include all wells at the Tailing Facility and all wells monitored under permit DP-933. In addition, for the Tailing Facility ground water monitoring wells, CMI shall provide to EPA and the State both total and dissolved concentrations for all analyzed compounds for the second quarterly sampling event in each of the first two years following the Effective Date of the

Consent Decree. The groundwater monitoring program shall include additional monitoring wells installed as part of the Administrative Settlement Agreement and Order on Consent for Early Design Actions and any others deemed appropriate by EPA. Upon written request by CMI and approval by EPA in consultation with the State, the number of monitoring wells, the specific parameters, and the frequency of monitoring may be reduced over time. CMI shall also monitor seeps and springs as directed by EPA. CMI shall add uranium and thorium to the list of analytical parameters to be monitored at all locations at the Tailing Facility.

5.2.6.    **Monitor and Maintain Tailing Dams**

CMI shall monitor and maintain the tailing dams. CMI shall collect quarterly piezometer data and perform quarterly inspections of the Tailing Facility dams to meet requirements of the New Mexico Office of the State Engineer. CMI shall continue such monitoring as part of the Selected Remedy until it has demonstrated to EPA's satisfaction that the tailing dams have been dewatered.

5.2.7.    **General Site Maintenance**

CMI shall perform general site maintenance at the Tailing Facility area. General maintenance of the tailing facility will be continued during operation and after closure of the tailing impoundments and shall include grading of roads and maintenance of all structures, including the dams, as EPA deems appropriate.

## 5.3.   **Eagle Rock Lake**

This Section 5.4 supersedes Section 6.3.4.9.1 and the portions of Section 7.0 of the Statement of Work for the Removal AOC relating to Eagle Rock Lake as of the Effective Date of this Consent Decree.

### 5.3.1. Operation of Inlet Control Structure

In order to minimize sediment loading to Eagle Rock Lake during and after storm events, CMI shall continue to operate the inlet controls, including the head gate and data collection systems that CMI installed pursuant to the Removal AOC. CMI shall operate the inlet controls in accordance with the EPA-approved Post-Construction Inspection and Monitoring Plan developed per paragraph 6.3.4.9.1 of the Removal SOW.  Consistent with the Removal AOC, CMI, in coordination with the United States Forest Service ("USFS"), shall ensure proper operation of the inlet controls for a period of at least five years following the Effective Date of the Removal AOC. Following this five year period, CMI shall continue to operate and maintain the inlet controls, including equipment replacements and technology upgrades, in coordination with the USFS for an additional five years, unless otherwise requested in writing by the USFS.  CMI shall, in consultation with the EPA and USFS, transition the sole operational responsibility of the inlet controls to the USFS by the end of this second five-year period, if agreed to by the USFS; provided, however, that CMI may elect to maintain responsibility for the operation and maintenance of the inlet controls beyond the second five-year period for successive five-year periods.  CMI may, in consultation with the EPA and USFS, transition the sole operational responsibility of the inlet controls to the USFS at the end of any of these successive five-year periods.  If such transition of responsibility to USFS has not occurred by the date that EPA certifies that the construction is complete for all remedial action at the Mine Site that is required by the ROD, CMI shall no longer be required to continue to operate and maintain the inlet controls; provided, however, that if EPA determines that a release from the Mine Site or from a CMI mining-related activity to the Red River has occurred that was not authorized by an EPA-

issued permit and that has contaminated the sediment of Eagle Rock Lake, EPA may require CMI to perform additional operation and maintenance of the inlet controls.

5.3.2.    **Performance Monitoring of Eagle Rock Lake Remediation**

Consistent with Section 7.0 of the Removal SOW, following completion of the Removal Actions, CMI shall perform post-construction inspection and monitoring to maintain the effectiveness and integrity of the Removal Actions in accordance with the EPA-approved Post Construction Inspection and Monitoring Plan required by paragraph 6.3.4.9.1 of the Removal SOW.

The monitoring requirements under the Post Construction Inspection and Monitoring Plan are described further in Section 10.3.2 of this SOW.

# 6.    PERFORMANCE STANDARDS

CMI shall ensure that the Work meets the Performance Standards, as that term is defined in the Consent Decree and herein. The Work shall not be considered complete until EPA determines that CMI's Work has achieved the Performance Standards.  Performance Standards include, but are not limited to, the remedial action objectives (RAOs) and remediation goals set forth in Section 8.0 of the ROD or other measures of achievement as defined in the ROD, the Consent Decree, this SOW, and other EPA-accepted submissions.  Performance Standards also reflect the standards, standards of control, and other substantive requirements, criteria and limitations contained in state or federal ARARS as set forth in the ROD.

## 6.1.    Remedial Action Objectives

RAOs were developed for the areas to be addressed by the Selected Remedy to protect human health and the environment.  They provide general descriptions of the objectives of the cleanup. They are media-specific goals that specify the COCs, exposure routes and receptors, and an acceptable contaminant level or range of levels for each exposure route (*i.e.,* remediation goal). The RAOs are established on the basis of the nature and extent of the contamination, the resources that are currently and potentially threatened, and the potential for human and environmental exposure. The RAOs relevant to the Work to be performed are set out in Section 8.0 of the ROD.

## 6.2.    Remediation Goals

Remediation goals are media-specific, quantitative goals that define the extent of cleanup required to achieve the RAOs.  They are based primarily on health or ecological criteria developed by EPA in risk assessment or federal and State of New Mexico (State) numeric criteria or standards identified by EPA to be ARARs for the Site.  These goals represent the cleanup levels set forth in the ROD for the COCs targeted in each medium being addressed by the Selected Remedy.  The remediation goals relevant to the Work to be performed are set out in Section 8 of the ROD and serve as a design basis for the remedial design and remedial action.

## 7.    GENERAL REQUIREMENTS

## 7.1.  Deliverables

CMI shall simultaneously submit copies of all deliverables required by the Consent Decree and SOW to EPA, the New Mexico Environment Department (NMED) and New Mexico Energy,

Minerals and Natural Resources Department's Mining and Minerals Division (MMD) for their review and comment in accordance with Section XXV, Paragraph 109 of the Consent Decree.

CMI shall submit any deliverables being submitted for meetings, such as any preliminary and final data, draft responses to agency comments, and draft reports that are to be used during meetings at least five working days in advance of the meeting to EPA, NMED, MMD and other stakeholders as appropriate, to allow for review prior to the meeting, unless otherwise agreed by the Project Coordinators.

CMI shall submit a minimum of one hard copy of all plans, reports, and other major deliverables to each of the following: the EPA Project Coordinator, the EPA Oversight Contractor, and the NMED and MMD Project Coordinators.  In addition, CMI shall maintain a SharePoint site on which it will make available to EPA, NMED, and MMD electronic copies of all such documents in both PDF (portable document format) and, upon request, in its original MS Office format (e.g., Word, Excel, Project, etc.) or in native or raw data formats.  All Excel spreadsheets submitted shall include all underlying formulas and calculations.  The number of copies required by EPA, NMED and MMD will periodically be reassessed throughout performance of the Work by the EPA Project Coordinator, and CMI will be notified if additional copies are needed.  If requested, CMI shall provide additional electronic copies and/or hard copies of final submissions to other key stakeholders (*e.g.,* Village of Questa, Taos County, U.S. Forest Service, Amigos Bravos, and other interested non-governmental organizations) as well as to other EPA technical consultants and regulatory officials, as directed by EPA.

## 7.2.  **Personnel, Materials and Services**

CMI shall furnish all necessary and appropriate personnel, materials, and services needed for, or incidental to, performing and completing the Work.

## 7.3.  **Communication**

The CMI Project Coordinator shall communicate and hold at least weekly meetings with the EPA Project Coordinator, either in face-to-face meetings, through conference calls, or through electronic mail, unless otherwise agreed to in writing.  CMI shall invite the NMED and MMD Project Coordinators to participate in those weekly meetings or calls with EPA and shall copy NMED and MMD Project Coordinators on all emails to EPA regarding weekly meetings.  CMI shall document all decisions that are made in those meetings and conversations and forward this documentation, which may be in the form of an email, to EPA, NMED, and MMD within five working days of the meeting or conversation.

## 7.4.  **Monthly Progress Reports**

CMI shall submit to EPA monthly progress reports to document the status of the Work, beginning in the month following the Effective Date of the Consent Decree and ending with the month following EPA's issuance of a Certificate of Completion, as provided in Section XIII of this Decree.  CMI shall provide copies of the monthly progress reports to NMED and MMD. The monthly progress reports shall include the following:

   a. Progress made: describe all actions that have been taken toward achieving compliance with the Consent Decree, SOW, and completion of the Work during the previous month

b. Problem areas and recommended solutions: describe efforts made to mitigate delays or anticipated delays

c. Status of all deliverables required by the Consent Decree and this SOW and those submitted during the previous month

d. Schedule updates: include any modifications to the work plans or schedules that Settling Defendants proposed to EPA or that have been approved by EPA

e. Activities planned for the next six (6) weeks

f. Results of field sampling, tests and all other data received by CMI pertaining to this Consent Decree (or reference to the posting of such data on a SharePoint site available to EPA)

g. Copies of laboratory data received during the month (or reference to the posting of such data on a SharePoint site available to EPA)

h. Summary of key personnel changes

i. Community relations support activities: describe all community relations activities undertaken or planned

j. Quantity of waste generated and quantity of waste disposed

k. Health and safety issues affecting project implementation or schedule

## 7.5. Attendance at Meetings

CMI shall attend periodic project meetings as requested by EPA, unless otherwise agreed to in writing or through e-mail. Such meetings and events shall be attended by at least one representative of EPA, EPA's Oversight Contractor, NMED and MMD. CMI shall coordinate all meetings, site visits, and conference call meetings with the EPA, NMED, and MMD Project Coordinators (or designees). CMI shall also attend all Work-related meetings at the Site with EPA, unless otherwise agreed in writing or through e-mail. CMI shall provide documentation of all final decisions made at each meeting to EPA within 5 working days following the meeting.

CMI shall invite EPA, NMED and MMD to each project meeting it holds with its contractors and subcontractors in the field.

## 7.6. Field Operation Office and Equipment

CMI shall provide office space for the EPA Project Coordinator and EPA authorized oversight officials/contractors, as well as NMED and MMD personnel, unless EPA determines that such office space is not needed. The office space may be in on-Site project trailers as a substitute for independent office accommodations. At a minimum, the office space shall have air conditioning, heating, lighting, privacy, one office desk, two chairs, a refrigerator, access to a fax machine, photocopier and sanitation facilities, and any other accessories needed to conduct oversight activities. CMI shall provide the field operation office space and equipment no later than one week prior to the start of field activities and shall maintain such office space and equipment until EPA has approved all *Final Remedial Action Construction Completion Reports* under the Consent Decree, CMI shall notify EPA in writing upon completion of these field support activities. The requirements of this paragraph may be met through compliance with the corresponding requirements of the Removal AOC and Early Design AOC until all field activities under those AOCs have been completed.

## 7.7. Community Relations Support

CMI shall provide the following community relations support to EPA throughout the Performance of the Work:

### 7.7.1. Attendance at Community Relations Events:

CMI and its contractors shall attend community meetings as requested by EPA, unless otherwise agreed to in writing or through e-mail.

### 7.7.2. Logistics and Presentation Support:

CMI shall help EPA in selecting and reserving meeting space for EPA to hold community meetings, as well as the logistics for such events. This includes helping to set up the seating arrangements, tables, presentation equipment, and any visual displays and then take down such arrangements after the meetings. CMI shall also prepare presentation materials/handouts (i.e., transparencies, slides, and/or handouts) as instructed by EPA. Such materials/handouts shall be approved by EPA before distribution or use.

### 7.7.3. Technical Support:

CMI shall provide technical support for community relations, including community meetings. This support may include preparing technical input to news releases, briefing materials and other community relations vehicles, arranging for Site tours upon request, and helping EPA to coordinate with local agencies as requested.

### 7.7.4. Fact Sheet Preparation Support:

CMI shall help EPA prepare fact sheets that inform the public about activities related to the Work, schedules for the Work, field investigations, construction, measures to be taken to protect the community, provisions for responding to emergency releases and spills, any potential inconveniences such as excess traffic and noise that may affect the community during the performance of the Work, and other topics as required by EPA. EPA will determine the final content of all fact sheets related to the Work.

### 7.7.5. Information Repository Support:

CMI shall support EPA in maintaining the Site information repositories by providing hard and/or electronic copies of all documents related to the Work to the repositories as directed by EPA.

CMI shall periodically visit the Village of Questa repository at EPA's request to verify that Site-related documents are being maintained and available for review by the public.

# 8. REMEDIAL DESIGN REQUIREMENTS

## 8.1. Site-Wide Plans

CMI shall prepare and submit for EPA's approval, update as needed, and maintain all Site-wide plans specified below for implementation of the RD work described in this SOW. CMI shall submit drafts of the Site-wide plans to EPA for review within 120 days of the Effective Date, with the exception of the Health and Safety Plan (HASP), which shall be submitted within 60 days of the Effective Date. Other than the HASP, the following plans may be provided as sections of a single Overall Site Plan.

CMI shall review the existing Site-wide plans that were prepared as part of the CERCLA Remedial Investigation and Feasibility Study (RI/FS), Removal Actions, or Early Design Actions and update the plans, as necessary, to implement the RD. The Site-wide plans prepared or developed for the RI/FS, Removal Actions or Early Design Actions should be referenced or adapted whenever possible when preparing such plans for the RD. Since CMI's contractors or subcontractors may prepare their own RD plans, CMI may incorporate such plans and procedures into the Site plans submitted to EPA for review and approval in accordance with the Consent Decree and this SOW. CMI shall make revisions to the Site-wide plans as a result of EPA's comments or agreements. Copies of draft final and, if necessary, final Site-wide plans shall be submitted within 30 days after receipt of EPA comments or within the time frames determined by the EPA RPM.

CMI shall periodically reassess and update Site-wide plans throughout the performance of the Work as necessary, or upon request from EPA.

### 8.1.1.  General Project Schedule

CMI shall prepare and submit to EPA for approval a General Project Schedule showing the sequencing of all major deliverables and tasks under this SOW, based on the time periods set forth in the Consent Decree and this SOW.  CMI shall update the General Project Schedule annually, or as EPA determines is needed.

### 8.1.2.  Site Management Plan

CMI shall prepare and submit to EPA for approval a Site Management Plan (SMP) that provides EPA with a written understanding of how CMI will manage access, security, contingency procedures, management responsibilities, and waste disposal during all RD and RA activities. The SMP shall consist of the following plans:

A.  *Pollution Control and Mitigation Plan*
    The Pollution Control and Mitigation Plan (PCMP) shall that outline the process, procedures, and safeguards that CMI will use to ensure contaminants or pollutants are not released off-Site.

B.  *Waste Management Plan*
    The Waste Management Plan (WMP) shall outline how CMI will manage and dispose of any wastes that are encountered during performance of the Work.  CMI shall specify the procedures that it will follow when wastes are managed, including on-Site and off-Site storage, treatment, and/or disposal. The WMP shall include the following plans:

(1) *Decontamination Plan*

The Decontamination Plan shall describe the equipment and methods that CMI will use as part of its decontamination procedures.

(2) *Water Control Plan*

The Water Control Plan a plan that addresses CMI's methods for collection, treatment, disposal or discharge of decontamination water, dust control water, storm water, and other surface water.

(3) *Transportation and Disposal Plan*

The Transportation and Disposal Plan shall establish procedures for any waste material that is to be transported off-Site for treatment and/or disposal. The Transportation and Disposal Plan shall be consistent with the Off-site Rule, 40 CFR § 300.440, all ARARs (including any applicable U.S. Department of Transportation regulations), and any applicable regulations or guidance documents listed in Attachment 6.

### 8.1.3. Health and Safety Plan

CMI shall update the Health and Safety Plan (HASP) for RD activities to be prepared in conformance with applicable Mine Safety and Health Administration (MSHA)[1], Occupational Safety and Health Administration (OSHA), and EPA requirements, including, but not limited to, 29 C.F.R. § 1910. EPA shall not approve or disapprove the HASP, but shall review it and shall require compliance by CMI with its terms as part of the Consent Decree.

---

[1] Conformance with MSHA requirements shall be for that portion of the Site on CMI property.

The HASP shall specify employee training, protective equipment, medical surveillance requirements, and standard operating procedures, and include an Emergency Response Plan in accordance with 40 C.F.R. § 300.150 of the NCP and 29 C.F.R. §§ 1910.120(l)(1) and (l)(2).  A task-specific section of the HASP shall also be included to address health and safety requirements for Site visits.  Since the Site is regulated under MSHA, the HASP shall identify health and safety requirements specified under MSHA for Site visitors.  The Emergency Response Plan describes how to handle emergencies at the Site and minimize risks associated with a response.  This response plan should be reviewed and rehearsed by CMI regularly, and a copy should be provided to local emergency response facilities.

8.1.4.    **Sampling and Analysis Plans**

CMI shall prepare sampling and analysis plans ("SAPs") as EPA determines necessary to conduct Remedial Design activities in particular Site areas.  The SAPs shall be written to reflect the specific objectives of all data acquisition efforts required to be conducted during the RD activities under the Consent Decree.  The SAPs will outline the data collection and quality assurance requirements of all sampling and analysis conducted by CMI.  CMI shall design the Plans to ensure that sample collection and analytical activities are conducted in accordance with technically acceptable protocols, as determined by EPA, and that the data meet all applicable data quality objectives (DQOs).  The SAPs shall include laboratory analytical methods for each COC identified in the ROD for the appropriate media, including Target Analyte List metals, molybdenum, uranium, pH, total dissolved solids (TDS), sulfate, and other inorganic chemicals or physical properties tests as appropriate.  CMI shall also include in the SAPs a mechanism for planning field activities and a Field Sampling Plan. The SAP(s) shall include the following plans:

A. *Quality Assurance Project Plan*

CMI shall update or prepare a "Quality Assurance Project Plan" ("QAPP") as part of the SAP. The QAPP shall be prepared in accordance with EPA QA/R-5 (latest draft or revision). The QAPP shall describe the project objectives and organization, functional activities, and quality assurance/quality control (QA/QC) protocols that shall be used to achieve the desired DQOs. The DQOs shall, at a minimum, reflect use of analytical methods for identifying and remediating contamination consistent with the levels for the RAOs and Performance Standards set forth in the ROD. The QAPP shall address sampling procedures, sample custody, analytical procedures, and data reduction, validation, reporting and personnel qualifications.

B. *Field Sampling Plan*

CMI shall prepare a Field Sampling Plan ("FSP") as part of the SAP that defines the sampling and data collection methods that shall be used in performing the Work. The FSP shall include sampling objectives, sampling media, sampling locations, depths and frequency; sampling equipment and procedures; sample handling, analytical methods, analytical parameters and constituents; and a breakdown of samples to be analyzed through Contract Laboratory Program (CLP) and other sources, as well as the justification for those decisions. The FSP shall include tables of geographical coordinates and the appropriate maps showing locations of previous sampling locations and proposed sampling locations. The FSP shall be written so that a field sampling team unfamiliar with the Site would be able to gather the samples and field information required.

### 8.1.5. Data Management Plan

CMI shall prepare a Data Management Plan that outlines the procedures for storing, handling, accessing, retaining and securing data collected during the RD phases. CMI shall consistently document the quality and validity of field and laboratory data compiled during the RD. CMI shall supply all data to EPA in ArcView® format or other electronic format as directed by the RPM in accordance with the Data Management Plan. All Geographic Information System (GIS) data sets will be in a Universal Transverse Mercator (UTM) or State Plane coordinate system.

### 8.1.6. Contingency Plan

CMI shall prepare a Contingency Plan that will provide contingency measures for potential spills and discharges from materials handling or transportation. The Contingency Plan shall describe methods, means, and facilities required to prevent contamination of soil, water, atmosphere, uncontaminated structures, equipment or material from the discharge of waste due to spills. CMI shall provide for equipment and personnel to perform emergency measures required to contain a spill and to remove and properly dispose of any media that become contaminated due to spillage, and provide for equipment and personnel to perform decontamination measures that may be required to remove spillage from previously uncontaminated structures, equipment, or material. CMI shall include the name and telephone number of the person or entity that is responsible for responding in the event of an emergency situation or incident. The Contingency Plan shall include a Spill Prevention, Control and Countermeasures Plan as specified in 40 CFR Part 112.

# 9.    REMEDIAL DESIGN

## 9.1    Tailing Facility Cover Demonstration Pilot Project

As detailed below, CMI shall design the Tailing Facility Cover Demonstration Pilot Project ("Pilot Project") as described in Section 5.2.1 of this SOW and then implement the design. The design process for the Pilot Project shall consist of two stages, as described below: pre-final design and final design. The final design shall provide sufficient detail to support invitation-to-bid packages for tailing facility demonstration Pilot Project construction.

### 9.1.1.    Pre-Final Design

Within 60 days after receipt of EPA's comments on the "Tailing Facility Dam 1 Grading Final Design Report," submitted under Section 6.12.5 of the Early Design AOC, or 60 days after lodging of the Consent Decree, whichever is later, CMI shall submit a Pre-Final Design for the Pilot Project. The pre-final design shall include or discuss, at a minimum, the following:

A. A pre-final "Design Criteria Report", as described in the *Remedial Design/Remedial Action Handbook*, EPA 540/R-95/059 (June 1995);

B. A pre-final "Basis of Design Report", as described in the *Remedial Design/Remedial Action Handbook*, EPA 540/R-95/059 (June 1995);

C. Pre-final/final drawings and specifications;

D. Construction Quality Assurance Plan ("CQAP")/Construction Quality Control Plan ("CQCP"). The purpose of the CQAP is to describe planned and systemic activities that provide confidence that the RA construction will satisfy all plans, specifications, and related requirements, including quality objectives. The purpose of the CQCP is to describe the activities to verify that RA construction has satisfied all plans,

31

specifications, and related requirements, including quality objectives. The CQAP/CQCP must:

(1) Identify, and describe the responsibilities of, the organizations and personnel implementing the QA/QC;

(2) Describe verification activities, such as inspections, sampling, testing, monitoring, and production controls, under the QA/QC;

(3) Describe industry standards and technical specifications used in implementing the QA/QC;

(4) Describe procedures for tracking construction deficiencies from identification through corrective action;

(5) Describe procedures for documenting all QA/QC activities; and

(6) Describe procedures for retention of documents and for final storage of documents.

E.  A Pre-final O&M Plan and O&M Manual; The O&M Manual and O&M Plan shall be developed in accordance with *Operation and Maintenance in the Superfund Program*, OSWER 9200.1 37FS, EPA/540/F-01/004 (May 2001).

F.  Pre-final performance monitoring plan, developed to evaluate the effectiveness of the Pilot Project. The plan shall be designed to collect information that will be used to evaluate the success of the Pilot Project in accordance with the criteria described in Section 5.2.1 of this SOW;

G.  Pilot Project schedule;

H.  A description of any permit requirements;

I. Identification of coordination issues with mining personnel and other coordination issues (*e.g.,* utilities, environmental, community impacts);

J. Potential work zone transportation and management strategies;

K. Potential work zone impacts; and

L. A description of how the Pilot Project will be implemented in a manner that minimizes environmental impacts in accordance with EPA's *Principles for Greener Cleanups* (Aug. 2009).

CMI shall address all EPA comments on the Pre-Final Design in the Final Design.

9.1.2. **Final Design**

Within 30 days after receipt of EPA's comments on the pre-final design, CMI shall submit to EPA a Final Design for the Pilot Project. The Final Design shall address comments generated from the Pre-final Design reviews and clearly show any modifications of the design as a result of incorporation of the comments. The Final Design must include final versions of all the Pre-final Design submitted under Section 9.1.1 of this SOW and the "Tailing Facility Dam 1 Grading Final Design Report" under Section 6.12.5 of the Early Design AOC. The Final Design shall be approved by a Professional Engineer registered in New Mexico. CMI shall obtain EPA's written approval of a Final Design before implementing the Final Design, unless specifically authorized in writing by EPA.

CMI shall address all EPA comments on the draft Final Design Report within 30 days after receipt of EPA comments. Upon EPA approval of the Final Design, the Final Design shall become enforceable as part of the Consent Decree.

### 9.1.3. Update Overall Site Plan

CMI shall update and maintain the necessary plans within the Overall Site Plan and the HASP for conducting the Pilot Project. Within 30 days after receipt of EPA's written acceptance of the Pilot Project Final Design, CMI shall review the existing plans and submit to EPA updated plans or addenda to plans, as necessary, to conduct the Pilot Project. The updated plans shall include an updated SAP, QAPP and FSP. Since CMI contractors or subcontractors may prepare their own plans, CMI shall incorporate any plans or procedures received from any of its contractors or subcontractors into the Overall Site Plan. CMI shall revise and update the appropriate plans, as necessary, throughout the Pilot Project.

### 9.1.4. Implement Tailing Facility Cover Demonstration Pilot Project

CMI shall implement the Tailing Facility Cover Demonstration Pilot Project by performing the Work set forth in the Consent Decree, this SOW, and the EPA-approved Tailing Facility Cover Demonstration Pilot Project Final Design. CMI shall perform the Pilot Project in accordance with the EPA-approved work plan schedule and the deadlines in Section 9.1.5. The Pilot Project implementation will be broken into two major phases:

- Construction; and

- Monitoring.

### 9.1.5. Construction Phase

The construction phase includes tasks covering the period of major construction activities. Activities which shall be conducted by CMI during this phase of the Pilot Project include without limitation the following:

A. Attend Pre-Construction Meeting

Within 15 days after receipt of EPA's written approval of the Pilot Project Final Design, or within 15 days after the Effective Date of this Consent Decree, or by September 15, 2016, whichever is latest, CMI shall hold a pre-construction meeting with EPA, NMED, and MMD. Participants at the meetings shall include CMI's Project Coordinator, QA Official(s), and a representative of each of CMI's contractors and subcontractors that will perform the Work. Other participants for the meeting may include local emergency responders to implement the HASP (*e.g.,* police and fire departments), State Department of Transportation officials (for potential road closures or vehicular traffic on state highways), or any other local or State government officials whose presence is appropriate for the nature of the Work to be performed. At the meeting, CMI shall provide participants with a detailed construction schedule that includes the actual dates for mobilization to the Site and construction start up.

B. Advance Notice of Start of Construction

CMI shall provide a 10-day advanced notification of the start of the Pilot Project field activities to EPA, NMED, MMD and all other participants at the pre-construction meeting.

C. Construct Pilot Project

Within 15 days following the Pre-Construction Meeting (9.1.5.A), CMI shall begin construction on the Pilot Project.

D. Mobilization and Demobilization

CMI shall provide the necessary personnel, equipment, and materials for mobilization and demobilization to and from the Site for the purpose of

performing the Pilot Project, including all required field testing, confirmatory sampling and performance and environmental monitoring. The following mobilization and demobilization Work shall be performed:

   (1) identify field support equipment, supplies and facilities;

   (2) mobilization;

   (3) site preparation;

   (4) installation of utilities;

   (5) construction of temporary utilities; and

   (6) demobilization.

E.  Provide Site Access

CMI shall provide EPA, NMED, MMD and other regulatory officials and their designated representatives with access to the Site and to all property owned or controlled by CMI and utilized by CMI in carrying out the Work, as provided in Section VIII of the Consent Decree (Access and Institutional Controls).

F.  Maintain Field Logs and Daily Records

CMI shall maintain field logs and daily records documenting activities occurring in the field during construction as specified in Section 10.2.3(C) of this SOW.

G.  Pre-final Construction Inspection

CMI shall schedule and conduct a pre-final construction inspection of the Pilot Project with EPA, NMED, and MMD. CMI shall develop a punch list of any deficiencies identified as part of the pre-final construction inspection.

Within 30 days after conducting the pre-final construction inspection, CMI shall prepare and submit to EPA a pre-final construction inspection report which

includes the list of deficiencies and completion dates for outstanding items, and the proposed date for a final construction inspection. The date for final construction inspection shall be scheduled within 14 days after completion of the corrective measures.

H. Corrective Measures to Address Deficiencies

CMI shall perform corrective measures to adequately address all deficiencies identified on the punch list in accordance with the EPA-approved schedules included with the pre-final construction inspection report.

I. Final Construction Inspection

CMI shall conduct a final construction inspection for the Pilot Project with EPA, NMED, and MMD. The final construction inspection shall consist of a walk-through of the project to determine the completeness of the Pilot Project construction and its consistency with the EPA-approved Final Design, the Consent Decree, and this SOW. The inspection will also be used to determine if all punch list items have been adequately addressed. Based on the final construction inspection, CMI shall provide written notification that all field construction activities have been completed in accordance with the EPA-approved work plan and the date such work was completed. The written notification shall be submitted to EPA within 14 days of the final construction inspection, unless otherwise agreed to in writing.

J. Final Pilot Project Construction Completion Report

Within 30 days after the final construction inspection, CMI shall prepare and submit to EPA for approval a draft "Final Tailing Facility Cover Demonstration

Pilot Project Construction Completion Report." The final construction completion report shall include without limitation the following elements:

(1) Background;

(2) Chronology of the Pilot Project construction;

(3) Pertinent Performance Standards and construction quality control;

(4) Pertinent ARARs and TBC material;

(5) Construction activities;

(6) As-built drawings that are certified by professional engineer licensed in the State of New Mexico;

(7) Final inspection documentation and date;

(8) Summary of project costs;

(9) Evaluation of construction methodology;

(10) Observations and lessons learned; and

(11) Contact information for key CMI and contractor personnel.

CMI shall make revisions to the Pilot Project construction completion report consistent with EPA's comments. The revised report shall be submitted to EPA for approval within 30 days after receipt of EPA comments or the time period determined by EPA.

9.1.6. **Monitoring Phase**

The monitoring phase includes tasks covering the period of monitoring subsequent to the completion of major construction. Activities which shall be conducted by CMI during this phase of the Pilot Project include without limitation the following:

A. Data Acquisition, Analysis, Validation and Evaluation

CMI shall perform all sample acquisition, field testing and performance monitoring for the Pilot Project in conformance with the updated SAP, QAPP, FSP and EPA-approved Final Design required under the Consent Decree and this SOW.

B. Performance Monitoring

CMI shall monitor the performance of the Pilot Project, in accordance with the monitoring plan included in the Pilot Project Final Design.

C. Operation and Maintenance of Pilot Project

After construction is completed, CMI shall perform O&M of the Pilot Project pursuant to the O&M Plan included in the Pilot Project Final Design.

D. Quarterly Inspections

CMI shall conduct quarterly inspections of the constructed Pilot Project with EPA, NMED and MMD. CMI may reduce the inspection frequency over time based on the data collected if approved by EPA. CMI shall develop a punch list of deficiencies or recommended modifications or adjustments to the Pilot Project as part of the quarterly inspections. CMI shall prepare and submit to EPA an Inspection Report which documents the inspection, the participants, all observations and list of deficiencies or modifications that require corrective measures. The quarterly Inspection Report shall be submitted within 30 days after each inspection. Any significant modifications which are recommended by CMI in the Inspection Reports, or directed by EPA, that require additional

planning, shall also be documented in the Annual Monitoring and Assessment Reports described in the following section of this SOW.

E.  Annual Monitoring and Assessment Reports for Pilot Project

CMI shall prepare and submit to EPA an "Annual Monitoring and Assessment Report for the Tailing Facility Cover Demonstration Pilot Project" (Annual Monitoring Report") no later than one year following CMI's notification pursuant to Section 9.1.5(I) (Final Construction Inspection) and annually thereafter for each year that the Pilot Project is ongoing.  The Annual Monitoring Report shall include but not be limited to:

1)  A description of all performance monitoring and O&M activities completed and data acquired the previous year;

2)  All acquired data and an analysis of the acquired data, including a description of the progress towards attaining the success criteria described in Section 5.2.1 of the SOW; and

3)  A description of any issues or problems that were raised as a result of the inspections and how they were solved or if they remain unresolved.

CMI shall revise the Annual Monitoring Report to address all EPA comments. The revised Report shall be submitted to EPA for approval within 30 days after receipt of EPA comments or the time period determined by EPA.

F.  Modifications to Pilot Project

Upon receiving EPA's acceptance of any recommended modification or adjustment to the ongoing Pilot Project or EPA's direction for modification, CMI shall implement the modifications in accordance with the EPA-approved

schedules contained in the Annual Monitoring Reports required in the previous section of this SOW.

G. Pilot Project Completion Report

No later than six years following CMI's notification pursuant to Section 9.1.5(I) (Final Construction Inspection), CMI shall prepare and submit to EPA for approval a draft "Tailing Facility Cover Demonstration Pilot Project Completion Report" ("Completion Report") summarizing and evaluating the data collected during the Pilot Project and evaluating the performance of the elements of the Pilot Project. The Completion Report shall include without limitation the following elements:

1) Summary of all monitoring results;

2) Evaluation of long term cover stability;

3) Evaluation of erosion;

4) Evaluation of cover performance;

5) Operations and maintenance requirements;

6) Evaluation of vegetation design performance; and

7) Summary of lessons learned.

CMI shall make revisions to the Completion Report consistent with EPA's comments. The revised report shall be submitted to EPA for approval within 30 days after receipt of EPA comments. EPA approval of the Tailing Facility Cover Demonstration Pilot Project Completion Report shall not be unreasonably delayed.

## 9.2. Tailing Facility Groundwater Extraction Well System

### 9.2.1. Pre-final Remedial Design

CMI shall submit a Pre-final Remedial Design for Installation and Operation of Tailing Facility Groundwater Extraction Well System based on the conditions identified in Section 5.2.4 of this SOW, in accordance with any plan and schedule approved by EPA under Section 5.2.4 for such work.

A. Pre-final RD Elements

The Pre-final RD will serve as the approved Final RD if EPA approves the Pre-final RD without comments. The pre-final design shall include or discuss, at a minimum, the following:

1) Pre-final drawings, detail drawings, list of materials and quantities;

2) Pre-final design calculations;

3) Design assumptions and parameters;

4) Pre-final technical specifications;

5) A pre-final/final O&M Plan and O&M Manual for the groundwater extraction system; The O&M Manual and O&M Plan shall be developed in accordance with Operation and Maintenance in the Superfund Program, OSWER 9200.1 37FS, EPA/540/F-01/004 (May 2001); and

6) Pre-final CQAPP.

B. Respond to Design Review Comments

CMI shall consolidate and respond to all comments on the Pre-final RD within the timeframe specified in the approved plan under Section 5.2.4. CMI shall provide a

written response to each comment, indicating whether CMI has decided to implement a design change as result of the comment, and how the change will impact the selected remedy, RD/RA costs, and/or schedule. For the Pre-final RD, CMI shall submit responses to EPA's comments prior to initiation of the Final RD.

C. Participate in Pre-final Design Reviews or Briefings

As requested by EPA, CMI shall participate in design review meetings to be held at locations as determined by the EPA RPM. Locations may include, but are not limited to, CMI's mining facility near Questa, EPA Region 6 offices in Dallas, Texas, or the NMED or MMD offices in Albuquerque, Santa Fe, or Taos, New Mexico.

9.2.2. **Final Remedial Design**

CMI shall submit a Final Remedial Design for the Installation and Operation of Tailing Facility Groundwater Extraction Well System based on the conditions identified in Section 5.2.4 of this SOW. CMI shall submit to EPA, for approval, a Final Remedial Design within 45 days after receipt of EPA comments on the Pre-Final RD (unless the pre-Final RD was approved by EPA without comment). The Final RD shall address comments generated from the Pre-final RD review and clearly show any modifications of the design as a result of incorporation of the comments. The Final RD must include final versions of all Pre-final deliverables. The Final RD shall be approved by a Professional Engineer registered in New Mexico. CMI shall obtain EPA's written approval of a Final RD before initiating the associated RA unless specifically authorized in writing by EPA. CMI shall make revisions to the Final RD as a result of EPA's comments and/or agreements.

A. Participate in Final Design Reviews (if needed)

As requested by EPA, CMI shall participate in Final RD review meetings to be held at locations as determined by the EPA RPM.  Locations may include, but are not limited to, CMI's mining facility near Questa, EPA Region 6 offices in Dallas, Texas, or the NMED or MMD offices in Albuquerque, Santa Fe, or Taos, New Mexico.

B. Final RD

CMI shall incorporate into the Final RD any comments and/or changes recommended by EPA in the Pre-final RDs or Pre-final RD meetings.  The Final RDs shall be submitted within 45 days of any final design review meeting that is needed.

## 10.    REMEDIAL ACTION

CMI shall perform all necessary RA Projects to construct and complete the work described in the Final RDs submitted under this SOW or the Early Design AOC SOWs.  CMI shall ensure that all RA Projects are consistent with the applicable Regulations and Guidance Documents listed in Attachment 6.  In order to construct and complete the RA Projects, CMI shall plan for and implement the Work described below.

## 10.1. Project Planning and Support

CMI shall plan for the execution and overall management of all RA Work by performing the following project planning and support activities to implement the RA Projects:

### 10.1.1. Attend Scoping Meetings

Before or concurrent with developing the RA Project Work Plans, CMI shall attend all scoping meetings, whether held at the Site in conjunction with Site visits, or at other locations, to be determined by the EPA RPM.

### 10.1.2. Conduct Site Visits

CMI shall conduct Site visits with EPA, NMED, and MMD officials and their designated representatives during RA Project planning phases to assist all parties in developing an understanding of the Site and any construction logistics. CMI shall use the information gathered during the visits to better scope the projects and to implement the RA Projects. A Health and Safety Plan is required prior to conducting Site visits.

### 10.1.3. Develop Draft RA Project Work Plans

Within 60 days after receiving EPA's written approval of each Final RD, or within 60 days after the Effective Date, whichever is later, CMI shall prepare and submit the following draft RA Project Work Plans for the construction of the Selected Remedy components according to the Final RD. CMI shall obtain EPA's approval of each RA Project Work Plan and all other related plans before conducting each component of the RA Project.

A. Mine Site Groundwater Extraction System (SOW Section 5.1.2)

B. Upgrade Tailing Facility Seepage Interception Systems (SOW Section 5.2.3)

C. Install and Operate Tailing Facility Groundwater Extraction Well System (SOW Section 5.2.4 – if required)

### 10.1.4. RA Project Work Plan Elements

The RA Project Work Plans shall include a detailed description of:

A. The technical approach and overall management strategy for the remediation;

B. The O&M, performance monitoring, other monitoring, and construction activities in accordance with the final designs and ROD;

C. The necessary procedures, inspections, deliverables, and RA schedules shall be specified;

D. The comprehensive construction management schedule for completion of each major activity and submittal;

E. The organizational structure outlining the roles, relationships, and responsibilities and authority of all organizations and key personnel involved in the RA including a description of key project personnel's qualifications (e.g., project coordinator, supervising contractor, resident engineer, quality assurance official, etc.); and

F. Information related to the execution of contracts for construction and the identification of and satisfactory compliance with permitting requirements.

10.1.5.  **Revise Draft RA Project Work Plans**

CMI shall revise the draft RA Project Work Plans based on EPA's comments and provide revised Work Plans within 30 days of receipt of EPA's comments.

10.1.6.  **Update Site-wide Plans**

Within 60 days after receiving EPA's written acceptance of each individual Final RD, CMI shall review the existing Site-wide plans identified below that were prepared during the RD, and submit to EPA an updated plan or addendum to the plan as part of each RA Project Work Plan, as necessary, to implement each RA Project.

Since CMI and any of its contractors or subcontractors will prepare their own RA Project plans, CMI shall incorporate the plans and procedures received from any of its contractors or subcontractors into the overall Site-wide plans. Construction plans and procedures are living documents and CMI's contractors shall update the appropriate plans, as necessary, throughout the Work. Any revisions to the Site-wide Plans will be submitted with the final version of each individual RA Project Work Plan.

A. _Site Management Plan_

CMI shall update the Site Management Plan (SMP) that was prepared during RD.

(1) _Pollution Control and Mitigation Plan_

CMI shall include in the SMP an update of the PCMP that outlines the process, procedures, and safeguards that will be used to ensure contaminants or pollutants are not released off Site.

(2) _Waste Management Plan_

CMI shall include in the SMP an update of the WMP that outlines how wastes that are encountered during the RAs will be managed and disposed. CMI shall specify the procedures that will be followed when wastes are managed, including on-Site and off-Site storage, treatment, and/or disposal. CMI shall include in the WMP updates to the Decontamination Plan, Water Control Plan, and Transportation and Disposal Plan.

B. _Health and Safety Plan_

CMI shall update the Health and Safety Plan (HASP) for RA activities in conformance with applicable Occupational Safety and Health Administration

(OSHA) and EPA requirements, including 29 C.F.R. 1910. EPA shall not approve or disapprove the Health and Safety Plan, but shall review it and require compliance by CMI with its terms as part of the Consent Decree.

The HASP shall specify employee training, protective equipment, medical surveillance requirements, standard operating procedures and a contingency plan in accordance with 29 C.F.R. 1910.120 (l)(1) and (l)(2).  The plan shall address employee training, protective equipment, medical surveillance requirements, standard operating procedures, and a contingency plan in accordance with 40 C.F.R. 300.150 of the NCP and 29 C.F.R. 1910.120 1(1) and (1)(2). Whenever possible, CMI shall refer to the HASP developed for the RD when preparing the HASP for the RA.  CMI shall also ensure the HASP identifies health and safety requirements specified under MSHA for Site visitors since the Site is an operating mining facility.

C. *Sampling and Analysis Plan*

CMI shall update the SAP to reflect the specific objectives of any data acquisition conducted during construction.  CMI shall ensure that the SAP outlines the data collection and quality assurance requirements of any sampling and analysis to be conducted by CMI during the RA.  As part of the SAP update, CMI shall also update the QAPP, FSP, and Data Management Plan.  The QAPP, FSP and Data Management Plan developed for the RD and/or RI/FS should be referenced or adapted whenever possible when preparing updates for the RA.

D. *Update Construction Quality Assurance Project Plan (CQAPP)*

CMI shall review and update the final CQAPP submitted as part of each

individual Final RD.  The CQAPP shall detail the approach for quality assurance

by addressing quality assurance requirements and standards related to

construction activities, including installation, excavation, and decontamination.

The updated CQAPP shall include the following updated elements:

    (1) personnel;

    (2) CQAPP personnel qualifications;

    (3) inspection activities;

    (4) sampling requirements; and

    (5) documentation

E. *Contingency Plans*

CMI shall update the contingency plans to provide contingency measures for

potential spills and discharges from materials handling or transportation.  This

plan shall describe methods, means, and facilities required to prevent

contamination of soil, water, atmosphere, uncontaminated structures, equipment

or material from the discharge of waste due to spills.  CMI shall provide for

equipment and personnel to perform emergency measures required to contain a

spill and to remove and properly dispose of any media that become contaminated

due to spillage, and provide for equipment and personnel to perform

decontamination measures that may be required to remove spillage from

previously uncontaminated structures, equipment, or material.

## 10.2. **Construction Phase**

CMI shall construct the portions of the Selected Remedy described in Section 10.1.3 of this SOW by performing the Work set forth in the EPA-approved Final RA Project Work Plans. CMI shall perform the Work in accordance with the EPA-approved RA Project Work Plan schedules. Activities that shall be conducted by CMI during this phase of the project include, but are not limited to the following:

### 10.2.1.    **Attend Pre-Construction Meeting**

Within seven (7) days of receipt of EPA's written approval of each individual RA Project Work Plan, CMI shall schedule a pre-construction meeting with EPA, NMED and MMD.  The pre-construction meeting shall be held within 30 days after receipt of EPA's written approval of the RA Project Work Plan.  Participants at the pre-construction meetings shall include CMI's Project Coordinator, Supervising Contractor, QA Official, a representative from each of CMI's RA Project contractors and subcontractors, and a representative of its RD contractor(s).  Other participants of the pre-construction meeting may include local emergency responders to implement the HASP (e.g., police and fire departments), State Department of Transportation officials (for potential road closures or vehicular traffic on state highways), or any other local or State government officials whose presence is appropriate for the nature of the Work to be performed.  At the meeting, CMI shall provide participants with a detailed construction schedule that includes the actual dates for mobilization to the site and construction start up.

### 10.2.2.    **Advance Notice of Start of Construction**

CMI shall provide a 14-day advanced notification of the start of all field construction activities to EPA, NMED, MMD and all other participants at the pre-construction meeting.

10.2.3.  **RA Project Construction**

Within 30 days after conducting each pre-construction meeting, or as otherwise provided in the approved schedule, CMI shall commence construction activities. CMI shall perform the following activities as part of each RA Project construction:

A.  Mobilization and Demobilization

CMI shall provide the necessary personnel, equipment, and materials for mobilization and demobilization to and from the Site for the purpose of performing construction and construction-related activities, including all required field testing, confirmatory sampling and performance and environmental monitoring.  CMI shall perform all of the following mobilization and demobilization Work:

(1) identify field support equipment, supplies and facilities;

(2) mobilization;

(3) site preparation;

(4) installation of utilities;

(5) construction of temporary utilities; and

(6) demobilization.

B.  Provide Site Access

CMI shall provide EPA, NMED, MMD, and other regulatory officials and their designated representatives with access to the Site, and to all property owned or controlled by CMI and utilized by CMI in carrying out the Work, as provided in Section VII of the Consent Decree (Access to the Site and Other Property).

C.  Maintain Field Logs and Daily Records

CMI shall maintain field logs and daily records documenting activities occurring in the field during construction.

D.  Perform Field Testing and Confirmatory Sampling

CMI shall provide the necessary personnel and equipment to collect any confirmatory samples, perform any necessary field testing, and conduct inspections of work.  Such field testing shall include testing of materials used during construction to determine if they are consistent with all screening criteria and specifications contained in the final designs and construction contract documents (*e.g.,* soils testing, materials testing, etc.).  Confirmatory sampling shall be performed to verify that the Performance Standards, as set forth in the ROD, have been achieved.

E.  Data Acquisition, Analysis, Validation and Evaluation

CMI and its contactors shall perform all sample acquisition and field testing in conformance with the updated Site-wide SAP, QAPP, FSP and EPA-approved monitoring plans required under the Consent Decree and this SOW.

CMI shall perform the appropriate combination of CLP analytical tests for any materials and/or confirmatory samples taken at the Site in accordance with the updated Site-wide SAP, QAPP and FSP.  CMI shall also ensure the proper management of samples in the field and arrange for shipment to the designated laboratory.  Accurate chain-of-custody procedures for sample tracking, protective sample packing techniques, and proper sample-preservation techniques must be used in accordance with the SAP, QAPP and FSP.

CMI shall evaluate, interpret, and tabulate data in an appropriate presentation format for final data tables. CMI shall design and set up an appropriate database for pertinent information collected that will be used to validate and monitor the RA and monitor the environment. These tables will include soil/sediment data, air data, groundwater data, surface water data, biological data, and waste data, if required to be collected during the RA. On a quarterly basis and upon request, CMI shall make these data tables available to EPA, NMED and MMD in a native and searchable format.

Within 14 days of receipt of validated analytical data, CMI shall evaluate the data and notify EPA of the results and identify what additional response actions are necessary, if any, to achieve the Performance Standards (e.g., additional excavation of soil). Within 14 days of providing such notification, CMI shall compile the sampling and analytical results in a summary report and submit it to EPA, NMED and MMD for review. The report will assess the progress of the RA Project based on these results and identify any actions required.

F. Perform Additional Work and Confirmatory Sampling, As Needed

If initial confirmatory sampling shows Performance Standards have not been attained after work is conducted, CMI shall perform additional work necessary to achieve the Performance Standards. CMI shall provide a 3-day advance notification to EPA, NMED, and MMD prior to start up of any additional work. Following performance of any additional work, CMI shall repeat the activities for confirmatory sampling, analysis, validation and evaluation to assess attainment of

the Performance Standards.  This process shall be repeated until the Performance Standards are attained or EPA determines that the work performed is adequate.

G.  Field Change Requests

During performance of the construction Work, CMI may identify and request approval for field changes to final RA Project work plans, final design reports, or the EPA-approved RA Project work plan schedules as necessary to complete the Work.  EPA will approve, disapprove or require modification of any requests for field changes in accordance with the procedures set forth in Section VI of the Consent Decree.

H.  Attend Additional Meetings and Conduct Inspections

CMI and its contractors shall attend additional meetings or conduct Site inspections at any time throughout implementation of construction activities, at the request of the EPA, to provide clarification on contract documents, specifications, construction progress, and field schedules.

I.  Dispose of Investigation-Derived Waste

CMI shall characterize and dispose of investigation-derived wastes in accordance with the Waste Management Plan.

10.2.4.  **RA Project Construction Completion**

CMI shall conduct all necessary inspections to obtain EPA's approval of the construction completion of the following RA Projects: the Mine Site Groundwater Extraction System (Section 5.1.2), the Seepage Barrier Upgrade (Section 5.2.3) and the Tailing Facility Groundwater Extraction System (Section 5.2.4).   For those RA Projects in which Performance

Standards are not achieved during the RA, CMI shall conduct the following activities to verify that each RA Project has been constructed and is performing as designed.

A. RA Project Construction Completion Inspections

For those RA Projects in which performance standards are not achieved at the completion of the RA construction phase, CMI shall schedule and conduct a pre-final inspection of the RA Project with, EPA, NMED, and MMD. CMI shall develop a punch list of deficiencies as part of the pre-final inspection.

Within twenty one (21) days after conducting a pre-final construction inspection, CMI shall prepare and submit to EPA a pre-final construction inspection report which includes the list of deficiencies and completion dates for outstanding items, and the proposed date for a final construction inspection. The date for final construction inspections shall be scheduled within 14 days after completion of the corrective measures.

B. Corrective Measures to Address Deficiencies

CMI shall perform corrective measures to adequately address all deficiencies identified on the punch list in accordance with the EPA-approved schedule included with the pre-final construction inspection report.

C. Final Construction Inspections

CMI shall conduct final construction inspections for each RA with its contractors, EPA and its representatives, NMED, and MMD. The final construction inspections will consist of a walk-through of each project to determine the completeness of the remedial construction and its consistency with the EPA-accepted final design reports, the final RA Project work plans, the ROD, the

Consent Decree, and this SOW. The inspections will also be used to determine if all punch list items have been adequately addressed. Based on the final construction inspection, CMI shall provide written notification that all field construction activities have been completed. The written notification shall be submitted to EPA within 14 days of the final construction inspection, unless otherwise agreed to in writing.

D. Shakedown Period

There shall be a shakedown period of up to one year for EPA to review whether the remedy is functioning properly and performing as designed. CMI shall provide such information as EPA requests for its review.

E. RA Project Construction Completion Report

Within 60 days after completion of the shakedown period, CMI shall prepare and submit to EPA an "RA Project Construction Completion Report" requesting EPA's approval of the Construction Phase and EPA's determination that the RA Project is operating as intended. The RA Project Construction Completion Report must:

(1) include statements by a registered professional engineer and by CMI's Project Coordinator that the Construction Phase is complete and that the RA Project is operating as intended;

(2) include a demonstration, and supporting documentation (with a summary of the documentation), that the Construction Phase is complete and that the RA Project is performing as designed;

(3) include as-built drawings signed and stamped by a professional engineer; and

(4) be prepared in accordance with Chapter 2 (Remedial Action Completion) of EPA's *Close Out Procedures for NPL Sites* guidance (May 2011).

If EPA notifies CMI that the RA Project Construction is not complete, does not comply with Final RD specifications, or the RA Project is not performing as designed, CMI shall meet with EPA as soon as practicable regarding such notice. EPA's notice may include a description of the activities that CMI must perform in order to complete the RA Project Construction or cause the RA Project to operate as intended. EPA's notice may include specifications and a schedule for such activities or must require CMI to submit specifications and a schedule for EPA approval. CMI shall perform all activities described in the notice or in the EPA-approved specifications and schedule.

F. Final RA Construction Completion Report
Within 30 days after receipt of EPA comments on each draft RA Project Construction Completion Report, CMI shall revise each such report to adequately address all EPA comments and submit a Final RA Project Construction Completion Report. CMI shall also submit written responses to all EPA comments with the report.

## 10.2.5. **Mine Site Water Treatment Plant RA Project Construction Completion**

Once CMI has completed construction of the new Mine Site Area Water Treatment Plant and concluded the initial shakedown period, or within 30 days of the Effective Date of this Consent Decree, whichever is later, CMI shall submit a RA Project Construction Completion Report to

EPA in accordance with Section 10.2.4(E). The Report should certify to EPA that the waters being collected by the selected remedy are being treated to meet discharge requirements included in the NPDES permit CMI has already obtained. Within 30 days after receipt of EPA comments on the draft RA Project Construction Completion Report, CMI shall revise the report to adequately address all EPA comments and submit a Final RA Project Construction Completion Report for the Mine Site Water Treatment Plant. CMI shall also submit written responses to all EPA comments with the report.

### 10.2.6. Surface Based Mine Dewatering System RA Project Construction Completion

Once CMI has completed construction of the Surface Based Mine Dewatering System, CMI shall submit a RA Project Construction Completion Report to EPA in accordance with Section 10.2.4(E). EPA may determine that the Final Pilot Surface-Based Mine Dewatering System Construction Completion Report submitted under Section 6.11.3.1.10 of Revision 3 of the Early Design SOW satisfies all the requirements of Section 10.2.4(E) and Section 10.2.6 of this SOW. Within 30 days after receipt of EPA comments on the draft RA Project Construction Completion Report (if required), CMI shall revise the report to adequately address all EPA comments and submit a Final RA Project Construction Completion Report for the Surface-Based Mine Dewatering System. CMI shall also submit written responses to all EPA comments with the report.

### 10.2.7. Dry/Maintenance Area Soil Excavation RA Project Completion

A. RA Project Completion Inspection.

Because CMI has performed the required soil excavation of the Dry/Maintenance Area pursuant to an addendum to the Phase 2 Demolition and Decommissioning Plan

(established pursuant to the Mining Act Permit No. TA001RE), an RA Project

Completion Inspection is not required.

B.  RA Project Completion Report

Because CMI has performed the required soil excavation of the Dry/Maintenance Area

pursuant to an addendum to the Phase 2 Demolition and Decommissioning Plan

(established pursuant to the Mining Act Permit No. TA001RE), CMI shall submit the RA

Project Completion Report within 90 days of the Effective Date of this Consent Decree.

The report must:

1)  Include a certification by CMI's Project Coordinator that the RA Project has been

completed in accordance with the Building Demolition and Cleanup Plan, Phase 2

Activities – Tailing Facility Area, Addendum No. 1 – Soil Removal at the Old

Maintenance Shop (Cleanup Plan);

2)  Include drawings showing the area and volume of soil removed; and

3)  Include the results of X-ray fluorescence measurements and laboratory

confirmation samples showing that the soil greater than 41 ppm molybdenum has

been removed.

C.  Final RA Project Completion Report

Within 30 days after receipt of EPA comments on the draft RA Project Completion

Report, CMI shall revise the report to adequately address all EPA comments and submit

the Final RA Project Completion Report for the Dry/Maintenance Area Soil Excavation.

CMI shall also submit written responses to all EPA comments with the report.

**10.2.8  EPA Certification of Completion Based on RA Project Completion Reports**

A.      The following RA Projects will be "Complete" when EPA has determined that the RA Project has been fully performed and the pertinent Performance Standards have been achieved: (1) Mine Site Groundwater Extraction System (5.1.2); (2) Tailing Facility Seepage Barrier Upgrade (5.2.3); (3) Tailing Facility Groundwater Extraction System (5.2.4).

B.      Monitoring Report: For those Remedial Action Projects identified in Section 10.2.8(A), CMI shall submit a Monitoring Report to EPA requesting Certification of RA Project Completion. The reports must:

> (1) include certification by CMI's Project Coordinator that the RA is complete;
>
> (2) be prepared in accordance with EPA's Close Out Procedures for NPL Sites guidance (May 2011).

C.      If EPA concludes that a RA Project is not Complete, EPA shall notify CMI. EPA's notice must include a description of any deficiencies. EPA's notice may include a schedule for addressing such deficiencies or may require CMI to submit a schedule for EPA approval. CMI shall perform all activities described in the notice in accordance with the schedule.

D.      If EPA concludes, based on the initial or any subsequent submittal of a Final RA Project Completion Report requesting Certification of Completion of a RA Project, that the RA Project is Complete, EPA shall timely so certify to CMI.  Certification of Completion of a RA Project will not affect CMI's remaining obligations under the Consent Decree.

## 10.3  Monitoring, Operation and Maintenance

CMI shall conduct operation and maintenance (O&M) of the following RA Projects to protect the integrity of the remedy. O&M activities shall be conducted using the O&M Plan and O&M Manuals included in the EPA-approved Final RD or plans developed pursuant to Section 10.3.1 for the following RA Projects:

- Surface-based Mine Dewatering System (SOW Section 5.1.1)

- New Groundwater Extraction System (SOW Section 5.1.2)

- New Mine Site Area Water Treatment Plant (SOW Section 5.1.4)

- Replace the Lower 002 Seepage Barrier with Extraction Wells and Replace the Upper 003 Seepage Barrier with a Deeper Collection System (SOW Section 5.2.3)

- Install and Operate Groundwater Extraction System (SOW Section 5.2.4)

- Operate Inlet Control Structure (SOW Section 5.3.1)

CMI shall conduct performance monitoring of the following RA projects to evaluate performance of the constructed remedies. Performance monitoring shall be conducted using monitoring plans developed pursuant to Section 10.3.2 for the following work components:

- Performance Monitoring (SOW Section 5.1.3)

- Monitor Groundwater and Surface Water (SOW Section 5.2.5)

- Monitor and Maintain Tailing Dams (SOW Section 5.2.6)

Performance monitoring and O&M for each of the RA components shall continue for as long as deemed necessary by EPA.

### 10.3.1  O&M Plan and O&M Manual

A.  New Mine Site Area Water Treatment Plant

Within 30 days of the Effective Date of this Consent Decree, or November 30, 2016, whichever

is later, CMI shall submit to EPA an O&M Plan and O&M Manual for the Mine Site Area Water

Treatment Plant. The O&M Plan and O&M Manual shall be developed in accordance with

*Operation and Maintenance in the Superfund Program*, OSWER 9200.1 37FS, EPA/540/F-

01/004 (May 2001).

Within 30 days after receipt of EPA's comments on the O&M Plan and O&M Manual, CMI

shall submit to EPA a revised O&M Plan and O&M Manual for the New Mine Site Water

Treatment Plant for EPA's approval.

B.  Surface-based Mine Dewatering System

Within 30 days of EPA's approval of the Pilot Surface-based Mine Dewatering System

Completion Report, submitted pursuant to SOW Section 6.11.3.2.6 of Revision 3 of the Early

Design SOW, CMI shall submit to EPA a revised Surface-based Mine Dewatering System O&M

Plan and O&M Manual for EPA's approval.

C.  Eagle Rock Lake Operation of Inlet Control Structure

In order to minimize sediment loading to Eagle Rock Lake during and after storm events, CMI

shall continue to operate the inlet controls, including the head gate and data collection systems

that CMI installed pursuant to the Removal AOC. CMI shall operate the inlet controls in

accordance with the EPA-approved Post-Construction Inspection and Monitoring Plan developed

per paragraph 6.3.4.9.1 of the Removal SOW. Consistent with the Removal AOC, CMI, in

coordination with the USFS, shall ensure proper operation of the inlet controls for a period of at

least five years following the Effective Date of the Removal AOC. Following this five year

period, CMI shall continue to operate and maintain the inlet controls, including equipment replacements and technology upgrades, in coordination with the USFS for an additional five years, unless otherwise requested in writing by the USFS. CMI shall, in consultation with the EPA and USFS, transition the sole operational responsibility of the inlet controls to the USFS by the end of this second five-year period, if agreed to by the USFS; provided, however, that CMI may elect to maintain responsibility for the operation and maintenance of the inlet controls beyond the second five-year period for successive five-year periods. CMI may, in consultation with the EPA and USFS, transition the sole operational responsibility of the inlet controls to the USFS at the end of any of these successive five-year periods. If such transition of responsibility to USFS has not occurred by the date that EPA certifies that the construction is complete for all remedial action at the Mine Site that is required by the ROD, CMI shall no longer be required to continue to operate and maintain the inlet controls; provided, however, that if EPA determines that a release from the Mine Site or from a CMI mining-related activity to the Red River has occurred that was not authorized by an EPA-issued permit and that has contaminated the sediment of Eagle Rock Lake, EPA may require CMI to perform additional operation and maintenance of the inlet controls.

### 10.3.2      Performance Monitoring Plans

A. Mine Site Performance Monitoring Plan

Within 60 days of the Effective Date, CMI shall develop and submit to EPA a plan to monitor performance of the Mine Site Groundwater Extraction System and Surface-based Mine Dewatering System under Section 5.1.3 (Performance Monitoring) of this SOW to assess the effectiveness of the systems on attaining performance standards in alluvial, colluvial and bedrock

groundwater. The Mine Site Performance Monitoring Plan shall include a schedule for implementation and monitoring.

Within 30 days after receipt of EPA's comments on the monitoring plan, CMI shall submit to EPA a revised Mine Site Performance Monitoring Plan for EPA's approval.

### B. Tailing Facility Performance Monitoring Plan

Within 60 days of the Effective Date, CMI shall develop and submit to EPA a plan to monitor groundwater and surface water at the Tailing Facility. The plan shall be written to address the requirements contained in Section 5.2.5 of this SOW. The Tailing Facility Performance Monitoring Plan shall include a schedule for implementation and monitoring.

Within 30 days after receipt of EPA's comments on the monitoring plan, CMI shall submit to EPA a revised Tailing Facility Performance Monitoring Plan for EPA's approval.

### C. Tailing Dams Monitoring and Maintenance Plan

Within 90 days of the effective date, CMI shall develop and submit to EPA a plan to monitor and maintain the tailing dams. The plan shall be written to address the requirements contained in Section 5.2.6 of this SOW.

Within 30 days after receipt of EPA's comments on the monitoring plan, CMI shall submit to EPA a revised Tailing Dam Monitoring and Maintenance Plan for EPA's approval.

### 10.3.3    Eagle Rock Lake Performance Monitoring

In addition to the performance monitoring described above, CMI shall conduct performance monitoring at Eagle Rock Lake. CMI shall perform post-construction inspection and monitoring in accordance with the requirements in the Post-Construction Inspection and Monitoring Plan for the Eagle Rock Lake Removal Action developed under Paragraph 6.3.4.9.1 of the Removal AOC SOW and approved by EPA on November 12, 2015.  The plan requires physical, chemical and

biological monitoring of Eagle Rock Lake to assess the long-term effectiveness of the remedy. The plan requires monitoring within Eagle Rock Lake be performed a total of three times over a period of ten years after completion of Eagle Rock Lake Removal Action construction. The three monitoring events shall occur at the following intervals: one month (baseline, completed September 30, 2015), five years, and ten years after the completion of the Removal Action construction. The plan requires monitoring of potential releases from the Mine Site, turbidity monitoring and monitoring of other appropriate parameters of the Red River upstream and downstream of the Mine Site. The plan also requires monitoring of the continuing performance and integrity of the inlet controls in limiting contamination entering the lake during storm and other high-flow events.

EPA will conduct five-year reviews of the Removal Actions. After the second Five-Year Review, EPA will assess the need to continue Eagle Rock Lake monitoring beyond the 10-year monitoring period established in the Removal Action SOW and continued in this Consent Decree. If EPA determines that a release from the Mine Site or from a CMI mining-related activity to the Red River has occurred that was not authorized by an EPA-issued permit and that has contaminated the sediment of Eagle Rock Lake, EPA may require CMI to perform additional monitoring of the lake.

### 10.3.4 Operation and Maintenance of Remedial Actions

CMI shall commence O&M activities as described in the Final RD for each of the following RA projects within 30 days after receiving EPA's approval of the relevant RA Construction Completion Report:

A. New Groundwater Extraction Systems (SOW Section 5.1.1);

B. Replace the Lower 002 Seepage Barrier with Extraction Wells and Replace the Upper 003 Seepage Barrier with a Deeper Barrier (SOW Section 5.2.3); and

C. Install and Operate Groundwater Extraction Well System (SOW Section 5.2.4).

Immediately following EPA's approval of the Mine Site Area Water Treatment Plant O&M Plan and O&M Manual, CMI shall commence O&M activities for the New Mine Site Area Water Treatment Plant (SOW Section 5.1.4).

Immediately following EPA's approval of the Surface-based Mine Dewatering System O&M Plan and O&M Manual, CMI shall commence O&M activities for the Surface-based Mine Dewatering System (SOW Section 5.1.1).

CMI shall commence O&M activities for Eagle Rock Lake in accordance with the schedule in the Post-Construction Inspection and Monitoring Plan for the Eagle Rock Lake Removal Action developed under Paragraph 6.3.4.9.1 of the Removal AOC SOW and approved by EPA on November 12, 2015.

### 10.3.5    Performance Monitoring

CMI shall perform all monitoring required by the EPA-approved Mine Site, Tailing Facility and Tailing Dams Performance Monitoring Plans developed under Section 10.3.2.  CMI shall perform all sample acquisition, field testing and performance monitoring in conformance with the updated SAP, QAPP, FSP and EPA-approved O&M Plans and O&M Manuals.

### 10.3.6    Annual Remedial Action Effectiveness Report

No later than one year after the effective date, and annually thereafter, CMI shall prepare and submit an annual RA Effectiveness Report for all Work conducted at the Site.

The annual RA Effectiveness Report shall include but not be limited to:

- A description of all RA, performance monitoring and O&M activities completed and data acquired the previous year;

- An analysis of the acquired data including a description of the progress towards attaining Performance Standards;

- Updated isoconcentration contour maps of COCs in Mine Site Area and Tailing Facility Area groundwater based on acquired water chemistry data;

- A description of any issues or problems that were raised as a result of the inspections and how they were solved or if they remain unresolved;

- A description of all permitting activities performed the previous year related to the Work and achievement of permit requirements or notification of permit violations, if any;

- Documentation of the volumes of water collected by all extraction well and seepage interception systems (system totals and per/well or basis);

- Documentation of the volumes of water treated at water treatment plant(s);

- Documentation of the volume of water discharged under NPDES permitting to Red River via outfall(s);

- Copy of NPDES permit effluent discharge reports; and

- A review of safety and emergency systems; and

- A description of the periodic evaluations to optimize system performance.

CMI shall make revisions to the annual Remedial Action Effectiveness Report as necessary to address EPA's comments. The revised report shall be submitted to EPA for approval within 30 days after receipt of EPA comments or the time period determined by EPA.

# 11 FIVE-YEAR REVIEWS

CMI shall conduct any studies and investigations requested by EPA, to support EPA's reviews of whether the Remedial Action is protective of human health and the environment in accordance with Section 121(c) of CERCLA, 42 U.S.C. § 9621(c) and the NCP.  EPA's determination of remedy protectiveness occurs within five years after commencement of remedial construction and at least every consecutive five years thereafter, as required by Section 121(c) of CERCLA, 42 U.S.C. §9621(c), and the NCP.  The five year reviews will continue in this manner and on this schedule as long as contaminants remain in place at the Site that prevent its unrestricted use.



Questa

Questa
Mine Site

Eagle Rock
Lake

Highway 38

RED RIVER

Capulin Canyon

Capulin
Rock Pile

Sulphur
Gulch North
Rock Pile

Goathill
North
Rock Pile

Open
Pit

Blind Gulch
Rock Pile

Spring
Gulch
Rock Pile

Goathill
South
Rock Pile

Sulphur
Gulch

Predicted
Subsidence
Area

Truck Shop
Slice

Sulphur
Gulch South
Rock Pile

Mill
Area

Bear Creek

Sugar Shack
West
Rock Pile

Middle
Rock Pile

Administration
Area

Sugar Shack
South
Rock Pile

RED RIVER

RED RIVER

| | REVISION | DATE | APPLICATION | CHEVRON MINING INC. - QUESTA MINE | PROJECT |
|---|---|---|---|---|---|
| | 2.0 | 8/25/2009 | ArcGIS 9.3 | | 22236247 |

**NOTES:**
Aerial photograph provided by
Molycorp - Questa Mine (2007).

N

2,000          0
Feet
Scale 1:24000 or 1 in = 2000 ft

**Map Features**
— Property Boundary
— Tailing Pipeline
▱ Rock Pile

— River
— Creek
-·- Gulch
-·- Canyon

**URS**
URS Center
8181 East Tufts Avenue
Denver, CO 80237-2637
(303) 694-2770

FILENAME
mine_area_fs.mxd
DRAWN BY
Denver/GIS
DATE
08/12/2009

**QUESTA MINE SITE**

**FIGURE 1-2**
*Final
Feasibility Study Report*

151475



Questa Tailing Facility

Questa Mine Site

Questa

Tailing Impoundments

Dam No. 1

Dam No. 4

Change House

Eagle Rock Lake

Tailing Pipeline

RED RIVER

Highway 38

Cabresto Creek

Highway 522

Bear Creek

Cabresto Canyon

**N**

NOTES:
Aerial photograph provided by
Chevron Mining Inc. - Questa Mine (2007).

**Map Features**
— Property Boundary
— Tailing Pipeline
— River
— Creek
— Gulch
— Canyon

2,000   0
Feet
Scale 1:24000 or 1 in = 2000 ft

151476

| REVISION | DATE |
|----------|------|
| 2.0 | 8/25/2009 |

**URS**

URS Center
8181 East Tufts Avenue
Denver, CO 80237-2637
(303) 694-2770

APPLICATION
ArcGIS 9.3

FILENAME
tailing_area_fs.mxd

DRAWN BY
Denver/GIS

DATE
08/12/2009

CHEVRON MINING INC. - QUESTA MINE

QUESTA
TAILING FACILITY

PROJECT
22236247

**FIGURE 1-3**

*Final
Feasibility Study Report*



Arbor Igbenit
Path: D:/GIS/Lease/CMI_questa/Early Design Actio – Geopage Earth/MXD/Planing Maps/GOW_5x/figrate_imand.cd

Sulphur Gulch
South Rockpile

New Extraction Wells Located
In the Vicinity of LSG-02/LSG-03

LSG-03
LSG-02
LSG-01

38

Red River

**Legend**

Approximate Area of the Lower
Sulphur Gulch Extraction System

Feet
0    250    500

2014 Exploratory Boreholes

Red River

CHEVRON MINING INC. QUESTA MINE
EARLY DESIGN ACTIONS

Approximate Area of the Lower
Sulphur Gulch Extraction System

ARCADIS

FIGURE
1

Service Layer Credits: Source: Esri, DigitalGlobe, GeoEye, i-cubed, Earthstar
Geographics, CNES/Airbus DS, USDA, USGS, AEX, Getmapping, Aerogrid,
IGN, IGP, swisstopo, and the GIS User Community



Tailing Facility Area

EPA Region 6
Superfund
12/18/2009

U.S. ENVIRONMENTAL PROTECTION AGENCY
RECORD OF DECISION
MOLYCORP, INC

FIGURE 12-26

DECEMBER 2010



## Regulations and Guidance Documents

**1.1**    The following regulations and guidance documents, among others, apply to the Work. Any item for which a specific URL is not provided below is available on one of the two EPA Web pages listed in ¶ 1.2:

(a)    A Compendium of Superfund Field Operations Methods, OSWER 9355.0-14, EPA/540/P-87/001a (Aug. 1987).

(b)    CERCLA Compliance with Other Laws Manual, Part I: Interim Final, OSWER 9234.1-01, EPA/540/G-89/006 (Aug. 1988).

(c)    Guidance for Conducting Remedial Investigations and Feasibility Studies, OSWER 9355.3-01, EPA/540/G-89/004 (Oct. 1988).

(d)    CERCLA Compliance with Other Laws Manual, Part II, OSWER 9234.1-02, EPA/540/G-89/009 (Aug. 1989).

(e)    Guidance on EPA Oversight of Remedial Designs and Remedial Actions Performed by Potentially Responsible Parties, OSWER 9355.5-01, EPA/540/G-90/001 (Apr.1990).

(f)    Guidance on Expediting Remedial Design and Remedial Actions, OSWER 9355.5-02, EPA/540/G-90/006 (Aug. 1990).

(g)    Guide to Management of Investigation-Derived Wastes, OSWER 9345.3-03FS (Jan. 1992).

(h)    Permits and Permit Equivalency Processes for CERCLA On-Site Response Actions, OSWER 9355.7-03 (Feb. 1992).

(i)    Guidance for Conducting Treatability Studies under CERCLA, OSWER 9380.3-10, EPA/540/R-92/071A (Nov. 1992).

(j)    National Oil and Hazardous Substances Pollution Contingency Plan; Final Rule, 40 C.F.R. Part 300 (Oct. 1994).

(k)    Guidance for Scoping the Remedial Design, OSWER 9355.0-43, EPA/540/R-95/025 (Mar. 1995).

(l)    Remedial Design/Remedial Action Handbook, OSWER 9355.0-04B, EPA/540/R-95/059 (June 1995).

(m)    EPA Guidance for Data Quality Assessment, Practical Methods for Data Analysis, QA/G-9, EPA/600/R-96/084 (July 2000).

(n)     Operation and Maintenance in the Superfund Program, OSWER 9200.1-37FS, EPA/540/F-01/004 (May 2001).

(o)     Comprehensive Five-year Review Guidance, OSWER 9355.7-03B-P, 540-R-01-007 (June 2001).

(p)     Guidance for Quality Assurance Project Plans, QA/G-5, EPA/240/R-02/009 (Dec. 2002).

(q)     Institutional Controls: Third Party Beneficiary Rights in Proprietary Controls (Apr. 2004).

(r)     Quality management systems for environmental information and technology programs -- Requirements with guidance for use, ASQ/ANSI E4:2014 (American Society for Quality, February 2014).

(s)     Uniform Federal Policy for Quality Assurance Project Plans, Parts 1-3, EPA/505/B-04/900A though 900C (Mar. 2005).

(t)     Superfund Community Involvement Handbook, EPA/540/K-05/003 (Apr. 2005).

(u)     EPA Guidance on Systematic Planning Using the Data Quality Objectives Process, QA/G-4, EPA/240/B-06/001 (Feb. 2006).

(v)     EPA Requirements for Quality Assurance Project Plans, QA/R-5, EPA/240/B-01/003 (Mar. 2001, reissued May 2006).

(w)     EPA Requirements for Quality Management Plans, QA/R-2, EPA/240/B-01/002 (Mar. 2001, reissued May 2006).

(x)     USEPA Contract Laboratory Program Statement of Work for Inorganic Analysis, ILM05.4 (Dec. 2006).

(y)     USEPA Contract Laboratory Program Statement of Work for Organic Analysis, SOM01.2 (amended Apr. 2007).

(z)     EPA National Geospatial Data Policy, CIO Policy Transmittal 05-002 (Aug. 2008), available at http://www.epa.gov/geospatial/policies.html and http://www.epa.gov/geospatial/docs/National_Geospatial_Data_Policy.pdf.

(aa)    Summary of Key Existing EPA CERCLA Policies for Groundwater Restoration, OSWER 9283.1-33 (June 2009).

(bb)    Principles for Greener Cleanups (Aug. 2009), available at http://www.epa.gov/oswer/greenercleanups/.

(cc)    USEPA Contract Laboratory Program Statement of Work for Inorganic Superfund Methods (Multi-Media, Multi-Concentration), ISM01.2 (Jan. 2010).

(dd)    Close Out Procedures for National Priorities List Sites, OSWER 9320.2-22 (May 2011).

(ee)    Groundwater Road Map: Recommended Process for Restoring Contaminated Groundwater at Superfund Sites, OSWER 9283.1-34 (July 2011).

(ff)    Recommended Evaluation of Institutional Controls: Supplement to the "Comprehensive Five-Year Review Guidance," OSWER 9355.7-18 (Sep. 2011).

(gg)    Construction Specifications Institute's MasterFormat 2012, available from the Construction Specifications Institute, www.csinet.org/masterformat.

(hh)    Updated Superfund Response and Settlement Approach for Sites Using the Superfund Alternative Approach , OSWER 9200.2-125 (Sep. 2012)

(ii)    Institutional Controls: A Guide to Planning, Implementing, Maintaining, and Enforcing Institutional Controls at Contaminated Sites, OSWER 9355.0-89, EPA/540/R-09/001 (Dec. 2012).

(jj)    Institutional Controls: A Guide to Preparing Institutional Controls Implementation and Assurance Plans at Contaminated Sites, OSWER 9200.0-77, EPA/540/R-09/02 (Dec. 2012).

(kk)    EPA's Emergency Responder Health and Safety Manual, OSWER 9285.3-12 (July 2005 and updates), http://www.epaosc.org/_HealthSafetyManual/manual-index.htm.

(ll)    Broader Application of Remedial Design and Remedial Action Pilot Project Lessons Learned, OSWER 9200.2-129 (Feb. 2013).

(mm)   Guidance for Evaluating Completion of Groundwater Restoration Remedial Actions, OSWER 9355.0-129 (Nov. 2013).

(nn)    Groundwater Remedy Completion Strategy: Moving Forward with the End in Mind, OSWER 9200.2-144 (May 2014).

(oo)    Closeout Plan Guidelines for Existing Mines" – "Attachment 2, Revegetation Standards and Sampling Methods", Mining and Minerals Division New Mexico Energy, Minerals and Natural Resources Department (1996)

(pp)    Recommended Approach for Evaluating Completion of Groundwater Restoration Remedial Actions at a Groundwater Monitoring Well" (OSWER 9283.1-44, August 2014) and EPA's Groundwater Statistics Tool User's Guide" (OSWER 9283.1-46)

**1.2**     A more complete list may be found on the following EPA Web pages:

Laws, Policy, and Guidance     http://www.epa.gov/superfund/policy/index.htm

Test Methods Collections          http://www.epa.gov/fem/methcollectns.htm

**1.3**     For any regulation or guidance referenced in the CD or SOW, the reference will be read to include any subsequent modification, amendment, or replacement of such regulation or guidance. Such modifications, amendments, or replacements apply to the Work only after SDs receive notification from EPA of the modification, amendment, or replacement.

**Summary of Major Deliverables**
**For The First Partial Remedial Design and Remedial Action Consent Decree**
**Chevron Questa Mine Superfund Site**

| SOW Section | Deliverable | Due Date |
|---|---|---|
| | Notification of Project Coordinator Designation | Within 20 days after lodging this Consent Decree |
| | Notification of Names and Qualifications of Supervising Contractor(s) | Within ten days after the Effective Date of the Consent Decree, |
| 7.3 | Weekly Communication Report | 5 workings days from meeting/conversation |
| 7.4 | Monthly Progress Report | Beginning on the 10th day in the month following the Effective Date of the Consent Decree and ending with the month following EPA's issuance of a Certificate of Completion |
| 7.5 | Meeting Decisions | 5 working days following meeting |
| 8.1.1 | General Project Schedule | 120 days after Effective Date |
| 8.1.2 | Site Management Plan – Draft | 120 days after Effective Date |
| | Site Management Plan – Final | 30 days after receipt of EPA comments |
| 8.1.3 | Health and Safety Plan | 60 days after Effective Date |
| 8.1.4 | Sampling and Analysis Plan – Draft | As EPA determines necessary |
| | Sampling and Analysis Plan – Final | 30 days after receipt of EPA comments |
| 8.1.5 | Data Management Plan – Draft | 120 days after Effective Date |
| | Data Management Plan - Final | 30 days after receipt of EPA comments |
| 8.1.6 | Contingency Plan – Draft | 90 days after Effective Date |
| | Contingency Plan – Final | 30 days after receipt of EPA comments |
| 9.1.1 | Pre-Final Design for the Pilot Project | Within 60 days after receipt of EPA's comments on the "Tailing Facility Dam 1 Grading Final Design Report," submitted under Section 6.12.5 of the Early Design AOC, or 60 days after lodging of the Consent Decree |
| 9.1.2 | Final Design for the Pilot Project - Draft | Within 30 days after receipt of EPA's comments on the pre-final design |

| SOW Section | Deliverable | Due Date |
|---|---|---|
| | Final Design for the Pilot Project - Final | Within 30 days after receipt of EPA's comments on the Final Design for the Pilot Project - Draft |
| 9.1.3 | Update Overall Site Plan | Within 30 days after receipt of EPA's written acceptance of the Pilot Project Final Design |
| 9.1.5(B) | Advance Notice of Start of Construction | 10-days prior to the start of the Pilot Project field activities |
| 9.1.5(G) | Pre-final construction inspection report | Within 30 days after conducting the pre-final construction inspection |
| 9.1.5(I) | Notification that all Pilot Project field construction activities have been completed | Within 14 days of the final construction inspection |
| 9.1.5(J) | Final Tailing Facility Cover Demonstration Pilot Project Construction Completion Report - Draft | Within 30 days after the final construction inspection, |
| | Final Tailing Facility Cover Demonstration Pilot Project Construction Completion Report - Draft | Within 30 days after receipt of EPA comments |
| 9.1.6(D) | Quarterly Inspection Report | Within 30 days after each inspection |
| 9.1.6(E) | Annual Monitoring and Assessment Report for the Tailing Facility Cover Demonstration Pilot Project | No later than one year following CMI's notification pursuant to Section 9.1.5(I) |
| | Annual Monitoring and Assessment Report for the Tailing Facility Cover Demonstration Pilot Project - Revised | Within 30 days after receipt of EPA comments |
| 9.1.6(G) | Tailing Facility Cover Demonstration Pilot Project Completion Report | No later than six years following CMI's notification pursuant to Section 9.1.5(I) |
| | Tailing Facility Cover Demonstration Pilot Project Completion Report - Revised | Within 30 days after receipt of EPA comments |
| 9.2.1 | Pre-final Remedial Design for Installation and Operation of Tailing Facility Groundwater Extraction Well System | In accordance with any plan and schedule approved by EPA under Section 5.2.4 |
| 9.2.1(B) | Respond to comments on the Pre-final RD | Within the timeframe specified in the approved plan under Section 5.2.4 |
| 9.2.2 | Final Remedial Design for the Installation and Operation of Tailing Facility Groundwater Extraction Well System | Within 45 days after receipt of EPA comments on the Pre-Final RD |
| 9.2.2(B) | Final Remedial Design for the Installation and Operation of Tailing Facility Groundwater Extraction Well System – Final | Within 45 days of any final design review meeting that is needed |

| SOW Section | Deliverable | Due Date |
|---|---|---|
| 10.1.3(A) | RA Project Work Plan - Mine Site Groundwater Extraction System | Within 60 days after receiving EPA's written approval of each Final RD, or within 60 days after the Effective Date, whichever is later |
| 10.1.3(B) | RA Project Work Plan - Upgrade Tailing Facility Seepage Interception Systems | Within 60 days after receiving EPA's written approval of each Final RD, or within 60 days after the Effective Date, whichever is later |
| 10.1.3(C) | RA Project Work Plan - Install and Operate Tailing Facility Groundwater Extraction Well System (if required) | Within 60 days after receiving EPA's written approval of each Final RD, or within 60 days after the Effective Date, whichever is later |
| 10.1.5 | Revised RA Project Work Plans | Within 30 days of receipt of EPA's comments |
| 10.1.6 | Review/Update Site-wide Plans | Within 60 days after receiving EPA's written acceptance of each individual Final RD |
| 10.2.2 | Advance Notice of Start of Construction | 14-days prior to the start of all field construction activities |
| 10.2.4(A) | Pre-final Construction Inspection Report | Within twenty one (21) days after conducting a pre-final construction inspection |
| 10.2.4(C) | Notification that all field construction activities have been completed | within 14 days of the final construction inspection |
| 10.2.4(E) | RA Project Construction Completion Report | Within 60 days after completion of the shakedown period |
| 10.2.4(F) | Final RA Project Construction Completion Report | Within 30 days after receipt of EPA comments on each draft RA Project Construction Completion Report |
| 10.2.5 | RA Project Construction Completion Report - Mine Site Area Water Treatment Plant (Draft) | CMI has completed construction of the new Mine Site Area Water Treatment Plant and concluded the initial shakedown period, or within 30 days of the Effective Date of this Consent Decree, whichever is later |
| | Final RA Project Construction Completion Report for the Mine Site Water Treatment Plant | Within 30 days after receipt of EPA comments on the draft RA Project Construction Completion Report |
| 10.2.6 | RA Project Construction Completion Report - Surface Based Mine Dewatering System (Draft) | Within 60 days after completion of the shakedown period. Note: EPA may determine that the Final Pilot Surface-Based Mine Dewatering System Construction Completion Report submitted under Section 6.11.3.1.10 of Revision 3 of the Early Design SOW satisfies all the requirements of Section 10.2.4(E) and Section 10.2.6 of this SOW |

| SOW Section | Deliverable | Due Date |
| --- | --- | --- |
| | Final RA Project Construction Completion Report for the Surface-Based Mine Dewatering System | Within 30 days after receipt of EPA comments on the draft RA Project Construction Completion Report (if required) |
| 10.2.7(B) | RA Project Construction Completion Report - Dry/Maintenance Area Soil Excavation RA Project | Ninety (90) days after the Effective Date |
| 10.2.7(C) | Final RA Project Completion Report for the Dry/Maintenance Area Soil Excavation | Within 30 days after receipt of EPA comments on the draft RA Project Completion Report |
| 10.2.8(B) | Monitoring Report - Mine Site Groundwater Extraction System | RA Project has been fully performed and the pertinent Performance Standards have been achieved |
| 10.2.8(B) | Monitoring Report - Tailing Facility Seepage Barrier Upgrade | RA Project has been fully performed and the pertinent Performance Standards have been achieved |
| 10.2.8(B) | Monitoring Report - Tailing Facility Groundwater Extraction System | RA Project has been fully performed and the pertinent Performance Standards have been achieved |
| 10.3.1(A) | O&M Plan and O&M Manual for the Mine Site Area Water Treatment Plant | Within 30 days of the Effective Date of this Consent Decree, or November 30, 2016, whichever is later |
| | O&M Plan and O&M Manual for the Mine Site Area Water Treatment Plant - Revised | Within 30 days after receipt of EPA's comments |
| 10.3.1(B) | Surface-based Mine Dewatering System O&M Plan and O&M Manual | Within 30 days of EPA's approval of the Pilot Surface-based Mine Dewatering System Completion Report, submitted pursuant to SOW Section 6.11.3.2.6 of Revision 3 of the Early Design SOW |
| 10.3.2(A) | Mine Site Performance Monitoring Plan | Within 60 days of the Effective Date |
| | Mine Site Performance Monitoring Plan (Revision) | Within 30 days after receipt of EPA's comments |
| 10.3.2(B) | Tailing Facility Performance Monitoring Plan | Within 60 days of the Effective Date |
| | Tailing Facility Performance Monitoring Plan - Revised | Within 30 days after receipt of EPA's comments |
| 10.3.2(C) | Tailing Dams Monitoring and Maintenance Plan | Within 90 days of the effective date, |
| | Tailing Dams Monitoring and Maintenance Plan - Revised | Within 30 days after receipt of EPA's comments |

| SOW Section | Deliverable | Due Date |
|---|---|---|
| 10.3.6 | Annual RA Effectiveness Report | No later than one year after the effective date, and annually thereafter |
| | Annual RA Effectiveness Report – Revised | Within 30 days after receipt of EPA comments |

_____
)
UNITED STATES OF AMERICA,     )
STATE OF NEW MEXICO, and      )
NEW MEXICO ENVIRONMENT     )
DEPARTMENT,                  )
)
            Plaintiffs,     )
)
v.                        )     Civil Action No. _16-904 WPL/SCY_
)
CHEVRON MINING INC.,       )
)
            Defendant.    )
_____)

## APPENDIX B TO THE FIRST PARTIAL CONSENT DECREE:

## CORPORATE GUARANTEE FOR CERCLA WORK

## CORPORATE GUARANTEE FOR CERCLA WORK

Guarantee made this [**insert date**] by Chevron Corporation, a business corporation organized under the laws of the State of Delaware ("Guarantor"). This Guarantee is made to the United States Environmental Protection Agency ("EPA") on behalf of Chevron Mining Inc. ("Settling Defendant") of 6001 Bollinger Canyon Road, San Ramon, CA 94583, which is our subsidiary, an entity with which Guarantor has a substantial business relationship as defined in 40 C.F.R. § 264.141(h).

## RECITALS

Whereas, under a Partial Consent Decree, dated [**insert date**], civil action number _____, (hereinafter, the "Settlement Agreement"), between Settling Defendant and the U.S. Environmental Protection Agency ("EPA") and the State of New Mexico, through the Energy, Minerals and Natural Resources Department ("EMNRD") and the New Mexico Environment Department ("NMED"), relating to the Chevron Questa Mine Superfund Site ("Site"), entered pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601-9675, Settling Defendant is required to perform the "Work" as defined in the Settlement Agreement (hereinafter, the "Work") and to fulfill its other obligations as set forth therein.

Whereas, the Settlement Agreement requires Settling Defendant to provide financial assurance to EPA to ensure completion of the Work at the Site.

Whereas, in order to provide part or all of such financial assurance required by the Settlement Agreement, Settling Defendant has agreed to provide EPA and the State of New Mexico, through EMNRD and NMED, with a guarantee, issued by Guarantor, of Settling Defendant's obligations arising under the Settlement Agreement, all as set forth more fully in this Guarantee.

Whereas, Guarantor meets or exceeds the financial test criteria as specified in the Settlement Agreement and attached as Exhibits A and B and agrees to comply with the reporting and notification requirements for guarantors as specified in the Settlement Agreement and this Guarantee.

## AGREEMENT

1.      For value received from Settling Defendant, Guarantor guarantees to EPA, EMNRD and NMED that, in the event that Settling Defendant fails to pay for or perform the Work as required by the Settlement Agreement, Guarantor shall do so or immediately, upon written demand from EPA, deposit into an account specified by EPA, in immediately available funds and without setoff, counterclaim, or condition of any kind, a cash amount up to but not exceeding the estimated cost of the remaining Work to be performed as of such date, as determined by EPA.

2.      For so long as this Guarantee is in effect, within 90 days after the close of each fiscal year of Guarantor, Guarantor shall submit to EPA, EMNRD and NMED (a) a letter signed by Guarantor's chief financial officer certifying Guarantor's compliance with the financial test

criteria set forth in the Settlement Agreement's financial assurance section; (b) a copy of Guarantor's audited financial statements for its latest completed fiscal year, and a copy of Guarantor's independent certified public accountant's report on examination of such financial statements, which report on examination shall be unqualified or, if qualified, shall have been approved in writing by EPA; and (c) a special report from Guarantor's independent certified public accountant to Guarantor attesting to Guarantor's compliance with the financial test criteria set forth in the Settlement Agreement's financial assurance section.

3.      Guarantor agrees that if, at the end of any fiscal year before termination of this Guarantee, Guarantor fails to meet the financial test criteria set forth in the Settlement Agreement, Guarantor shall send, within 90 days, by certified mail, notice to EPA, EMNRD, NMED and to Settling Defendant that Guarantor intends to provide alternative financial assurance as specified in the Settlement Agreement in the name of Settling Defendant. Within 120 days after the end of such fiscal year, Guarantor shall establish such financial assurance unless Setting Defendant has done so.

4.      Guarantor agrees to notify EPA, by certified mail, of a voluntary or involuntary proceeding under Title 11 (Bankruptcy), U.S. Code, naming Guarantor as debtor, within 10 days after commencement of the proceeding.

5.      Guarantor agrees that, within 30 days after being notified by EPA of a determination that Guarantor no longer meets the financial test criteria set forth in the Settlement Agreement or that Guarantor is disallowed from continuing as a guarantor, Guarantor shall establish alternative financial assurance as specified in the Settlement Agreement, as applicable, in the name of Settling Defendant unless Settling Defendant has done so.

6.      Guarantor agrees to remain bound under this Guarantee notwithstanding any or all of the following: amendment or modification of the Settlement Agreement or any documents, instruments or agreements executed in connection therewith, the extension or reduction of the time of performance of the Work required by the Settlement Agreement, or any other modification or alteration of an obligation of Settling Defendant pursuant to the Settlement Agreement.

7.      Guarantor agrees to remain bound under this guarantee for as long as Settling Defendant must comply with the applicable financial assurance requirements of the Settlement Agreement, except as provided in paragraph 8 of this Guarantee.

8.      Guarantor may terminate this Guarantee by sending notice, by certified mail, to EPA, EMNRD, NMED and to Settling Defendant, provided that this Guarantee may not be terminated unless and until Settling Defendant obtains, and EPA, EMNRD and NMED approves, alternative financial assurance as specified in the Settlement Agreement.

9.      Guarantor agrees that if Settling Defendant fails to provide alternative financial assurance as specified in the Settlement Agreement and obtain written approval of such assurance from EPA within 90 days after a notice of cancellation by Guarantor is received by EPA from Guarantor, Guarantor shall provide such alternative financial assurance in the name of Settling

Defendant.

10.     Guarantor expressly waives notice of acceptance of this Guarantee by EPA or by Settling
Defendant. Guarantor also expressly waives notice of amendments or modifications of the
Settlement Agreement or any documents, instruments or agreements executed in connection
therewith.

11.     All notices, elections, approvals, demands, and requests required or permitted hereunder
shall be given in writing to (unless updated from time to time) the following:

>       If to Guarantor:
>
>       c/o Robert A. Malinoski
>       Senior Counsel
>       Environmental & Safety Law Group
>       Chevron U.S.A. Inc.
>       1400 Smith Street, 5th Floor
>       Houston, TX  77002
>       Tel: (713) 372-5652
>       Fax: (713) 372-9171
>       Email: RMalinoski@chevron.com
>
>       If to Settling Defendant:
>
>       Michael D. Coats
>       Project Manager
>       Chevron Environmental Management Company
>       469 354 State Rd 38
>       Questa, NM  87556
>       Tel: (575) 586-7507
>       Email: MichaelCoats@chevron.com
>
>       If to EPA:
>
>       Chief, Enforcement Assessment Section (6SF-TE)
>       Superfund Division
>       U.S. EPA Region 6
>       1445 Ross Avenue, Suite 1200
>       Dallas, Texas 75202

and

If to State of New Mexico:

Division Director
Water Protection Division
New Mexico Environment Department
1190 St. Francis Dr.
P.O. Box 5469
Santa Fe, NM 87502-5469

Division Director
Mining and Minerals Division
Energy, Minerals and Natural Resources Department
1220 South St. Francis Dr.
Santa Fe, NM 87505

**IN WITNESS WHEREOF**, the parties hereto, by their authorized representatives duly authorized, intending to be legally bound, have caused this Guarantee to be duly executed and delivered as of the date first above written.

Name of Guarantor:  _____

Authorized signature for guarantor:  _____
Name of person signing:  _____
Title of person signing:  _____
Contact information for signatory:  _____

State of [**insert state**] County of [**insert county**]

On [**insert date**], before me, [**insert name of Guarantor's signatory**], A Notary Public, personally appeared [**insert name of Guarantor**], who proved to me on the basis of satisfactory evidence to the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the person(s), or the entity on behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


_____
[Signature of Notary Public]